## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Timothy Record | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Dkt. No. 19-cv-00034-LM |
| v. | ) | |
| | ) | |
| Hannaford Bros. Co., LLC | ) | |
| | ) | |
| Defendant | ) | |

## <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff's Complaint arises out of his employment with and resignation from Hannaford Bros. Co., LLC ("Hannaford"). In Counts I through III of his Complaint, Plaintiff claims that he was subject to hostile work environment harassment based on his gender, sex and sexual orientation in violation of Title VII and New Hampshire law, and in Count IV, Plaintiff claims that he was wrongfully terminated based on a constructive discharge theory. As explained below, these claims fail as a matter of law.

Plaintiff's hostile work environment harassment claims are premised on five isolated incidents involving his supervisor, Bruce Grover, three of which allegedly occurred in February/March 2017 and two of which allegedly occurred in August 2017 a few weeks before Plaintiff resigned. These incidents, however, simply do not rise to the level of severity or pervasiveness required under the law. Moreover, Hannaford easily satisfies the *Faragher-Ellerth* defense because it maintained an anti-harassment policy and took immediate and effective steps to correct Mr. Grover's February/March 2017 conduct and because Plaintiff failed to report Mr. Grover's August 2017 to Hannaford conduct prior to resigning.

Plaintiff's wrongful termination claim is equally without merit. As a matter of law, Mr.

Grover's alleged August 2017 conduct towards Plaintiff was not sufficiently intolerable that a reasonable person would feel compelled to resign. Moreover, the undisputed facts show that Plaintiff planned on resigning his employment and was interviewing for a new job *prior* to Mr. Grover's alleged August 2017 conduct, and even after his resignation, Plaintiff expressed a willingness to return to his prior position with Hannaford under the supervision of Mr. Grover.

In sum, Plaintiff's claims fail as a matter of law, and Hannaford is entitled to summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.    Plaintiff Timothy Record began working for Hannaford in October 2007 at the Hampton, New Hampshire store. He worked in several different supervisory positions and eventually moved to the Portsmouth Store as the Evening Operations Manager from 2011-2014. He then returned to the Hampton Store as the Assistant Manager of Customer Service and later became the Assistant Manager of the Seafood Department, which is the position he occupied until he resigned his employment in August 2017. Record Dep. 8:2-6; 8:18-9:7.

2.    In his position as the Assistant Manager of the Seafood Department at the Hampton store, Plaintiff was supervised by the Manager of the Meat and Seafood Departments; Bruce Grover assumed that position on February 27, 2017. Record Dep. 10:16-11:1, 52:4-15; Grover Dep. 11:12-15.

3.    Throughout his employment at Hannaford, Mr. Record received training on different subjects, one of which was the Respect in the Workplace policy, which he received on annual basis. Record Dep. 12:1-3; 12:24-13:9; 13:18-14:15, Record Ex. 1 (1st - 2nd page).

---

[1] The facts outlined in this brief are presented as undisputed, and in the light most favorable to Plaintiff, only for purposes of Defendant's Motion for Summary Judgment. All referenced transcripts and exhibits are submitted with the Declaration of Timothy J. O'Brien (Record – Ex. A, Campo – Ex. B, Howard – Ex. C, Grover – Ex. D).

4.      The Respect in the Workplace policy contains Hannaford's prohibitions against harassment and a comprehensive complaint procedure identifying different individuals to whom claims of harassment could be made including: a member of management, the associate relations representative for the employee's store or district, and the director or Vice President of associate relations for the employee's region.   Record Dep. 14:16-15:5; Record Ex. 1, (1st – 2nd page); Campo Dep. 162:14-163:23.

5.      The Respect in the Workplace Policy also states that employees could report any concerns or possible violations of the Policy by using the  "I-Share" confidential reporting system, and the Policy includes a "1-800" number for making such reports.   Record Dep. 15:6-11; Campo Dep. 37:15-38:7.

6.      Mr. Record was also familiar with and had access to Hannaford's I-Share policy while he was employed.   Record Dep. 16:4-18:9.   Record Ex. 1, (5th – 7th page).

7.      The I-Share policy specifies that any concerns within the workplace may be reported by speaking with (a) the employee's direct supervisor, (b) the local Human Resources, legal or compliance representative, (c) by calling a toll-free 800 number which is available 24/7, (d) on the web at www.ethicspoint.com, or (e) on Hannaford's intranet, and that each method is secure and provides for the anonymity of the reporter and the confidentiality of the report.   Record Dep. 16:17-18:9, Record Ex. 1, (5th -7th page).

8.      Mr. Record was also familiar with Hannaford's Open Door policy, under which an employee is encouraged to freely communicate with any level of management about any issue. Record Dep. 19:1-22:19; Record Ex. 1 (8th page).

9.      Mr. Record told coworkers about his sexual orientation and sometimes referred to himself as "gay," "queer," and a "faggot" in discussions with trusted coworkers at Hannaford; he

would also joke with them about topics involving sexual orientation.  Record Dep. 48:5-51:1.

10. Soon after Mr. Grover began working at the Hampton Store on February 27, 2017, Mr. Record claims that Mr. Grover said and did the following things to or toward Mr. Record. Record Dep. 52:16-53:4, 59:7-60:18; 102:16-103:1; 117:8-18.

   a. In or around the first week that Mr. Record worked at the Hampton store, Mr. Grover told another Hannaford employee that Mr. Record "is three feet shorter with his head in the pillow".  Record Dep. 53:5-16.

   b. During the second week of Mr. Grover's employment at the store, Mr. Grover tapped Mr. Record in the genitals with a baguette loaf of bread and said "baseball, baseball." Record Dep. 53:18-54:13.

   c. At some point during Mr. Grover's first three weeks of employment, Mr. Grover said to Mr. Record "everyone knows that you eat the meat" when Mr. Record declined an offer to try a vendor's meat samples. Record Dep. 54:14-55:4.

11. In April 2017, Mr. Record reported the statements and conduct above to Jeff Howard, the Evening Operations Manager at the Hampton store.  Record Dep. 61:2-64:19, Record Ex. 9; Campo Dep. 38:3-12.  The Evening Operations Manager is the senior manager in the store when other members of Store management depart for the day at 5:00 p.m., and the position reports to the Store Manager.   Howard Dep. 17:21-18:5; 37:7-14.  Mr. Howard informed Mr. Record that he would investigate his complaint.  Record Dep. 61:10-62:15; 63:20-23.

12. Immediately after Mr. Record made the complaint, Mr. Howard spoke to Mr. Grover, who admitted the conduct and explained that he was joking and did not mean anything by it. Mr. Howard informed Mr. Grover that his conduct was inappropriate and that he needed to apologize to Mr. Record, and Mr. Grover agreed to do so. Howard Dep. 28:21-31:4, 33:12-35:17; 85:15-87:9; Campo Dep. 176:1-178:12; Record Dep. 62:16-63:1; 63:24-64:5.

13. Mr. Grover apologized and Mr. Record accepted the apology with the condition that the conduct not happen again.  Mr. Record told Mr. Howard that he had accepted the apology,

but that if the conduct occurred again, he would report it to Human Resources.  Record Dep. 63:6-10; 64:6-19; Campo Dep. 18:-23-19:12; 166:18-167:23.

14.     Because Mr. Grover accepted responsibility for his action and Mr. Record accepted the apology, Mr. Howard viewed the matter as immediately addressed and resolved.  As a result, he determined that no additional documentation of the incident was required.  Campo Dep. 35:9-37:6; 46:14-47:20; 89:5-19; 139:1-18; Howard Dep. 11:3-13:5, 28:21-31:4, 33:12-35:17, 38:10-43:5, 45:4-11, 85:15-87:9.

15.     In April 2017, after speaking with Mr. Howard and after receiving Mr. Grover's apology, Mr. Record separately reported Mr. Grover's prior conduct to Ashley Campo, the Hampton Store Manager, and told her the same thing that he told Mr. Howard.  Record Dep. 60:17-61:1; 64:20-66:25; Campo Dep. 17:9-19:12; 39:9-12.

16.     Ms. Campo immediately spoke with Mr. Howard to find out what had been done in response to Mr. Howard's complaints, and she also informed the Store's Associate Relations Manager, Terry Dube, of Mr. Record's complaint.   Mr. Howard updated Ms. Campo on the immediate actions he had taken after receiving Mr. Record's complaint.  Campo Dep. 19:16-20:18; 34:2-6; 56:11-14; 173:4-175:8.

17.     Even though Mr. Grover had already been counseled about his conduct by Mr. Howard and had apologized to Mr. Record, Ms. Campo spoke with Mr. Grover and emphasized that it is never permissible to joke or make comments that could be deemed inappropriate.  Campo Dep. 22:8-23:15; 28:6-11; 89:20-90:15: 134:3-135:8.

18.     Because Mr. Grover was a new department manager and had not previously had any disciplinary issues, Ms. Campo decided that it was appropriate to counsel Mr. Grover (rather than issue him formal written discipline).   Campo Dep.  23:10-15; 46:14-47:5; 50:4-23; 91:19-

92:10; 102:1-103:3; 134:3-135:8; 179:12-184:16.

19.     Ms. Campo consulted with Ms. Dube, and they agreed that the matter had been handled appropriately and was resolved.  Campo Dep. 174:13-175:20.

20.     After meeting with Mr. Grover, Ms. Campo convened a meeting with all managers at the Store – including Mr. Grover – to review the Respect in the Workplace policy and insure that all managers understood the policy and Hannaford's expectations around it.  Campo Dep. 29: 3-31:1; 33:10-34:1; 47:21-48:10; 144:10-154:22; 161:3-17, Campo Ex. 6, 7.

21.     Ms. Campo followed up with Mr. Record a few days later to make sure that Mr. Record did not have anything new to report with regard to Mr. Grover and to confirm that he was still comfortable with Hannaford's response to his complaint, which he was.  Campo Dep. 27:19-28:21; 48:22-49:7.

22.     Sometime after Mr. Record made the report to Ms. Campo in April 2017, as Mr. Record was passing by her office, Ms. Campo asked him if anything further had happened with Mr. Grover, and he responded that nothing had happened.   Record Dep. 72:6-13; 106:9-107:3.

23.     Because of the length of time that Ms. Campo had known Mr. Record, she believed that he was very comfortable with the way that Hannaford had responded to his complaint in April, and she also believed he would have reported to her if he otherwise felt uncomfortable.  Campo Dep. 102:13-103:3; 136:20-137:10.

24.     As the Store Manager, Ms. Campo walked around the Store each morning and checked in with each Department, including speaking regularly with Mr. Record in the Seafood Department. Mr. Record never reported any new concerns about Mr. Grover's conduct until after Mr. Record submitted his resignation in August 2017.  Campo Dep. 28:12-21; 49:9-22; 101:4-17.

25.     After March 2017, the allegedly harassing conduct by Mr. Grover stopped, and

there was no further alleged harassing conduct by Mr. Grover until August 2017.   Record Dep. 67:1-9; 117:19-21; Campo Dep. 172:10-21.

26.     On July 25, 2017, Mr. Record had a meeting with the Meat Manager and Store Manager at McKinnon's Supermarket in Portsmouth in which he was seeking employment at that establishment.  Record Dep. 25:10-24, Record Ex. 2.

27.     On August 25, 2017, Mr. Record emailed a notice of resignation to the Associate Relations Manager (Ms. Dube) at the Hampton Store and forwarded a copy to Ms. Campo, which stated "Hello, After much consideration and thought I have decided to leave Hampton Hannaford. My last day will be Friday, September 1st, 2017."  Record Dep. 68:12-69:16, Record Ex. 10.

28.     Ms. Campo asked to meet with Mr. Record about his resignation email, and they did so on August 26, 2017. Record Dep. 69:17-25, 70:22-71:7, Record Ex. 11.

29.     After explaining to Ms. Campo that he had obtained another job as a manager trainee at the Golden Harvest supermarket in Kittery, Maine, Mr. Record informed Ms. Campo about new conduct by Mr. Grover that occurred in August 2017.   Record Dep. 67:7-21; 70:2-76:19; Record Ex. 11; Campo Dep. 171:19-23.   Ms. Campo said she was sorry he had not told her about the conduct earlier and that she would be looking into his concerns.   Record Dep. 76:5-19.

30.     In the course of the conversation, Ms. Campo offered Mr. Record the opportunity to remain as a part-time employee (in addition to his new job at Golden Harvest), and Mr. Record agreed to consider it.  Campo Ex. 5(a)(1st paragraph);  Campo Dep. 123:10-124:10, 129:15-130:6.

31.     Ms. Campo asked Mr. Record to provide a written list of Mr. Grover's August 2017 conduct, and he did so in an August 31, 2017 email to Ms. Campo.  Record Dep. 77:10-78:11; Record Ex. 12; Campo Dep. 187:15-189:13, Campo Ex. 2.

32.     The conduct outlined in Mr. Record's August 31, 2017 email was as follows:

    a.  On or about August 19 or 20, 2017, when Mr. Record bent down to place a mat beneath a scale in the meat department,  Mr. Grover placed two hands over his (i.e., Mr. Grover's) groin; Mr. Record believed this was a gesture being made to another employee to suggest that Mr. Record was attempting to perform a sexual act on Mr. Grover. Record Dep. 57:21-58:23; 78:12-22; Record Ex. 12.

    b.  Around the second week of August, 2017, Mr. Grover referred to Mr. Record as a "bitch".  Record Dep. 55:17-57:20; 78:12-22; Record Ex. 12.

    c.  Mr. Grover ignored Mr. Record's requests to take morning breaks at 9:00 a.m. on August 17, 18 and 20, 2017.  Record Dep. 79:3-23, Record Ex. 12.

    d.  Mr. Grover told Mr. Record during the previous week in August (week of August 7) that he could have lunch at the six hour mark of his shift, rather than earlier in his work day. Record Dep. 79:24-80:6; Record Ex. 12.

    e.  During the previous week in August (week of August 7), Mr. Record observed Mr. Grover on the internet looking to find a girlfriend for another employee, and during that same week, Mr. Record observed Mr. Grover making an anniversary dinner in the meat department to bring home instead of helping an associate who could have used assistance.   Record Dep. 80:7-81:6, Record Ex. 12.

    f.  Mr. Grover had Mr. Record doing inventory, training new employees, and waiting on customers at the same time in August 2017.  Record Dep. 81:7-81:11, Record Ex. 12.

    g.  Mr. Grover left early without saying goodbye to the employees and asking them if they need help.  Record Dep. 81:12-16; Record Ex. 12.

33.    Mr. Record confirmed that this is the extent of the conduct by Mr. Grover in August 2017 that Mr. Record believed was harassing and discriminatory.  Record Dep. 82:6-11; 117:22-119:7, Record Ex. 12, Ex. 8.

34.    Mr. Record's claim in this case that he was subjected to derogatory, demeaning and/or effeminate language is limited to Mr. Grover's use of the word "bitch" on one occasion in August 2017, when Mr. Grover responded to him about a work assignment by saying: "You don't have to be a bitch about it".  Record Dep. 104:6-21; 75:2-10.

35.    Mr. Record claims that Mr. Grover's conduct in August 2017 led him to conclude

that he could no longer work at Hannaford and that he had to resign his employment. Record Dep. 82:21-83:5; 119:17-120:17.   Instead of reporting Mr. Grover's new conduct to Hannaford, Mr. Record decided to resign and take a new job at Golden Harvest.  Record Dep. 67:17-68:2.

36.    Mr. Record never reported Mr. Grover's August 2017 conduct to anyone in Hannaford management or Human Resources until after he had tendered his resignation on August 25, 2017 and only in response to Ms. Campo's request to meet with him to discuss his resignation. Record Dep. 68:24-69:25; 76:11-19.

37.    Around the same time she received Mr. Record's new complaints about Mr. Grover's August 2017 conduct, Ms. Campo was scheduled to go on vacation and so she directed her Assistant Store Manager (Steve Gerry) and the Associate Relations Manager (Ms. Dube) to investigate Mr. Record's new allegations about Mr. Grover.  Campo Dep. 110:11-115:7; 116:12-118:23; 189:13-10:4; Campo Ex. 4.

38.    Mr. Gerry and Ms. Dube met with Mr. Grover on September 4, 2017, and memorialized Mr. Grover's responses to the allegations. Campo Dep. 190:5-21, Campo Ex. 8 (2nd – 5th pages).

39.    Mr. Grover denied the "bitch" allegation, explained that he had a clipboard in his hands and was preparing a list of meats to prepare when Mr. Record thought he had just his hands over his groin and denied and/or provided further context to the other allegations that were not connected to sex or sexual orientation.   Campo Ex. 8 (3rd – 5th pages) ; Campo Dep. 190:5-191:3.

40.    After reviewing the matter, Ms. Campo met with Mr. Grover individually and reviewed the Respect in the Workplace policy with him; had Mr. Grover sign a copy of the policy; and placed it in his personnel file.  Campo Dep. 191:6-192:8.

41.    Mr. Record started working at Golden Harvest Supermarket on September 6, 2017.

Record Dep. 22:20-25:9, 26:11-20.

42.     Ms. Campo again offered Mr. Record the opportunity to return to work at Hannaford, (Record Dep. 93:2-11; Campo Dep. 170:10-171:9), and on September 11, 2017, Mr. Record sent an email to Ms. Campo which stated in part: "Hello Ashley, I'd like to take you up on your offer.   I wanted to see if you have time to talk tomorrow about returning to Hannaford. …". Record Dep. 92:18-93:5; Record Ex. 15 (1st – 2nd pages).  Ms. Campo responded the same day with possible dates and times to meet.  Id., 93:20-23.

43.     On September 13, 2017, Mr. Record sent an email to Ms. Campo which stated in part:  "…I would like to return to Hannaford full-time if my position was still left open. …". Record Dep. 94:3-15; Record Ex. 15 (1st page).

44.     Ms. Campo responded that while his position had been filled, Mr. Record could consider any of the open full-time positions available at Hannaford and that there were quite a few. Record Dep. 94:16-23; Record Ex. 15 (1st page).

45.     On or about September 16, 2017, Mr. Record met with Ms. Dube and Mr. Gerry at the Hampton store and reviewed open positions.  Record Dep. 100:9-101:10

46.     On September 16, 2017, Mr. Record left employment at Golden Harvest.  Record Dep. 26:21-28:21, Record Ex. 3.

47.     On September 19, 2017, Ms. Campo sent an email to Mr. Record to check on his thoughts on returning and Mr. Record responded with an email which stated in part: "…I still would like to get a job full time to keep all my benefits, vacation, and time that I built. …".  Record Dep. 95:9-96:7, Record Ex 15 (4th -5th pages).  On September 20, Mr. Record asked about meeting the following day, but Ms. Campo was closing on her house and could not meet on that date. Record Dep. 96:8-97:4; Record Ex. 15 (4th-5th pages).

48.     On September 21, 2017, Mr. Record telephoned Ms. Campo and left the following voice message on Ms. Campo's phone:

> "Hi Ashley, it's Tim. I just got your message.  It is noon and I understand you're closing on your house, so that's exciting, but let — could you just text me or email me and let me know when you're available. I don't want to be terminated.  I want to get back to Hannaford, but I need your help to do that.  Hopefully, you know, my pay is not going to change or anything like that, but I did want to, you know, take you up on your offer to get back in there and stay.  …".

Record Dep. 97:8-98:99:3; Record Ex. 16.

49.     Ms. Campo left a voice message for Mr. Record on September 25, but he did not respond and so on September 27, she sent him an email asking if he was still interested in a position at Hannaford.  Mr. Record responded by email saying that he had decided to take a full-time position elsewhere.  Record Dep. 99:4-25; Record Ex. 15 (7th page).

50.     Mr. Record commenced full-time employment with McKinnon's Supermarket on September 29, 2017.  Record Dep. 25:25-26:7; 28:25-29:18.

## ARGUMENT

### A.     Mr. Record's hostile work environment claims fail as a matter of law.

In order to establish a hostile work environment sexual harassment claim under federal or state law, a plaintiff must establish the following:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Ponte v. Steelcase Inc*., 741 F.3d 310, 319-20 (1st Cir. 2014); *Rand v. Town of Exeter*, 976 F. Supp. 2d 65, 72 (D.N.H. 2013) (applying Title VII framework to New Hampshire sexual harassment claim).   As explained below, the undisputed facts demonstrate that Mr. Record cannot establish

11

the last three elements of his harassment claims, and therefore his claims fail as a matter of law.[2]

**1.  The alleged harassment was not sufficiently severe or pervasive.**

Mr. Record's harassment claims are premised upon three isolated occurrences in February/March 2017 and two isolated occurrences five months later in August 2017.[3] Specifically, in February/March 2017, Mr. Grover told another Hannaford employee that Mr. Record is "three feet shorter with his head in the pillow"; tapped Mr. Record in the genitals with a baguette loaf of bread and said "baseball, baseball"; and told Mr. Record that everyone "knows that he eats the meat" when Mr. Record declined an offer to try a vendor's meat samples.   In August 2017, Mr. Grover allegedly referred to Mr. Record as a "bitch" and when Mr. Record bent down to place a mat beneath a scale in the meat department, Mr. Grover allegedly placed two hands over his own groin.   These five incidents are neither severe nor pervasive.

Decisions handed down by the United States Supreme Court make it clear that the laws prohibiting harassment are not a civility code but rather they only prohibit workplace behavior that is so objectively offensive that it alters the conditions of a plaintiff's employment.  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (conduct resulting from genuine, but innocuous differences in ways men and women interact does not violate Title VII); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("We have made it clear that *conduct must be extreme* to amount to a change in the terms and conditions of employment, and the Courts

---

[2] Solely for the purposes of this motion, the first three requirements are not disputed.

[3] Although Mr. Record alleges seven occurrences in August, only two of them are even remotely connected to gender, sex or sexual orientation. See Statement of Facts at No. 32. The other alleged occurrences in August 2017 can be disregarded because they have nothing to do with gender, sex or sexual orientation and therefore fail to satisfy the third element for a sexual harassment claim.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed *only* at discrimination *because of sex.*") (emphasis added).  Even if these additional incidents are considered in support of the harassment claims, they likewise fail the severity test because, at best, they describe unprofessional conduct, and there is no evidence that they are connected to Mr. Record's gender, sex or sexual orientation. *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014) (claim fails in the absence of a connection of the allegations to harassment); *Pérez v. Horizon Lines, Inc.*, 804 F.3d 1, 7 (1st Cir. 2015) (unprofessional conduct is not the focus of the anti-discrimination laws).

of Appeal have heeded this view. . . .") (emphasis supplied); *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34 (1st Cir. 2003).   The severe or pervasive requirement is "crucial" because it ensures that "courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay and intersexual flirtation – for discriminatory 'conditions of employment.'"   *Oncale*, 523 U.S. at 81; *see also Faragher*, 524 U.S. at ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.").   Therefore, a plaintiff is required to show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Pérez v. Horizon Lines, Inc.,* 804 F.3d 1, 6 (1st Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).   "Simple teasing…offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 778 (citing *Oncale*, 523 U.S. at 82).

There is no mathematically precise test that can be used to determine whether conduct was severe or pervasive enough to alter the conditions of employment.   Instead, courts consider numerous factors, including frequency and severity; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.   *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 18 (1st Cir. 2013); *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006).   While certain statements or actions may make an employee feel uncomfortable in the workplace, mere discomfort is not the required test for an actionable hostile work environment harassment claim. *Pérez v. Horizon Lines, Inc.,* 804 F.3d 1, 7 (1st Cir. 2015).   Similarly, "[d]iscourtesy or rudeness should not be confused with [unlawful] harassment

and . . . a lack of … sensitivity does not, alone, amount to actionable harassment." *Faragher*, 524 U.S. at 787. Courts should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," and "use '[c]ommon sense, and an appropriate sensitivity to social context,' to distinguish between such innocuous behavior and severely hostile or abusive conduct." *Morgan*, 536 U.S. at 116; *see also Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.").

With these principles in mind, numerous First Circuit decisions have consistently held that conduct similar to or more serious than that alleged by Mr. Record failed to rise to the level of severity and pervasiveness required under the law. *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 53-54 (1st Cir. 2006) (supervisor's statements in vulgar terms to gay plaintiff that he was looking for a homosexual to have sex with, and his action in straightening the front of his pants or touching his own buttocks in plaintiff's presence after previous complaint about supervisor's vulgar statements about homosexual activity and stereotyping certain profession as homosexual were not considered sufficiently severe in the totality of the circumstances); *Morgan v. Massachusetts General Hosp.*, 901 F.2d 186, 192-93 (1st Cir. 1990) (male plaintiff's complaint that an allegedly homosexual co-worker asked plaintiff to dance and started to pull on him, stood behind plaintiff while he mopped, and looked at plaintiff's genitals while standing next to him in the restroom were insufficient to state a severe and pervasive hostile work environment claim); *Rivera-Martinez v. Commonwealth of Puerto Rico*, No. 05-2605, 2007 WL 16069, at *1 (1st Cir. Jan. 4, 2007) (no hostile work environment when male supervisor gently caressed female plaintiff on her arm and touched her hip and buttocks while using his hips to push her out of a room); *Conto v. Concord Hospital, Inc.*, 265 F. 3d 79,81 (1st Cir. 2001) (inquiries about the plaintiff's personal

life may have been insensitive, but were not physically threatening or humiliating and they were at most offensive utterances); *Chamberlain v. 101 Realty*, 915 F.2d 777, 783 (1st Cir. 1990) (five isolated remarks and sexual advances over a five week period, without more, do not establish a hostile environment); *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 81 (1st Cir. 2006) (supervisor's response to employee's invitation to accompany her on a sales visit by grabbing his crotch and stating that "it would be great to come with you" did not create a hostile environment); *Ponte v. Steelcase Inc.*, 741 F.3d 310, 320 (1st Cir. 2014) (supervisor's "hitting on" plaintiff, telling her he was responsible for hiring her, offering her a ride back to her hotel and placing his arm around her shoulders was "not close" to the required level of egregious conduct).

The First Circuit's decision in *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 38-39 (1st Cir. 2003), is particularly instructive because the Court rejected a same sex hostile environment claim premised on conduct and statements that were much more egregious than those alleged by Mr. Record.   In that case, the supervisor told the employee "you know that now I'm your supervisor and now you have to do what I tell you to do"; she made comments to the plaintiff regarding the private lives and sexual preferences of employees; she told stories about the private lives of co-workers; she said the plaintiff got her job because their manager was "crazy about her looks"; she asked meddlesome and prying questions about the plaintiff's personal life and made comments about her appearance and behavior; she told the employee that she was using her physical attributes, not her technical knowledge, to make sales; and while at a company convention, she asked the employee for the keys to the plaintiff's hotel room.  In rejecting the claim, the First Circuit observed:

> Here, the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to [the employee's] work performance.

> The record establishes that [the supervisor] was an inexperienced manager who had trouble navigating the boundary between the personal and the professional. [The supervisor] often displayed a disregard for professional courtesy and a penchant for inquiring about the personal affairs of other workers (both male and female). But a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws. The district court correctly concluded on this evidence that [the supervisor's] conduct was not so severe or pervasive that it altered the terms and conditions of [the employee's] employment.

*Id.* at 46-47.

Consistent with the First Circuit cases above, this Court has similarly held that conduct of the type alleged by Mr. Record is insufficient to satisfy the severe or pervasive requirement. *See, e.g.*, *Posteraro v. RBS Citizens, N.A.,* 159 F. Supp. 3d 277, 284-287 (D.N.H. 2016) (holding that isolated comments neither sufficiently severe nor pervasive to survive summary judgment, including using the "sexually suggestive retort 'that's what she said' to turn stray comments into sexual innuendo," being subjected to a "reference to tea bags which [the plaintiff] interpreted as sexual innuendo," and suggestions from plaintiff's colleagues that she watched pornography); *Hawk v. Land Air Express of New England, Ltd.*, 05–cv–283–JD, 2006 WL 2850589, at *2-4 (D.N.H. Oct. 2, 2006) (holding that five comments over a five month period were neither severe nor pervasive, including comments to the plaintiff from her supervisor that he gave her the sales account because "he liked her legs," that he was "expecting to see some skin," that the previous sales representative was "a wild cat," and describing "in graphic detail, his sexual exploits with a woman he met at a bar, which included tying her sprawled across a bed while she was nude").

Like the conduct in the cases above, the five alleged incidents of inappropriate behavior by Mr. Grover do not rise to the level of severity or pervasiveness required to support a hostile work environment claim. For starters, there were only five alleged incidents – three in February 2017 and two in August 2017 – which is insufficient to establish pervasive conduct. Moreover, Mr.

Grover's alleged conduct and statements fall far short of establishing severe conduct.  At best, they represent unprofessional conduct, offhand comments and isolated incidents.[4]  *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 44-45 (1st Cir. 2011) (supervisor's brusque and uncivil actions and unprofessional managerial approach insufficient).

Finally, there is absolutely no evidence that the alleged harassment had a negative impact on Plaintiff's work performance.  *Rivera-Martinez*, 2007 WL 16069, at *3 (affirming summary judgment of hostile work environment claim, in part, because the harassment was "never . . . an impediment to [plaintiff's] work performance").  Even in the light most favorable to Mr. Record, Mr. Grover's alleged conduct does not rise to the level of severe or pervasive sex harassment, and thus, Hannaford is entitled to summary judgment with respect to Mr. Record's harassment claims.

**2.  The alleged harassment is not objectively or subjectively offensive.**

In addition to failing the severity/pervasiveness requirement, Mr. Record cannot establish the fifth required element of a sexual harassment claim.  It is settled that the alleged harassing conduct must be both objectively and subjectively offensive, such that a reasonable person would find the conduct to be hostile or abusive and that the victim perceived it as so.   This assessment is made by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening  or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher*, 524 U.S. at 787-88.  These standards should "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"  *Id.* at 788.

For the same reasons that the allegations are not "severe", they are also not objectively

---

[4] This argument also applies with equal effect to Mr. Record's five other allegations of misconduct that purportedly occurred in August, but have no relation to gender, sex or sexual orientation.  See Statement of Facts, No. 32.

offensive.  The allegations are individual isolated occurrences separated by a five-month period of time in which nothing objectively offensive occurred.  As explained above, the first three instances occurred in February/March, and Hannaford immediately responded.  The final two instances which allegedly occurred many months later in August involved Mr. Record being called a "bitch" on one occasion and his interpretation of what Mr. Grover intended when he placed his hands over his groin.  At best, the incidents in February/March represented Mr. Grover's inappropriate effort at joking and when considered with the allegations in August, they were nothing more than occasional, isolated and sporadic occurrences that are not objectively offensive under *Faragher*. *See also Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006) (rude and indifferent treatment alone was not objectively offensive conduct); *Asselin v. Waldron*, 02–330–M, 2004 WL 57083, at *4-8 (D.N.H. Jan. 13, 2004) (holding that six statements from supervisor were not objectively offensive, including comments to the female plaintiff that she had been given the job because of her "sexy voice" and refusing to provide her a company cellphone because she would "only use it to call her boyfriend").

Finally. Mr. Record's expressed desire to return to work at Hannaford, including to his former position reporting to Mr. Grover, completely undermines and is inconsistent with the requirement that he perceive the conduct to be offensive and objectionable as required by *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).

### 3.  There is no basis for holding Hannaford liable for Mr. Grover's alleged conduct.

Even if Mr. Record could establish the other required elements, his harassment claims nonetheless fail because, as a matter of law, Hannaford cannot be held liable for Mr. Grover's alleged conduct.  The Supreme Court has made clear that, when a supervisor's alleged harassment does not result in a tangible employment action, an employer can raise an affirmative defense to

mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *Vance v. Ball State Univ.*, 570 U.S. 421, 428–30, 133 S. Ct. 2434, 2441–42, 186 L. Ed. 2d 565 (2013).

It is undisputed that Hannaford maintained and promoted awareness of its Respect in the Workplace policy. It is also undisputed that Mr. Record had been trained on and was keenly aware of the various avenues by which he could report harassing behavior. Indeed, in addition to the various complaint reporting alternatives under the Respect in the Workplace policy of which Mr. Record was aware, he was also familiar with the I-Share policy and process and the Open Door policy, both of which provided him other avenues through which complaints could be reported.

Aware of his ability to report to a member of Store management conduct that may violate the Respect in the Workplace policy, Mr. Record did so by complaining to Mr. Howard in April 2017 about Mr. Grover's February/March 2017 conduct. Hannaford's response to Mr. Record's complaint was swift and effective. Mr. Howard immediately addressed the issue and informed Mr. Grover that his conduct was inappropriate. Mr. Grover acknowledged his wrongdoing and apologized to Mr. Record. Mr. Howard then followed up with Mr. Record who indicated that he accepted the apology and said that if it occurred again, he would report any new harassing conduct to the Human Resources office.

When Mr. Record separately informed Ms. Campo of his complaint to Mr. Howard about Mr. Grover's February/March 2017 conduct, Mr. Campo also responded immediately by gathering the facts from Mr. Record, Mr. Howard, and then Mr. Grover. When she spoke to Mr. Grover, Ms. Campo underscored the inappropriate nature of his conduct and that it could not occur again. Ms. Campo subsequently followed up with Mr. Record, and he confirmed that the counseling had

been effective and that Mr. Grover had not acted inappropriately again.[5]  This type of immediate, comprehensive, and supportive response by Hannaford is exactly what is envisioned by the law. *See Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 232 (1st Cir. 2007) (undisputed facts show prompt investigation and imposition of initial level of discipline).  Importantly, the First Circuit has also expressly held that an employer must be provided a level of flexibility in determining what action and/or level of discipline to take in response to an initial complaint of harassment and that a verbal admonition is sufficient.  *See, e.g.*, *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 8 (1st Cir. 2011) (verbal reprimand for egregious and flagrant racial epithets was appropriate response).

Consistent with the First Circuit's decisions, in this matter, Hannaford immediately responded to Mr. Record's initial complaint about Mr. Grover's February/March 2017 conduct; confronted Mr. Grover with the inappropriate nature of his conduct; and told him that his conduct must stop, and he apologized to Mr. Record.    Moreover, after Mr. Record informed Ms. Campo of his complaint to Mr. Howard, she also immediately counseled Mr. Grover on the inappropriate nature of the conduct.  Thus, on two separate occasions within two weeks of Mr. Record's complaint, Hannaford placed Mr. Grover on notice of the unacceptable nature of his actions.

In sum, it is undisputed that Hannaford had an appropriate anti-harassment policy; the policy was widely known and disseminated; it  was known to Mr. Record; Mr. Record took advantage of the policy; and Hannaford investigated and addressed the February/March 2017 issues with Mr. Grover.  Thus, Hannaford was fully in compliance with *Faragher-Ellerth* as it relates to Mr. Grover's February/March 2017 conduct, and there is no basis for Hannaford to be liable for such conduct.  *Chaloult v. Interstate Brands Corp.*, 540 F.3d 64, 75 (1st Cir. 2008).

All parties agree that this remedial action was effective from April 2017 to August 2017.

---

[5] In fact, the effectiveness of the Company's response is demonstrated by Mr. Record's concession that, between his complaint in April 2017 and August 2017, there were no further incidents of alleged harassing conduct.

*See Moore v. Dartmouth Coll.*, 2001 DNH 180, 2001 U.S. Dist. LEXIS 17415, at *27-28 (D.N.H. Sept. 28, 2001) (cessation of harassment demonstrates effectiveness of response). The fact that Mr. Record claims that Mr. Grover again engaged in harassing behavior in August 2017 does not negate the fact that Hannaford's initial, immediate response was a legally satisfactory form of prompt remedial action. *See Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1259-60 (10th Cir. 2003) (verbal warning in response to a first offense was appropriate and proportional, and future misconduct did not negate the reasonableness of the initial handling of the matter). Thus, Hannaford satisfied its legal obligations in response to Mr. Record's complaint about Mr. Grover's conduct in February/March 2017.

With respect to the second set of alleged harassing conduct that Mr. Record claims occurred in August 2017, Hannaford cannot be held liable for such conduct because Mr. Record failed to report the offensive statements or actions until after he submitted his resignation to Hannaford and, even then, he only did so in response to Ms. Campo's inquiry about why Mr. Record was resigning.[6] It is settled that an employee has a duty to report alleged harassing conduct to the employer and allow the employer the opportunity to correct it. *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 10–11 (1st Cir. 2011); *Chaloult v. Interstate Brands Corp.*, 540 F.3d 64, 73, 77 (1st Cir. 2008) (company deprived of opportunity to take remedial actions when new complaint of harassing behavior by supervisor was not advanced until after end of employment).

This is especially true here where Mr. Record knew from his initial complaint in February/March 2017 that Hannaford took his complaint seriously and acted swiftly to eradicate

---

[6] As explained below, Mr. Record's attempt to reframe his departure as a constructive discharge (and thereby attempt to avoid the application of the *Faragher-Ellerth* defense) fails as a matter of law. Indeed, his claim in this regard is factually undercut by the nature of the alleged harassment in August, his efforts to seek new employment elsewhere one month prior to Mr. Grover's alleged August 2017 conduct, his acceptance of another job and resignation prior to reporting any alleged harassment in August, and his request and desire to return to work at Hannaford at any position, including his former position working for the alleged harasser. For the same reasons that his wrongful termination claim fails, any argument that he was constructively discharged and that is a tangible personnel action fails as well.

the alleged offensive behavior.  In addition, Mr. Record was well aware of the numerous reporting avenues that were available to him as a Hannaford employee, including but not limited to the I-Share toll free number, intranet or internet report, report to a member of the store's management, store and regional associate relations managers, as well as higher level management, and reporting under the open door policy, among other avenues.  Mr. Record also can remember the Store Manager (Ms. Campo) following up with him on at least one occasion as to how things were going with Mr. Grover.  Mr. Record also admits that he told Mr. Howard that if the harassing conduct occurred again after his initial complaint, he would report it to Human Resources.

Notwithstanding his thorough knowledge of these reporting avenues, and his representation that he would report future harassing conduct to Human Resources, it is undisputed that Mr. Record did not report any renewed harassment until after he submitted his resignation from employment.  The observations of the First Circuit in a similar scenario are instructive:

> The company, in keeping with its obligations under Title VII, had in place a clearly stated antiharassment policy, which directed aggrieved employees to report harassment either to a supervisor or to the owner. The plaintiff was aware of this policy (indeed, he used it successfully to report the initial harassment) yet failed to adhere to it with respect to the subsequent incidents of harassment. This omission occurred despite the fact that Moulison reinforced the policy by explicitly instructing the plaintiff to speak directly to him. Under these circumstances, the plaintiff's failure to put the defendant on notice of the renewed harassment is fatal to his claim of employer liability.

*Wilson v. Moulison N. Corp.*, 639 F.3d 1, 10–11 (1st Cir. 2011).

Because Mr. Record failed to use any of the available internal complaint processes in August 2017 to report the alleged reemergence of harassing conduct, the second prong of the *Faragher-Ellerth* defense is established, and Mr. Record's harassment claims with respect to Mr. Grover's August 2017 conduct fail as a matter of law.  *See Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 57 (1st Cir. 2006) (affirming summary judgment

where, among other reasons, plaintiff failed to use established complaint process).

**B.      Plaintiff's wrongful termination claim fails as matter of law.**

Mr. Record claims that he was wrongfully terminated by Hannaford on the theory that he was constructively discharged and forced to resign because of the alleged harassment.[7]   More specifically, he argues that Mr. Grover's conduct in August 2017 compelled him to leave.   To establish a constructive discharge claim based on Mr. Grover's August 2017 conduct, Mr. Record must prove that Hannaford imposed working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities:

> Constructive discharge typically "refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." *Lee–Crespo v. Schering–Plough Del Caribe, Inc.,* 354 F.3d 34, 45 (1st Cir.2003) (internal quotation marks and citation omitted). A successful constructive discharge claim requires "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). A plaintiff seeking to withstand summary judgment must point to evidence in the record showing that just such conditions existed. *Ahern v. Shinseki,* 629 F.3d 49, 59 (1st Cir.2010). The standard to meet is an objective one, "it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." *Roman v. Potter,* 604 F.3d 34, 42 (1st Cir.2010) (internal quotation marks and citation omitted).

*Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 25 (1st Cir. 2013).

Mr. Record testified that he had no choice but to leave employment because of Mr. Grover's actions in August 2017, which were limited to Mr. Grover calling him a "bitch" once and his interpretation on another occasion that when Mr. Grover placed his hands over his own groin it was meant to have a sexual connotation.[8]   When viewed in their totality, these allegations do not

---

[7] Mr. Record does not allege any of the elements of a common law claim of wrongful termination, and even if he did, it would be barred because of the existence of a statutory remedy for harassment related conduct. See Complaint, ¶¶ 37, 66; *Parker v. MVM, Inc.,* 2006 DNH 70, 2006 U.S. Dist. LEXIS 41447 *6-8 (D.N.H. June 20, 2006).

[8] The other actions in August 2017 that Mr. Record claims caused him to leave are wholly unrelated to gender, sex or sexual orientation and are therefore not actionable.  See Statement of Facts, No. 32. However, even if they were considered as well, they also do not amount to intolerable working conditions.  Similarly, if the conduct from February/March was also considered, the claim still fails.

come close to being considered intolerable. *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 139 (1st Cir. 2014) (employee cannot assume the worst and jump to conclusions that departure is the only option); *Cherkaoui v. City of Quincy*, 877 F.3d 14, 30 (1st Cir. 2017) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins--thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.").  Moreover, Mr. Record's successful invocation of the complaint reporting process in April 2017 combined with Hannaford's immediate and effective response undermines Mr. Record's claim that he had no recourse for Mr. Grover's August 2017 actions but to resign.  *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (evaluation of constructive discharge claim takes into account the employer's responses to complaints); *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 10–11 (1st Cir. 2011).

Mr. Record was aware that Ms. Campo was investigating his latest allegations which she elicited from him in response to his notice of resignation.   Thus, when he departed Hannaford, he was aware that Hannaford continued to take any alleged misconduct seriously.   This fact is important because Ms. Campo repeatedly attempted to convince Mr. Record to remain as an employee over the course of the next 30 days even if from Mr. Record's perspective it had to be on a part-time basis because of his acceptance of a position with a new employer. *See, De la Vega v. San Juan Star, Inc.*, 377 F.3d 111, 118 (1st Cir. 2004) (employer's request that employee return to work belies any intention to force resignation by creating a hostile work environment). What's more, Mr. Record's constructive discharge claim is undermined by his own statements and actions after his resignation in which he stated that he wanted to return to the Hampton store and he even asked to return to his previous position reporting to Mr. Grover.  *Id.*

Finally, and perhaps most importantly, the undisputed facts show that Mr. Record was

making plans to leave Hannaford and was seeking new employment *before* Mr. Grover's August 2017 conduct occurred.   Mr. Grover's August 2017 conduct did not cause Mr. Record's resignation; that resignation was in the works *before* Mr. Grover's August 2017 conduct.

When viewed in the totality, Mr. Record's constructive discharge claim is not supported by the undisputed facts in this case.  His claim should be dismissed.

## CONCLUSION

Allegations of sex harassment must "be extreme to be actionable."  *Rivera-Martinez*, 2007 WL 16069, at * 3 (citing *Oncale*, 523 U.S. at 82).  Mr. Grover's alleged conduct in this case falls far short of meeting that requirement.  Though Mr. Record may have experienced discomfort as a result of the alleged conduct, he has presented no facts that the conduct rose to the level of being severe or pervasive.  Moreover, Hannaford took immediate and effective steps to correct and address Mr. Grover's February/March 2017 conduct, and Mr. Record unreasonably failed to report Mr. Grover's alleged August 2017 conduct prior to his resignation.

Mr. Record's claim that he was constructively discharged as a result of Mr. Grover's August conduct is directly contradicted by the undisputed fact that Mr. Record was already interviewing for a new job before the alleged August conduct and the undisputed fact that, after resigning, he wanted to return to his former Hannaford position reporting directly to Mr. Grover.

For all of these reasons, Hannaford is entitled to judgment as a matter of law, and Mr. Record's claims should be dismissed with prejudice.

Dated: July 29, 2020                    Respectfully submitted,

                                          */s/ Timothy J. O'Brien*
                                         Timothy J. O'Brien, (Bar No. 7925)
                                         Libby O'Brien Kingsley & Champion, LLC
                                         62 Portland Road, Suite 17
                                         Kennebunk, ME  04043
                                         tobrien@lokllc.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which caused a copy of this document to be served electronically on all registered counsel of record as follows:

Christopher J. Fischer, (Bar No. 20632)
82 Court Street
Portsmouth, NH  03801
cfischer@nhlawfirm.com

Dated:  July 29, 2020

_/s/ Timothy J. O'Brien_
Timothy J. O'Brien, (Bar No. 7925)
Attorney for Defendant
Libby O'Brien Kingsley & Champion, LLC
62 Portland Road, Suite 17
Kennebunk, ME  04043
tobrien@lokllc.com