IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


TIMOTHY RECORD,           )
                          )
          Plaintiff,      )
v.                        )   Civil Action 1:19-CV-00034-LM
                          )
HANNAFORD BROS. CO., LLC, )
                          )
          Defendant       )




          DEPOSITION of TIMOTHY RECORD, taken pursuant

to notice, at the law office of Libby O'Brien Kingsley

& Champion, LLC, 62 Portland Road, Suite 17, Kennebunk,

Maine, on October 3, 2019, commencing at 10:22 A.M.,

before Amy J. Linscott, Registered Professional Reporter,

a Notary Public in and for the State of Maine.




              Amy J. Linscott, RPR
             BOYCE & LEIGHTON, LLC
              31 Guillemette Street
              Sanford, Maine 04073
                (207) 883-0378

Page 2

```
1   APPEARANCES:
2   For the Plaintiff
3               CHRISTOPHER J. FISCHER, ESQ.
4   Boynton, Waldron, Doleac, Woodman & Scott, P.A., 82 Court
5   Street, Portsmouth, New Hampshire  03801 - (603) 775-0002
6
7   For the Defendant
8               TIMOTHY J. O'BRIEN, ESQ.
9   Libby O'Brien Kingsley & Champion, LLC, 62 Portland Road,
10  Suite 17, Kennebunk, Maine  04043 - (207) 985-1815
11
12  Also Present:
13  Anne Cunningham
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                INDEX OF TESTIMONY
2   DEPONENT                                              PAGE
3   TIMOTHY RECORD
4       By Mr. O'Brien                                     5
5       By Mr. Fischer                                    121
6
7                EXHIBITS OF EXHIBITS
8   NO.   DESCRIPTION                                     PAGE
9   1     Series of Policies                              13
10  2     Handwritten Notes                               22
11  3     Golden Harvest Employee Policy                  26
12  4     McKinnon's Markets Documents                    28
13  5     Record of Conversation and Coaching Memo        32
14          Documentation
15  6     Hannaford Retail Performance Appraisal,         39
16          Timothy Record, 4/2/15
17  7     Delhaize America Performance Counseling Form,   40
18          Tim Record, 4/16/15
19  8     Equal Employment Opportunity Commission Charge  43
20          of Discrimination
21  9     Note prepared by Jeff Howard, November 6, 2017  61
22  10    E-mail Chain, August 25, 2017                   68
23  11    Conversation Recap, August 26, 2017             70
24  12    E-mail, August 31, 2017                         77
25          (Exhibits continued on next page.)
```

Page 4

```
1            EXHIBITS OF EXHIBITS (Continued)
2   NO.   DESCRIPTION                                     PAGE
3   13    Medical Records from Jeffrey M. Wagner, Ph.D    83
4   14    Memo by Kyle Lasher, 8/13/17                    88
5   15    Series of E-mails, September 2017               92
6   16    Transcript of Voicemail Message, September 21,  97
7          2017
8   17    Letter from Theresa Dube, September 30, 2017    101
9   18    Series of Notes                                 107
10
11          (Original exhibits are attached.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1           TIMOTHY RECORD, having been sworn by the Notary
2   Public, was examined and deposed as follows:
3               EXAMINATION BY MR. O'BRIEN:
4   Q.  Good morning, Mr. Record.  My name is Tim O'Brien,
5       and I'm the attorney for Hannaford Bros. in this
6       matter, and I'll be asking you a series of questions
7       today.  If you don't understand any of the questions
8       that I pose, there's no problem, just let me know
9       and I'll be happy to rephrase it; is that fair?
10  A.  Mm-hmm.
11  Q.  Is that -- the other thing is, what I'd ask you to
12      do is, you have to verbally respond to each of the
13      questions that I pose because the nods of the heads
14      or saying something like mm-hmm, you know, may not
15      be fully reflected on the transcript, and so for
16      full accuracy I would just ask that you verbalize
17      each and every one of your responses.  Is that a
18      fair approach as well?
19  A.  Yes.
20  Q.  Okay.  Thank you.
21          If you need to take a break at any point,
22      either this morning or this afternoon, please just
23      let me know and we'll be happy to accommodate that.
24      Is that a fair approach as well?
25  A.  Yes, thank you.
```

Page 6

1  Q.  Okay.  At the outset I have to ask you whether or
2      not you're taking any medication or have any medical
3      condition that would limit your ability to listen to
4      and fully comprehend and understand and respond to
5      the questions that I'm posing today?
6  A.  I am taking a generic version of Lexapro.
7  Q.  Okay.  And will that impact your ability to listen
8      to, understand, and be fully responsive to the
9      questions that I ask today?
10 A.  No.
11 Q.  Okay.  Thank you.
12     With that then I'm just going to begin with
13     some background questions and then we'll move into
14     some of the more substantive issues.  But, from a
15     global perspective, if I understand correctly, you
16     began working for Hannaford Bros. at its Hampton
17     store as a service team leader in the deli
18     department in October of 2007?
19 A.  Correct.
20 Q.  Okay.  Do you recall who was the deli department
21     manager at that time?
22 A.  Ray McCubrey.
23 Q.  What was his last name?
24 A.  McCubrey.
25 Q.  And do you happen to know how to spell it?

Page 7

1  A.  I don't -- I think it's M-C-C-U-B-R-A-Y.
2  Q.  All right.  Great.  And how long was he your manager
3      there?
4  A.  About two years.
5  Q.  Okay.  And then my next question is, if I understand
6      correctly, in 2009 you were promoted to the position
7      of assistant deli manager at that Hampton store; is
8      that right?
9  A.  That's correct.
10 Q.  All right.  And did you have the same deli
11     manager --
12 A.  Yes.
13 Q.  -- at that point in time?  Okay.
14     MR. FISCHER:  If I could just interject, if
15     you can wait for Tim to finish the question before
16     you respond, just so we have a clear record.  So
17     let Tim ask his question and then you respond so
18     you're not talking over one another.
19     THE DEPONENT:  Yes.
20 BY MR. O'BRIEN:
21 Q.  Great, yeah.  We as human beings have a natural
22     tendency, attorneys as well, to try to jump ahead
23     because we know what the question and/or answer is
24     and so, just as he gave you that guidance, I'll try
25     to follow it as well, and if I don't please bring

Page 8

1      that to my attention.
2      So, if I understand correctly then, in 2010 you
3      ultimately applied for and were offered a position
4      as the evening operations manager at the Portsmouth
5      store and you started there in January 2011?
6  A.  Yes.
7  Q.  Okay.  And who was the store manager at that point
8      in time, if you can recall?
9  A.  Farah Lavigne.
10 Q.  Farrell Lavigne?
11 A.  Farah.
12 Q.  Farah?
13 A.  Yeah, F-A-R-A-H.
14 Q.  Okay.  Lavigne.  Thank you.
15     And do you remember who the assistant store
16     manager was at that point in time?
17 A.  I do not.
18 Q.  Okay.  And if I understand correctly, you continued
19     in that position until June of '14, June of 2014,
20     when you applied for and were selected to be the
21     assistant manager of customer service back in the
22     Hampton store?
23 A.  Yes.
24 Q.  Okay.  And then in -- you continued in that position
25     until April of 2015, when you moved over to be the

Page 9

1      assistant manager in the seafood department in the
2      Hampton store?
3  A.  Yes.
4  Q.  All right.  And you continued in that position as
5      the assistant manager in the seafood department
6      until you departed your employment in 2017?
7  A.  Yes.
8  Q.  All right.  And who was your manager when you were
9      the assistant manager in the seafood department when
10     you obtained the position in April of 2015, if you
11     recall?
12 A.  I can't remember who that was.  I think it was --
13     wasn't there for a very long period of time.  I
14     think it might have been Tanya -- I can't remember.
15 Q.  Okay.  Was there another position who -- was there
16     another individual who was hired who you worked for
17     longer when you were the assistant manager?
18     MR. FISCHER:  Objection to form.
19     MR. O'BRIEN:  I'll withdraw the question.
20 BY MR. O'BRIEN:
21 Q.  After that Tanya, whoever it was, departed, who was
22     the next manager that you reported to when you were
23     the assistant manager of the seafood department?
24 A.  His name was Will, but I can't remember his last
25     name.

Page 10

1  Q.  Okay.  Were there any other managers that you worked
2     for when you were the assistant manager of the
3     seafood department other than those first two
4     individuals that you identified?
5  A.  Not that I can recall.
6  Q.  Okay.  And was there a time period in which you ever
7     reported to an individual by the name of Bruce
8     Grover?
9  A.  Yes.
10  Q.  And when was that?  Would that have been when he was
11     hired into that position in February of 2017?
12  A.  Yes.
13  Q.  Okay.  And prior to that had you ever worked with
14     Bruce Grover at all in the past?
15  A.  No.
16  Q.  Okay.  Could you describe for me the organizational
17     structure of the seafood department vis-a-vis the
18     meat department as far as the reporting structure?
19  A.  The reporting structure?  Well, I was the assistant
20     seafood manager, Bruce Grover was the manager of
21     both the meat department and myself and the other
22     associates in the seafood department.
23  Q.  Okay.  So Bruce Grover was the manager of the meat
24     department, but also of the seafood department, if I
25     understand correctly?

Page 11

1  A.  That's correct.
2  Q.  Okay.  And within the seafood department who were
3     the other -- as of February of 2017 onward, who were
4     the other associates working in the seafood
5     department?
6  A.  There was a woman named Linda, a gentleman named
7     Ray, I believe, and I think myself were the only
8     three in the seafood department.
9  Q.  And do you recall the associates who worked in the
10     meat department?
11  A.  Yes.
12  Q.  And do you recall their names and if so could you
13     provide them to us?
14  A.  There was Don Waters, Dan Acuna, Joe Dodge, Stephen
15     Gray, Pam Proctor, and I think that's all that I
16     could remember.
17  Q.  Okay.  Thank you.
18       Throughout your tenure at Hannaford, is it fair
19     to say that you received training in different
20     subject areas?
21       MR. FISCHER:  Objection to form, but you can
22     answer the question.
23       MR. O'BRIEN:  I'll rephrase the question
24     based upon the objection.
25     BY MR. O'BRIEN:

Page 12

1  Q.  Throughout your tenure at Hannaford, did you receive
2     training?
3  A.  Yes.
4  Q.  All right.  And did you receive training in seafood
5     operations and the management of the seafood
6     department?
7  A.  Not completely.
8  Q.  All right.  Why don't you then, instead of me asking
9     you individually, can you tell me what type of
10     training that you did receive at Hannaford?
11  A.  For the seafood department?
12  Q.  First for the seafood department and then we'll go
13     more globally.
14  A.  The seafood department, I received training in
15     customer service, ordering procedures.  I think that
16     was it, really.
17  Q.  All right.  What about inventories --
18  A.  Partial training --
19  Q.  Okay.
20  A.  -- in inventories.
21  Q.  All right.  And you worked in the seafood department
22     since April of 2015?
23  A.  Correct.
24  Q.  Okay.  Is it fair to say that you also received
25     training from Hannaford on various policies that the

Page 13

1     company maintains?
2  A.  Yes.
3  Q.  All right.  And one of those policies is respect in
4     the workplace?
5  A.  Yes.
6  Q.  All right.  And how often would you say that you
7     received training on respect in the workplace?  Was
8     it on an annual basis?
9  A.  It was, I believe, on an annual basis.
10  Q.  Okay.  And then in addition to training on respect
11     in the workplace, I assume that you received some
12     information and/or training on the company's I-Share
13     program, I -- capital I-Share program?
14  A.  I don't recall that.
15  Q.  Okay.  All right.  Are you familiar with the
16     company's I-Share program and policy?
17  A.  Not fully.
18       (Exhibit 1, Series of Policies, marked for
19     identification.)
20     BY MR. O'BRIEN:
21  Q.  All right.  I'm going to show you what's been marked
22     as your Deposition Exhibit Number 1, which is a
23     series of policies, and we'll just walk through them
24     relatively quickly, but if I could just first turn
25     your attention to the first policy entitled Respect

Page 14

```
1      in the Workplace.
2           MR. FISCHER:  Just for the record, is there a
3      question on the table?
4           MR. O'BRIEN:  No, we're just allowing him to
5      review it right now.
6           MR. FISCHER:  All right.
7      BY MR. O'BRIEN:
8  Q.  Okay.  Before -- if I could interject, before
9      proceeding beyond the Respect in the Workplace
10     policy, I just have a couple of questions, and the
11     first one is:  After reviewing this, do you
12     recognize this as the Respect in the Workplace
13     policy that Hannaford had in place while you were an
14     employee?
15 A.  Yes.
16 Q.  Okay.  And if you could turn to the second page of
17     this policy, under Procedures for Reporting
18     Harassment and/or Discrimination, under A -- the
19     second sentence of that says:  There are several
20     ways to report harassment or discrimination.  Do you
21     see that sentence?
22 A.  Yes.
23 Q.  Okay.  And then, under A, it says:  Notify any of
24     the following individuals.  The first one is a
25     member of management, the second is the associate
```

Page 15

```
1      relations representative for his or her store or
2      district, and the third one is the director or vice
3      president of associate relations for his or her
4      region.  Did I read them correctly?
5  A.  Yes.
6  Q.  All right.  And then, in addition, under B, it says:
7      Alternatively, associates may report any concerns or
8      possible violations of this or any other policy by
9      calling I-Share, and then provides the 1-800 number
10     for I-Share.  Did I read that correctly?
11 A.  Yes.
12 Q.  Okay.  We can turn to the next policy, please.  The
13     next policy is Diversity and Inclusion, policy
14     number 201.  Are you familiar with this policy from
15     your time at Hannaford?
16 A.  Yes.
17 Q.  Okay.  And was this included in some of the annual
18     training that you had received, the subject matter?
19 A.  I do not recall this.
20 Q.  Okay.  Being included in the training?
21 A.  Correct.
22 Q.  Okay.  The next policy is Equal Opportunity.  I'd
23     ask you to take a look at that and tell me if you
24     are familiar with that policy from your time at
25     Hannaford?
```

Page 16

```
1      Do you recognize this -- are you familiar with
2      this policy from your time at Hannaford?
3  A.  I don't recall this one.
4  Q.  Okay.  All right.  Then we'll turn to the next one,
5      which is the I-Share policy and program, which is
6      three pages in length, and I'd ask you if you -- if
7      after reviewing this you remember this from your
8      time at Hannaford?
9  A.  Yes.
10 Q.  After reviewing that policy, are you familiar -- do
11     you recall having access to or being familiar with
12     that policy while you were at Hannaford?
13 A.  Yes.
14 Q.  Okay.  And do you -- and what do you recall about
15     it, the I-Share policy, from your time at Hannaford?
16 A.  I recall it was available.
17 Q.  Okay.  If I could turn your attention to the second
18     page of the I-Share policy -- you might have to go
19     back one or two pages.  One more page.  And it's
20     entitled I-Share, dash, Frequently Asked Questions,
21     and the first question is:  How do I report a
22     concern or ask a question?  You have many options,
23     colon.  Did I read that correctly?
24 A.  Yes, did you.
25 Q.  Okay.  Number one, Discuss with your supervisor.
```

Page 17

```
1      Did I read that correctly?
2  A.  Discuss with your direct supervisor.
3  Q.  With your direct supervisor, thank you.  Number one,
4      Discuss with your direct supervisor.  Did I read
5      that correctly?
6  A.  You did.
7  Q.  Thank you.  Number two, Discuss with your local
8      human resources, legal or compliance representative.
9      Did I read that correctly?
10 A.  You did.
11 Q.  All right.  Number three, Access the I-Share network
12     as follows, colon:  A, toll-free 24/7 by phone, and
13     then it provides the 800 number.  Did I read that
14     correctly?
15 A.  Yes.
16 Q.  B, on the web 24/7 at colon, www.ethicspoint.com.
17     Did I read that correctly?
18 A.  Yes.
19 Q.  Okay.  C, through the Delhaize America intranet or
20     your specific banner's intranet pages.  Did I read
21     that correctly?
22 A.  Yes.
23 Q.  All right.  And four, Contact Delhaize Group's
24     Office of Compliance and Ethics, colon, and then A
25     is by phone, and it provides the phone number, B, by
```

Page 18

```
 1        secure fax, and it provides the fax number, and C,
 2        by e-mail, and it provides the e-mail address.  Did
 3        I read that correctly?
 4   A.   Yes.
 5   Q.   All right.  And then it states:  Each of these
 6        reporting methods is secure, enabling anonymity of
 7        the reporter and confidentiality of the report.  Did
 8        I read that correctly?
 9   A.   Yes.
10   Q.   Okay.  All right.  We'll move on.  We don't need to
11        address that next policy.
12             MR. FISCHER:  For the record, what policy
13        were you talking about?
14             MR. O'BRIEN:  There's one final policy on the
15        open door policy.
16             MR. FISCHER:  So the Bates stamped 766 --
17             MR. O'BRIEN:  Yeah, I'm not posing any
18        questions --
19             MR. FISCHER:  Thank you.
20             MS. CUNNINGHAM:  773.
21             MR. O'BRIEN:  773.
22             MR. FISCHER:  773?
23             MR. O'BRIEN:  Yes.
24             MR. FISCHER:  Yes.
25   BY MR. O'BRIEN:
```

Page 19

```
 1   Q.   All right.  We'll ask the question then anyway, just
 2        so the record is clear, that last policy is the open
 3        door policy.  One more page.  Open Door and Appeal
 4        policy.  And do you remember this being a policy in
 5        place during your tenure at Hannaford?
 6   A.   Yes.
 7   Q.   Okay.  And is it fair to say that after you departed
 8        Hannaford you did not utilize the Open Door and
 9        Appeal policy?
10   A.   I don't understand that question.
11   Q.   All right.  Is it fair to say that any time that you
12        were at Hannaford or after you left Hannaford you
13        did not utilize this policy?
14             MR. FISCHER:  Object to the form, but you can
15        answer the question.
16   A.   I'm confused.  If you could restate that.
17   BY MR. O'BRIEN:
18   Q.   Okay.  I'll break it down into two, two parts.  The
19        first one is, while you were an employee of
20        Hannaford, did you -- is it fair to say that you did
21        not try to use the Open Door and Appeal policy for
22        anything?
23   A.   I did use the open door policy.
24   Q.   Okay.  When did you use the open door policy as an
25        employee?
```

Page 20

```
 1   A.   In reporting to Ashley.
 2   Q.   All right.  And when you say in reporting to Ashley,
 3        you're talking about how, in April of 2017, after
 4        you had made an initial report to evening operations
 5        manager Jeff Howard, you made a report to Ashley
 6        about the treatment that you had received from Bruce
 7        Grover?
 8   A.   I'm actually still confused about the question.
 9   Q.   All right.  You said while you were an employee you
10        had used the open door policy in making a report to
11        Ashley Campo?
12   A.   Yes.
13   Q.   Okay.  Now I'm just trying to identify the time and
14        the subject matter of your report to Ashley Campo,
15        and from the complaint that was filed in this case,
16        both at the EEOC and in court, it appears as if you
17        made a report to Ashley in April of 2017 after
18        initially making a report to Jeff Howard --
19   A.   Correct.
20   Q.   -- about --
21   A.   So sorry.
22   Q.   Is that correct?
23   A.   That's correct.
24   Q.   Okay.  And the subject matter of that report to
25        Ashley Campo was the treatment that you were
```

Page 21

```
 1        receiving from Bruce Grover that you initially
 2        reported to Jeff Howard in April of 2017?
 3   A.   Correct.
 4   Q.   Okay.  Is there any other time as an employee you
 5        utilized the open door policy?
 6   A.   Yes.
 7   Q.   And when was that?
 8   A.   2009.
 9   Q.   Okay.  And tell me what occurred in 2009.
10             MR. FISCHER:  I'm going to object to the form
11        of the question, but you can answer it.
12   A.   Two associates had remarked that God kills gay
13        people.  The other one stated that God -- that gay
14        people don't deserve the same rights as us.
15   BY MR. O'BRIEN:
16   Q.   And which store were you working in at that point
17        and time?  Was that the Hampton or the Portsmouth
18        store?
19   A.   That was the Hampton store.
20   Q.   All right.  And these were co-workers of yours?
21   A.   Correct.
22   Q.   Okay.  And you utilized the open door policy to make
23        a report about those statements; is that correct?
24   A.   Correct.
25   Q.   All right.  And who did you make that report to?
```

Page 22

1  A.  Robin Beeson.
2  Q.  And what was her position at that time?  Was she the
3      store manager?
4  A.  That's correct.
5  Q.  Okay.  Did you make reports to anyone else
6      associated with those statements?
7  A.  Not that I recall.
8  Q.  Is it fair to say that you don't know what Robin did
9      with your report after you made the report to her?
10     I'll withdraw --
11 A.  I do not know.
12 Q.  Okay.  All right.  After you left employment was
13     there any other time that you utilized -- tried to
14     utilize the open door policy?  I'll withdraw that
15     question.
16         After you left employment was there any time
17     that you attempted to utilize the open door policy
18     with respect to your departure from Hannaford?
19 A.  Not that I recall.
20         (Exhibit 2, Handwritten Notes, marked for
21     identification.)
22 BY MR. O'BRIEN:
23 Q.  Okay.  Next I'm going to show you what's been marked
24     as your Deposition Exhibit Number 2, which is a
25     page -- one page of what appears to be some

Page 23

1      handwritten notes.  I'd ask you to just take a look
2      at it and then I have a couple questions on it.
3          Okay.  Having looked at it, my first question
4      is -- revolves around the first note on this page,
5      and it appears to say Golden Harvest, talk in
6      parking lot.  Did I read that correctly?
7  A.  Yes.
8  Q.  Okay.  And I assume that that meant that you -- did
9      you speak to someone at Golden Harvest in a parking
10     lot?
11 A.  That's correct.
12 Q.  Do you remember who you spoke to?
13 A.  The owner.
14 Q.  And do you remember his name or her name?
15 A.  Jim.
16 Q.  Okay.  We'll review the next note and then I'll
17     circle back with some follow-up questions.  The next
18     note says, Golden Harvest, six, comma, seven, comma,
19     eight, comma, and then underneath it has the -- what
20     appears to be a date, a 7/6/17, dash, took a job.
21     Did I read that correctly?
22 A.  Yes.
23 Q.  Okay.  Is it fair that we should read those two
24     notes together to indicate that you talked to Golden
25     Harvest on July 16 of 2017?

Page 24

1          MR. FISCHER:  Objection to the form, but you
2      can answer.
3  A.  The seven should be a nine.
4  BY MR. O'BRIEN:
5  Q.  Okay.  And so it should read September 6 of 2017, as
6      opposed to July 6 of 2017?
7  A.  Correct.
8  Q.  Okay.  All right.  With respect to the first note,
9      talked in the parking lot, do you remember when you
10     had the discussion with Jim in the parking lot and
11     which parking lot it was?
12 A.  I do not remember.  It -- could you rephrase that?
13 Q.  Sure.  You indicated that you spoke with the owner
14     of Golden Harvest, Jim, in a parking lot, and so my
15     question is, first question is, what parking lot did
16     you have the discussion with him in?
17 A.  In the Golden Harvest parking lot.
18 Q.  Okay.  And do you remember when you had that
19     discussion with him?
20 A.  No.
21 Q.  Okay.  And do you remember what the subject matter
22     of the discussion was?
23 A.  Yes.
24 Q.  What was it?
25 A.  An interview.

Page 25

1  Q.  You were interviewing for a position with Jim at
2      Golden Harvest?
3  A.  Correct.
4  Q.  All right.  And as a result of that interview were
5      you immediately offered a job or how did that work
6      out?
7  A.  Correct.
8  Q.  So you were immediately offered a job?
9  A.  Correct.
10 Q.  Okay.  All right.  The next note is McKinnon's
11     meeting, 7/25/17, Jared and Patrick.  Did I read
12     that correctly?
13 A.  Yes.
14 Q.  All right.  And is it fair to say this note pertains
15     to you seeking employment at McKinnon's Supermarket?
16 A.  Correct.
17 Q.  All right.  And the names Jared and Patrick, who do
18     they refer to?
19 A.  Jared is a meat manager, Patrick is the store
20     manager.
21 Q.  Okay.  And so was this meeting an interview or were
22     you just seeking employment or other opportunities?
23     What was the nature of the meeting?
24 A.  Seeking job interviews.
25 Q.  Okay.  And then the final note on it is September

Page 26

1   29, 2017, first day at McKinnon's.  And so I
2   assume -- did I read that correctly?
3   A.   You did.
4   Q.   Okay.  And I assume that pertains to when you
5        actually commenced employment at McKinnon's
6        Supermarket?
7   A.   Correct.
8            (Exhibit 3, Golden Harvest Employee Policy,
9        marked for identification.)
10  BY MR. O'BRIEN:
11  Q.   Okay.  Next I'm going to show you what's been marked
12       as Exhibit Number 3, which is entitled Golden
13       Harvest Employee Policy, and my question is, is that
14       your signature at the bottom of the page with the
15       date of September 6, 2017?
16  A.   Yes.
17  Q.   And based upon your prior testimony I understand
18       that's the date you actually began employment at
19       Golden Harvest?
20  A.   Yes.
21  Q.   Okay.  All right.  And then the next two pages
22       within this exhibit are notes from your personnel
23       file from Golden Harvest, indicating some concerns
24       they had with you and your performance at Golden
25       Harvest; is that fair to say?

Page 27

1   A.   Could you restate the question?
2   Q.   The second two documents in exhibit -- the last two
3        documents in Exhibit 3 are handwritten notes dated
4        September 13th and September 15th, 2017, purportedly
5        from a manager at Golden Harvest, both of which
6        indicate some issues that they had with the manner
7        in which you were performing your duties at Golden
8        Harvest; is that fair to say?
9   A.   Coaching memos.
10  Q.   So these are both you'd characterize as coaching
11       memos on your performance at Golden Harvest --
12  A.   Yes.
13  Q.   -- is that fair to say?
14  A.   Yes.
15  Q.   And, ultimately, you left employment at Golden
16       Harvest?
17  A.   Yes.
18  Q.   All right.  And what led to your departure from
19       Golden Harvest?  What caused you to leave Golden
20       Harvest?
21  A.   A discussion with Steve.
22  Q.   Okay.  Could you describe when that discussion
23       occurred, and the follow-up is going to be what was
24       the substance of the discussion?
25  A.   Could you state the first part again, please?

Page 28

1   Q.   Sure.  Do you recall when you had that discussion
2        with Steve?
3   A.   Yes.  It was --
4   Q.   The second coaching memo was September 15th, if
5        that --
6   A.   -- it was September 16.
7   Q.   Okay.
8   A.   If I -- if I recall correctly.
9   Q.   Okay.  And what was the substance of that
10       discussion?
11  A.   We discussed that the job was not -- it wasn't a
12       good job fit.
13  Q.   Okay.  And as a result of the discussion that it was
14       not a good company fit, what, if anything, did you do or
15       did the company do?
16  A.   We parted ways.
17  Q.   All right.  Is it fair to say that you voluntarily
18       left employment at that point in time?
19  A.   It was agreed.
20  Q.   There was a mutual agreement that you would leave?
21  A.   That's correct.
22            (Exhibit 4, McKinnon's Markets Documents,
23       marked for identification.)
24  BY MR. O'BRIEN:
25  Q.   All right.  Next I'm going to show you a document

Page 29

1   marked Deposition Exhibit Number 4, which is -- the
2   first page of which appears to have your signature
3   again at the bottom of it and a date of September 29
4   of 2017; is that correct?
5   A.   Yes.
6   Q.   Okay.  And if I understand correctly, you commenced
7        employment with McKinnon's Market on September 29th
8        of 2017?
9   A.   Yes.
10  Q.   All right.  And if we could turn to the second page
11       in this document, it has a new hire rate of pay, and
12       it indicates, under the date of September 29, 2017,
13       a rate of pay of $16 per hour; is that correct?
14  A.   Yes.
15  Q.   All right.  And how many hours a week were you
16       working at McKinnon's when you were being paid at
17       the rate of $16 per hour?
18  A.   Forty.
19  Q.   Okay.  And were there any weeks in which you were
20       able to work more than 40 hours a week?
21  A.   Not that I recall.
22  Q.   Okay.  If you can turn to the final page of this
23       deposition exhibit.  It's entitled Raise History,
24       and it indicates that on March 18 of 2018 you moved
25       from a rate of $16 per hour to an hourly rate of

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
30..33

Page 30

1     $18.50 per hour, and you were promoted to full-time
2     assistant manager; is that accurate?
3  A. Assistant store manager.
4  Q. Okay.  But is the rate of pay accurate?
5  A. Yes, it is.
6  Q. And is the date that you received the increase
7     accurate?
8  A. Yes.
9  Q. And is that the rate of pay that you continue to
10    receive as of today, or have you received any
11    additional increases?
12 A. It is the same rate.
13 Q. All right.  And you continue to be compensated on an
14    hourly basis as of today?
15 A. Yes.
16 Q. All right.  And while employed at -- I'll withdraw
17    that question.
18        Could you describe for me what benefits are
19    made available to you as an employee at McKinnon's
20    Supermarket?
21 A. Benefits?  I get one vacation a year.
22 Q. And how long is that vacation?
23 A. Five days.
24 Q. And what, if any, additional benefits do you
25    receive?

Page 31

1  A. None.
2  Q. Do they offer health insurance?
3  A. They do.
4  Q. They do?
5  A. Yes.
6  Q. Okay.  And do you not elect to take their health
7     insurance?  Or do you take their health insurance?
8  A. I pay for it.
9  Q. Okay.  All right, so you're under their health
10    insurance plan?
11 A. Yes.
12 Q. All right.  And how much do you pay for that health
13    insurance?
14 A. I can't recall at this time.
15 Q. Okay.  And do you know what the deductible is that
16    you have on a yearly basis for your health
17    insurance?
18 A. I can't recall that.
19 Q. Okay.  Okay.  We'll probably make some follow-up
20    requests to your attorney, you know, which can
21    easily be supplied along those lines, so we won't
22    belabor that issue now.
23        Are there any other benefits that you receive?
24    Do you get holidays off?
25 A. I believe Christmas and Thanksgiving.

Page 32

1  Q. And when you work on holidays do you receive an
2     enhanced rate of pay?
3  A. No.
4  Q. Okay.  And how many days per week do you work?
5  A. Five.
6  Q. Five.  And I think you answered this question
7     before, but just in case it was asked to the other
8     store, Golden Harvest, how many hours a week do you
9     ordinarily work at McKinnon's?
10 A. I work about 43 hours.
11 Q. Forty-three hours, okay.
12        And if I understand correctly -- I'll withdraw
13    that question.
14        Okay.  We're going to move from Golden Harvest
15    and McKinnon's back to Hannaford, and this next set
16    of documents, which is marked Deposition Exhibit
17    Number 5 goes back a few years prior to your
18    departure, and I'm just going to ask that you and I
19    walk through them together.
20        So, the first document is from July 28 of 2011,
21    and it's a Record of Conversation that you had with
22    Ashley Shaw.  I'd ask you to just take a look at it.
23        (Exhibit 5, Record of Conversation and Coaching
24    Memo Documentation, marked for identification.)
25 BY MR. O'BRIEN:

Page 33

1  Q. Is it fair to say that that represents a type of
2     coaching memo from her to you on a performance
3     issue?
4  A. It is a coaching memo.
5  Q. And do you recall it?
6  A. Yes.
7  Q. All right.  And Ashley Shaw, is that her maiden name
8     and then it become Ashley Campo?
9  A. Correct.
10 Q. Okay.  So you've known Ashley Campo since at least
11    2011, it appears?
12 A. Yes.
13 Q. And did you know her when you first started
14    employment at the Hampton store, which would have
15    been 2007?
16 A. I had not met her yet.
17 Q. Okay.  When do you recall first meeting her?
18 A. When I was promoted and went to the Portsmouth
19    store.
20 Q. Okay.  Okay.  All right.  If we can turn to the next
21    page in this exhibit, which is another Record of
22    Conversation, this one signed by Ashley as Ashley
23    Campo, and it references a conversation on
24    November 21st, 2011, with respect to her
25    expectations of you as an evening operations

**BOYCE & LEIGHTON, LLC**
**207-883-0378**

Page 34

1    manager.  Is it fair to say this is another
2    coaching-type memo that she had with you?
3 A.  Yes.
4 Q.  Okay.  And do you recall this issue from November of
5    2011?
6 A.  Yes.
7 Q.  Okay.  All right.  The next document is a record of
8    conversation with you, again from Ashley Compo,
9    purporting to be from November 23rd of 2011, and
10   again dealing with your performance as an evening
11   operations manager.  Is it fair to characterize this
12   as another coaching memo?
13 A.  Yes.
14 Q.  All right.  And do you recall the subject of the
15   discussion that's memorialized in this memo?
16 A.  I do not recall this incident.
17 Q.  Okay.  It's fair to say that you can recall coaching
18   discussions with Ashley Campo during the course of
19   your employment?
20 A.  Yes.
21 Q.  Okay.  All right.  The next document in this
22   packet -- if you could just turn one more page.  We
23   just -- we have page separators between each
24   document, so there are blank page separators, but
25   the next substantive document is entitled Coaching

Page 35

1    Memo, and it's dated January 15 of 2015.  Do you see
2    that in the upper --
3 A.  Yes.
4 Q.  -- right-hand corner?  And it's entitled Respect in
5    the Workplace, comma, physical contact.  Did I read
6    that correctly?
7 A.  Yes.
8 Q.  All right.  In the message it reads, in typewritten
9    form, on 1/13/15 Tim engaged in a conversation with
10   the other AMOCS, which is in caps -- which assume to
11   be assistant manager of customer service --
12 A.  Yes.
13 Q.  -- okay, in the till room that became escalated.
14   Did I read that correctly?
15 A.  Yes.
16 Q.  Okay.  The next sentence reads:  At some point
17   during this encounter, Tim placed his hand on the
18   AMOCS's chest.  Did I read that correctly?
19 A.  Yes.
20 Q.  The next sentence reads:  Tim needs to understand
21   that at no point is it appropriate for the workplace
22   to place your hands on another associate regardless
23   of the manner.  Did I read that correctly?
24 A.  Yes.
25 Q.  The next sentence reads:  Tim is being given the

Page 36

1    Respect in the Workplace policy to review.  Did I
2    read that correctly?
3 A.  Yes.
4 Q.  All right.  And can you recall in connection with
5    this incident you receiving the Respect in the
6    Workplace policy?
7 A.  No.
8 Q.  Okay.  And do you recall the incident that resulted
9    in this coaching memo?
10 A.  Yes.
11 Q.  And do you recall receiving the coaching memo?
12 A.  Yes.
13 Q.  Okay.  And if we turn to the next page, which has a
14   signature at the top of the page, is that your
15   signature with the name Tim Record --
16 A.  Yes.
17 Q.  -- at the top of the page?
18       And do you recall who provided you the coaching
19   memo?
20 A.  Hilary.  Hilary Hamilton.
21 Q.  Okay.  All right.  If we can turn to the next
22   substantive document in this deposition exhibit.
23   It's again entitled the Coaching Memo.  This one is
24   dated January 25th of 2015, and the subject is
25   Performance in Assistant Manager Role.  Did I read

Page 37

1    that correctly?
2 A.  Correct.
3 Q.  All right.  And the first sentence says:  Tim is not
4    meeting all of the expectations of leading the front
5    end and taking opportunities to coach associates and
6    build relationships.  This is causing frustration
7    and confusion among front end associates.  Did I
8    read that correctly?
9 A.  Yes.
10 Q.  And then it -- the next paragraph begins:  Tim needs
11   to foster a positive and inclusive environment to
12   all front end associates.  Did I read that
13   correctly?
14 A.  Yes.
15 Q.  All right.  And if you can turn to the next page of
16   this document.  Once again, there is a place for a
17   signature.  Is that your signature, Tim Record, on
18   that page?
19 A.  Yes.
20 Q.  All right.  And so it's fair to say that you
21   received a copy of this coaching memo?
22 A.  Yes.
23 Q.  And do you recall the discussion with respect to
24   when this coaching memo was provided to you?
25 A.  Yes.

Page 38

1  Q.  Okay.  And it appears as if Lindsey Boston may have
2      been the individual who delivered the coaching memo
3      to you?
4  A.  Yes.
5  Q.  All right.  All right.  If we can turn to the next
6      substantive document in this deposition exhibit.
7      It's another coaching memo, this one is dated
8      February 25th of 2015, and it's entitled Not Meeting
9      Expectations.  Did I read that correctly?
10 A.  Yes.
11 Q.  All right.  And if we can turn to the third page of
12     this document, is that your signature on that third
13     page?
14 A.  Yes.
15 Q.  Okay.  So it's fair to say that you received a copy
16     of this coaching memo in February of 2015?
17 A.  Yes.
18 Q.  All right.  And do you remember -- again, this deals
19     with performance, and do you remember the subject
20     matter of this and this coaching discussion?
21 A.  Yes.
22 Q.  Okay.  All right.  Next, I'm going to turn your
23     attention to the next substantive document in this
24     packet, which is a performance -- annual performance
25     evaluation for you, and --

Page 39

1      MR. FISCHER:  I don't think that's in here.
2      MS. CUNNINGHAM:  It's not attached.
3      MR. O'BRIEN:  It's not attached, okay.
4      Sorry.  It's the next exhibit.  I apologize.
5      (Exhibit 6, Hannaford Retail Performance
6      Appraisal, Timothy Record, 4/2/15, marked for
7      identification.)
8      BY MR. O'BRIEN:
9  Q.  I'm going to show you what's been marked as your
10     Deposition Exhibit Number 6, which is an annual
11     performance evaluation.  And on the front page, the
12     third line down, it says associate's signature.  Is
13     that your signature, Timothy Record, as the
14     associate's signature?
15 A.  Yeah.
16 Q.  And it appears as if you dated it April 2nd of 2015?
17 A.  Yes.
18 Q.  Okay.  And do you recall receiving this performance
19     evaluation at that point in time?
20 A.  Yes.
21 Q.  Okay.  If you can turn to the second page of this
22     document.  There are different categories in which
23     you received ratings.  Is it fair to say that you
24     received a partially meets rating in the first,
25     third, fourth, fifth and eighth categories?

Page 40

1  A.  Yes.
2  Q.  Okay.  And if you could turn to the next page.  This
3      is a typewritten page?
4  A.  Yes.
5  Q.  And if you could turn to the second paragraph, and,
6      in particular, the second sentence in the second
7      paragraph.  It states:  However, Tim needs to
8      remember to keep all the relationships he has formed
9      here professional.  The perception of his favoritism
10     has caused unnecessary drama in the department.  Tim
11     needs to form relationships with all associates and
12     treat everyone fairly and consistently.  Did I read
13     that correctly?
14 A.  You did.
15 Q.  And is it fair to say you recall receiving this
16     performance evaluation in 2015?
17 A.  Yes.
18     (Exhibit 7, Delhaize America Performance
19     Counseling Form, Tim Record, 4/16/15, marked for
20     identification.)
21     BY MR. O'BRIEN:
22 Q.  Okay.  I'm showing you next what's been marked as
23     Deposition Exhibit Number 7.  And this is a
24     Performance Counseling Form, and it appears to be
25     dated April 16, 2015 in the upper right-hand corner.

Page 41

1      And the reason for counseling is personal behavior,
2      as indicated in the middle of the page, towards the
3      top.  If you go down a little bit further it says,
4      type of counseling, and it says, step one, verbal
5      counseling, that box is checked; do you see that?
6  A.  Yes.
7  Q.  Is it fair to say that you remember receiving this
8      step one counseling --
9  A.  Yes.
10 Q.  -- around April of 2015?
11 A.  Yes.
12 Q.  Yes?
13 A.  Yes.
14 Q.  All right.  It has a description of an incident and
15     the date of the incident as being on April 13 of
16     2015.  And the description of the incident is as
17     follows:  On April 13, it was brought to Tanya and
18     my attention that there are few -- that there are a
19     few associates on the front end that feel
20     uncomfortable working with AMCS Tim Record.  Did I
21     read that correctly?
22 A.  Yes.
23 Q.  Okay.  We were informed that these associates feel
24     as though Tim has made comments and remarks that
25     they feel to be unprofessional and have made them

Page 42

```
 1      feel uncomfortable working with Tim.  Did I read
 2      that correctly?
 3  A.  Yes.
 4  Q.  Okay.  These associates have also stated that they
 5      feel that Tim invades their personal space by
 6      standing very close to them, which sometimes results
 7      in Tim brushing up against these associates.  Did I
 8      read that correctly?
 9  A.  Yes.
10  Q.  All right.  Tim needs to understand that these
11      behaviors are unprofessional and he needs to ensure
12      he is conducting himself as a supervisor at all
13      times.  Did I read that correctly?
14  A.  Yes.
15  Q.  And do you recall receiving this performance
16      counseling step in April of 2015?
17  A.  Yes.
18  Q.  All right.  And do you remember having a discussion
19      with your supervisor about the subject matter of
20      this counseling memo?
21  A.  Yes.
22  Q.  All right.  And in conjunction with the counseling
23      memo, if I understand correctly, you're also
24      provided a copy of the company's personal behavior
25      policy?
```

Page 43

```
 1  A.  Yes.
 2  Q.  And those are your initials in the bottom right-hand
 3      corner of the Personal Behavior policy, which is the
 4      third page of this exhibit?
 5  A.  Correct.
 6          MR. O'BRIEN:  Okay.  Good.  Okay.  It's
 7      11:22.  We could take a very short break here, or
 8      we can just push through to lunch.  I just want to
 9      provide the option at this point in time.
10          MR. FISCHER:  Appreciate that.  If you want
11      to take a break --
12          THE DEPONENT:  I'm all set.  All set.
13          MR. FISCHER:  Okay, then let's just push
14      through.
15          MR. O'BRIEN:  Okay.
16          (Exhibit 8, Equal Employment Opportunity
17      Commission Charge of Discrimination, marked for
18      identification.)
19  BY MR. O'BRIEN:
20  Q.  Mr. Record, I'm showing you what's been marked as
21      your Deposition Exhibit Number 8, which is the
22      Charge of Discrimination that you filed with the
23      Equal Employment Opportunity Commission.  It
24      consists of two pages.  Do you recognize this
25      document?
```

Page 44

```
 1  A.  Yes.
 2  Q.  Okay.  I want to turn your attention to the second
 3      page, in the left-hand corner, it appears to be
 4      dated November 29th of 2017, and has your signature
 5      in the lower left-hand corner; is that right?  Is
 6      that your signature?
 7  A.  Yes.
 8  Q.  Okay.  And immediately above your signature is the
 9      statement:  I declare under penalty of perjury that
10      the above is true and correct; is that right?
11  A.  Yes.
12  Q.  All right.  And so it's fair to say that you read
13      this charge carefully before signing it to make sure
14      it was fully accurate; is that --
15  A.  Yes.
16  Q.  Okay.  All right.  I want to turn your attention
17      then back to the first page.  And in particular, I
18      want to turn your attention to the particulars in
19      the box in the lower half of the page.  It indicates
20      that as of 2017 you had been at Hannaford for
21      approximately 10 years, in the first -- number one.
22      I'm sorry.
23  A.  Yes.
24  Q.  Okay.  And number two says that -- indicates that
25      you're gay and that your co-workers were aware of
```

Page 45

```
 1      your sexual orientation; is that correct?
 2  A.  Correct.
 3  Q.  All right.  And can you -- which co-workers were
 4      aware of your sexual orientation?
 5  A.  I don't think I can recall all of them.
 6  Q.  Well, if you don't mind just telling me which of the
 7      co-workers that you recall being aware of your
 8      sexual orientation?
 9  A.  Pam Proctor, Dan Acuna.
10  Q.  Dan Acuna?
11  A.  Acuna.
12  Q.  A-C-U-N-A?
13  A.  Correct.
14  Q.  Okay.  Pam --
15  A.  Yeah, Joe Dodge.
16  Q.  Anyone else?
17  A.  I think there are too many to actually name.  There
18      were actually a lot of people who were aware.
19  Q.  Whoever you -- right now I'm just asking you who do
20      you recall being aware of your sexual orientation,
21      and my following question is how were they aware of
22      it?
23          MR. FISCHER:  Which question is on the table
24      right now?
25          MR. O'BRIEN:  Yeah, thank you for that
```

Page 46

1    clarification.  It will help here.
2    BY MR. O'BRIEN:
3  Q.  Right now we'll just simply focus on which of your
4    co-workers were aware of your sexual orientation?
5    Thank you.
6       MR. FISCHER:  Yes.
7  A.  I think almost everyone was.
8  Q.  And who -- when you say almost everyone, other than
9    Pam Proctor and Dan Acuna and Joe Dodge, who are the
10   others that you're referring to?
11 A.  Like Ashley Campo, Steve Gary, Terri Dube, Jen
12   McPherson, Ray McCubrey, David Archibald.  I can't
13   remember Linda's last name, Linda.  Steve Gary.  I
14   can't remember people's last names.
15 Q.  Okay.  As far as --
16      MR. FISCHER:  I don't know, are you -- he
17   hasn't -- have you finished answering that
18   question?  I apologize, I don't mean to interrupt,
19   but --
20      MR. O'BRIEN:  Yeah, you are though.
21      MR. FISCHER:  I understand that, but it was a
22   very open-ended question where his response was
23   nearly everyone, and --
24      MR. O'BRIEN:  I appreciate that.
25 BY MR. O'BRIEN:

Page 47

1  Q.  Other than the individuals you've identified, is
2    there anyone else who was aware of your sexual
3    orientation?
4  A.  Not that I know of.
5  Q.  Okay.  Is it fair to say that for at least some of
6    these individuals you openly disclosed your sexual
7    orientation to them?
8  A.  Not unless they asked.
9  Q.  But there -- it's fair to say that there were some
10   co-workers that you were very friendly with and
11   trusted?
12 A.  That I trusted.
13 Q.  Yes.
14 A.  Yes.
15 Q.  Okay.  Tell me who they were that you were friendly
16   with and trusted.
17 A.  They -- that I trusted.
18      MR. FISCHER:  Before you answer, I'm going to
19   object to the form of that question, but you can
20   answer it.
21 BY MR. O'BRIEN:
22 Q.  So, just so that -- so my question is:  Which of the
23   employees you identified before who knew of your
24   sexual orientation were you friendly with and
25   trusted?

Page 48

1  A.  Dan Acuna, Joe Dodge, Stephen Gray, Pam Proctor,
2    David Archibald, Ray McCubrey, and a woman named
3    Renee, I can't remember her last name.  Those are
4    the people who I at the core trust.
5  Q.  Okay.  And it's fair to say you shared information
6    about your sexual orientation and about being gay
7    with them?
8  A.  That's not fair to say.
9  Q.  It's not fair to say?  Well, somehow information --
10   somehow they became aware of your sexual
11   orientation; is that fair to say?
12 A.  Through friendships.
13 Q.  Through friendships?
14 A.  Yes.
15 Q.  And the friendships you're talking about is your
16   friendship with each one of them?
17 A.  That's correct.
18 Q.  Okay.  And as with any friendships, you share
19   information, and among the information you shared
20   within the context of your friendship with those
21   individuals was your sexual orientation?
22 A.  Correct.
23 Q.  And it's fair to say you were very comfortable with
24   them?
25 A.  With people I trust.

Page 49

1  Q.  Right.  And with those individuals you identified as
2    trusting at Hannaford, you were open and candid with
3    them?
4  A.  Yes.
5  Q.  Okay.  And it's fair to say that sometimes you refer
6    to yourself as being gay to them in discussions with
7    them?
8       MR. FISCHER:  Objection to the form of the
9    question.
10 BY MR. O'BRIEN:
11 Q.  Is it fair to say that in some of your discussions
12   with them you referred to yourself as being gay?
13 A.  Yes.
14 Q.  Okay.  And in some of those discussions you used
15   other terms to describe yourself as being gay?
16      MR. FISCHER:  Objection to form.  You can
17   answer the question.
18 A.  Yes.
19 BY MR. O'BRIEN:
20 Q.  Okay.  Sometimes you would refer to yourself as
21   being queer?
22 A.  Yes.
23 Q.  Sometimes you referred to yourself as a faggot?
24 A.  Yes.
25 Q.  All right.  What other terms have you used to

Timothy Record                                          TIMOTHY RECORD vs HANNAFORD BROS.
October 03, 2019                                                                    50..53

Page 50

1    describe yourself in those discussions with your
2    co-workers?
3    A.   Those are the only ones I can recall.
4    Q.   All right.  Is it fair to say that sometimes you
5         joked with them about issues involving sexual
6         orientation?
7    A.   Could you rephrase?
8    Q.   All right.  Is it fair to say that sometimes in your
9         private discussions with them you would joke about
10        topics involving sexual orientation?
11   A.   In private discussions.
12   Q.   Yes, in private discussions?
13   A.   Yes.
14   Q.   Okay.  And those private discussions would occur at
15        the Hannaford store, but between you and one or two
16        of your trusted friends?
17   A.   Correct.
18   Q.   Okay.  Do you recall any of the types of jokes that
19        you made in those private discussions with them?
20   A.   I do not.
21   Q.   But it's fair to say that you were comfortable
22        enough with them and trusting enough with them that
23        throughout your employment when you worked with them
24        you felt free to share, you know, jokes along that
25        basis?

Page 51

1    A.   Yes.
2    Q.   Okay.  And are you aware if anyone ever overheard
3         the subject matter of the jokes?
4             MR. FISCHER:  Objection to form.
5    A.   I'm not aware.
6        BY MR. O'BRIEN:
7    Q.   Okay.  Now, did any of those trusted co-workers
8         share with you personal information?
9    A.   Could you rephrase that?
10   Q.   Yes.  Did any of those -- thank you for that.  Did
11        any of your co-workers share with you personal
12        information regarding their sexual orientation?
13   A.   Yes.
14   Q.   Okay.  And who was that?
15   A.   Dan Acuna, Joe Dodge, Stephen Gray.  I think those
16        were pretty it -- pretty much it for people.
17   Q.   Okay.  And did any of them indicate that they were
18        gay?
19   A.   No.
20   Q.   No, okay.  But they trusted you enough to be able to
21        share personal subject matter with you?
22             MR. FISCHER:  Objection to form.
23   A.   Could you rephrase that, because --
24   Q.   Sure.  But they -- they -- I'll withdraw the
25        question.

Page 52

1    It's fair to say that they shared information
2    that was personal to them with you?
3    A.   Correct.
4    Q.   Okay.  All right.  If we can turn back to this
5         document, number three says:  I was working as the
6         assistant seafood department manager in the Hampton,
7         New Hampshire Hannaford store when, in or around
8         February 2017, Hannaford hired Bruce Grover as the
9         meat department manager.  And that's -- that's
10        accurate; is that correct?
11   A.   Correct.
12   Q.   All right.  And the next paragraph, number four
13        indicates:  As the meat department manager,
14        Mr. Grover was my direct supervisor?
15   A.   That's correct.
16   Q.   Okay.  And then paragraph number five states:
17        Almost immediately after Mr. Grover was hired, and
18        through the date I resigned, Mr. Grover subjected me
19        to an offensive, discriminatory and hostile
20        environment -- hostile and abusive work environment,
21        and Mr. Grover's intentional and overt harassment
22        made me apprehensive about working at Hannaford in
23        Hampton, New Hampshire.  Did I read that correctly?
24   A.   Yes.
25   Q.   Okay.  And then the next paragraph, you actually

Page 53

1    describe the harassment and abusive treatment that
2    he subjected you to, is that correct, in paragraph
3    number six?
4    A.   Yes.
5    Q.   Okay.  So, first, he -- he remarked, under paragraph
6         A, it says:  Remarking to another Hannaford employee
7         while I was present that I am three feet shorter
8         with my head in the pillow.  Is that accurate?
9    A.   Yes.
10   Q.   Okay.  Which employee did Mr. Grover allegedly make
11        that remark to?
12   A.   David Archibald.
13   Q.   Okay.  And when -- and that was in February or March
14        of 2017, if I understand correctly?
15             MR. FISCHER:  Objection to form.
16   A.   In and around the first week he was here.
17        BY MR. O'BRIEN:
18   Q.   Okay.  All right.  And the second, B, paragraph B it
19        says:  While Mr. Grover and I were on the floor
20        during store hours, Mr. Grover tapped me in the
21        genitals twice and said baseball, baseball.  Is that
22        accurate?
23   A.   That is.
24   Q.   And if I understand correctly, he tapped you in the
25        genitals with a baguette loaf of bread?

Page 54

1   A.   Correct.
2   Q.   Okay.  And was he in front of you or behind you when
3        this occurred?
4   A.   I think he was standing to my side, my right side.
5   Q.   And so if he was standing to your side, he used --
6        he swung his right hand around to you, towards you,
7        with the baguette and tapped you in the front?
8   A.   Yes.
9   Q.   Okay.  And where was this?
10  A.   In front of the seafood department.
11  Q.   And, again, was this within a week or two of
12       Mr. Grover starting work?
13  A.   In and around the second week.
14  Q.   Okay.  And then paragraph C states:  When I declined
15       to try some of the meats from a vendor offering
16       samples in the store, Mr. Grover said, with an
17       obvious tone of inflection, that everyone knows I
18       eat the meat.  Is that accurate?
19  A.   Yes.
20  Q.   Okay.  And is it fair to say that occurred within
21       the first, second or third week of Mr. Grover's
22       employment?
23            MR. FISCHER:  Objection to form.
24  A.   Correct.
25            BY MR. O'BRIEN:

Page 55

1   Q.   Okay.  And where did that occur?
2   A.   In front of the meat department.
3   Q.   And was anyone else present?
4   A.   I do not recall.
5   Q.   Going back to B, was anyone else present for the use
6        of the baguette and tapping of you?
7   A.   No.
8   Q.   Okay.  All right.  We can move on to -- I'll
9        withdraw that question.
10            With respect to C, did you have any discussion
11       with Mr. Grover at that point in time about the
12       comment that he made?
13  A.   No.
14  Q.   Okay.  When he tapped you with the baguette did you
15       have any discussion with Mr. Grover?
16  A.   I walked away.
17  Q.   Okay.  All right.  Paragraph D, Mr. Grover would
18       openly refer to me by derogatory, demeaning and
19       effeminate names, calling me, for example, a bitch,
20       with obvious inflection -- I'm sorry, with obvious
21       inflection to signify his intent in using that
22       particular name.  All right.  Is that accurate?
23  A.   Yes.
24  Q.   All right.  Other than -- when did he call you a
25       bitch?  Was that again in the first week -- week

Page 56

1        one, week two, or week three of his employment?
2            MR. FISCHER:  Objection to form.
3   A.   That was later on.
4            BY MR. O'BRIEN:
5   Q.   So the reference to the bitch comment was in --
6   A.   Several months.
7   Q.   Several months later in August?
8   A.   That is correct.
9   Q.   Okay.  Okay.  Were there any other -- so, if I
10       understand correctly, referring to you as a bitch
11       was the derogatory, demeaning or effeminate name
12       that he referred to you as, but that didn't take
13       place until August?
14  A.   In and around.
15  Q.   In and around August?
16  A.   Correct.
17  Q.   Okay.  Other than that reference to you and the use
18       of that name in August or -- I'll withdraw that.
19            So this paragraph refers to what took place in
20       August solely?
21            MR. FISCHER:  Which paragraph are you
22       referring to, just for the record?
23            MR. O'BRIEN:  Paragraph D.
24            BY MR. O'BRIEN:
25  Q.   If I understand correctly, paragraph D refers solely

Page 57

1        to the comment to you in August about you being a
2        bitch?
3   A.   In and around the second week of August.
4   Q.   Okay.  And that's all that that paragraph refers to?
5            MR. FISCHER:  Objection to the form.
6   A.   I believe he said that more than once.
7            BY MR. O'BRIEN:
8   Q.   Tell me any other time he used the term bitch or any
9        other derogatory, demeaning or effeminate name?
10  A.   Other than in August?
11  Q.   Other than August?
12  A.   It was in August?
13  Q.   It was in August?
14  A.   Yes.  Yes.
15  Q.   So the only time he used that terminology was in --
16       and referred to you by a derogatory, demeaning or
17       effeminate name was when he used the term bitch --
18  A.   Yes.
19  Q.   -- in August of '17?
20  A.   Yes.  I'm sorry to interrupt.
21  Q.   Okay.  The next paragraph is paragraph E, and it
22       states:  When I was bending to place down a mat
23       beneath a scale in the meat department and
24       Mr. Grover was nearby, Mr. Grover made gestures to
25       another employee to suggest that I was attempting to

Page 58

1    perform a sexual act on him.  Is that accurate?
2    A.  Yes.
3    Q.  Okay.  And, again, did this occur, this incident
4        occur within the first few weeks of Mr. Grover's
5        employment?
6    A.  It was the third -- it was around August, the third
7        week, August 19th or 20th.
8    Q.  Oh, so the -- okay.  So this occurred in August,
9        okay.  And who was present for that, if anyone?
10   A.  Kyle Lasher.
11   Q.  And if I understand correctly, Mr. Grover had a
12       clipboard in his hands and he placed it over his
13       groin area when you were around at that point in
14       time?
15           MR. FISCHER:  Objection to form.
16   Q.  Is that right?
17   A.  I do not believe there was a clipboard.
18   Q.  Okay.  What do you recall about that?  Did he place
19       his two hands --
20   A.  That's correct.
21   Q.  I see.  Okay.  So he placed his two hands over his
22       groin area at that point in time?
23   A.  That is correct.
24   Q.  Okay.  All right.  And then -- so that describes --
25       you've described to us the harassing and abusive

Page 59

1        treatment by Mr. Grover prior to your report to
2        Ashley Campo; is that correct?
3            MR. FISCHER:  Objection to the form of the
4        question.
5    A.  Could you rephrase that?
6    BY MR. O'BRIEN:
7    Q.  Sure.  Mr. Grover started employment in the
8        department in February of 2017?
9    A.  Correct.
10   Q.  All right.  And I just want to make sure that I
11       understand all the harassing and discriminating
12       behavior exhibited by Mr. Grover between the time he
13       started and the time you made the report to Jeff
14       Howard, and then subsequently -- initially to Ashley
15       Campo in April of 2017.  So I just wanted to make
16       sure that we've covered each one of those incidents
17       that you believe were harassing and discriminatory.
18   A.  Mm-hmm.  Yes.
19   Q.  Okay.  So, have you told us everything that he did
20       that was harassing and discriminatory between
21       February of 2017 and your report to Jeff Howard and
22       Ashley Campo in April of 2017?
23           MR. FISCHER:  Objection to the form of the
24       question, but you can answer.
25   A.  If you look under paragraph six --

Page 60

1    Q.  Yes.
2    A.  -- A, B and C --
3    Q.  Yes.
4    A.  -- were within the first three weeks of his hire.
5    Q.  Yeah.
6    A.  If you go to D and E, those occurred in August.
7    Q.  Okay.  So looking at the time period between
8        April -- first of all, thank you for that breakdown.
9        So if you look at the time period between his -- the
10       commencement of his employment in February -- when I
11       say him -- Mr. Grover's employment in February of
12       2017, and your report to Mr. Howard and subsequently
13       to Ms. Campo in April of 2017, you've now described
14       for us all of the issues that you had that you
15       believed constituted harassing or discriminatory
16       behavior by Mr. Glover in that initial time period?
17   A.  In that whole timeframe.
18   Q.  Correct.
19   A.  Yes.
20   Q.  Thank you.  Okay.
21           Okay.  So next we're going to move to paragraph
22       seven.  It states that in or around April 2017, I
23       complained to the store manager, Ms. Ashley Campo,
24       about Mr. Grover's conduct and harassment.  And
25       that's correct, you did do that?

Page 61

1    A.  Correct.
2    Q.  All right.  Now, prior to reporting to Mr. -- prior
3        to reporting to Ms. Campo, I understand that you
4        made a report to Jeff Howard, the evening operations
5        manager; is that right?
6    A.  Correct.
7            (Exhibit 9, Note prepared by Jeff Howard,
8        November 6, 2017, marked for identification.)
9    BY MR. O'BRIEN:
10   Q.  Okay.  Mr. Record, I'm showing you what's been
11       marked as your Deposition Exhibit Number 9.  And
12       then we'll go back to Number 8 in a little bit.  But
13       Deposition Exhibit Number 9, which is a note
14       prepared by Jeff Howard, the evening operations
15       manager, and it states:  This past April I was in
16       the seafood department having a conversation with
17       Tim Record.  Did I read that correctly?
18   A.  Yes.
19   Q.  And is that accurate, that he had a conversation
20       with you in the seafood department?
21   A.  Yes.
22   Q.  Okay.  It continues:  Bruce Grover walked by, and
23       Tim stated he did not know if he would be able to
24       continue working with Bruce.  Did I read that
25       correctly?

Page 62

1  A.  Yes.

2  Q.  And is that accurate?

3  A.  Yes.

4  Q.  It continues:  I asked him why, and he said he was

5      tired of his sexual remarks.  Did I read that

6      correctly and is that accurate?

7  A.  Yes.

8  Q.  All right.  It continues:  One of which included a

9      reference of Tim eating meat.  Did I read that

10     correctly and is that accurate?

11 A.  Yes.

12 Q.  All right.  It continues:  I told Tim I would look

13     into it.  Did I read that correctly and is that

14     accurate?

15 A.  Yes.

16 Q.  Okay.  It continues:  I then talked to Bruce, and he

17     said it was said to be funny.  I told Bruce this was

18     unacceptable and that he needed to apologize to Tim,

19     which he did.

20         I know you may not know the context of the

21     conversation between Jeff Howard and with Bruce

22     Grover, but my question to you is, is it accurate to

23     say that Bruce Grover apologized to you as a result

24     of this discussion that you had with Jeff Howard for

25     his conduct?

Page 63

1  A.  Yes.

2  Q.  Okay.  Later on that night, I talked again to Tim

3      and asked him how the talk with Bruce went.  Did I

4      read that correctly and is it accurate?

5  A.  Yes.

6  Q.  Tim said he accepted Bruce's apology with the

7      condition that it never happens again, because if it

8      did he would go to HR.  Did I read that correctly

9      and is it accurate?

10 A.  Correct.

11 Q.  All right.  Is it fair to say that other than this

12     report to Jeff Howard you made no other reports to

13     Jeff Howard about Mr. Grover's alleged sexual

14     harassment or discrimination towards you?

15 A.  I'm sorry, could you rephrase that?

16 Q.  Sorry, yes.  I understand that in April -- thank you

17     very much.  I'll break it up and walk through it.

18     That's exactly the type of point you should make, so

19     thank you.

20         So, if I understand correctly, you made this

21     report to Jeff Howard as the evening operations

22     manager in April of 2017?

23 A.  Correct.

24 Q.  Okay.  Now, after you made this report to Jeff

25     Howard, it appears as if there was a discussion that

Page 64

1      Bruce Grover had with you in which he apologized to

2      you for his conduct?

3  A.  He apologized.

4  Q.  Yes, Bruce Grover apologized to you for his conduct?

5  A.  He apologized, yes.

6  Q.  Yes, okay.  And as a result of that discussion, it

7      sounds as if you were willing to accept an apology,

8      you know, from another individual on that basis; is

9      that fair to say?

10 A.  With conditions, yes.

11 Q.  Yes.  So you were willing to accept the apology with

12     the condition that it not happen again?

13 A.  Correct.

14 Q.  Okay.  And so as of that time things were fine

15     because you accepted it, but you made the condition

16     that it can't happen again?

17 A.  At that time.

18 Q.  Yes.  Is that correct?

19 A.  Correct.

20 Q.  Okay.  All right.  So turning back to Deposition

21     Exhibit Number 8.  We were on paragraph seven, and

22     it refers to a discussion that you had with Ashley

23     Campo in April of 2017.  And if I understand

24     correctly, this discussion with Ashley occurred

25     after your initial report to Jeff Howard?

Page 65

1  A.  Correct.

2  Q.  All right.  And you explained to Ashley what had

3      transpired with Bruce Grover and your report to Jeff

4      Howard?  I'll rephrase that question.

5          When you met with Ashley Campo in April of

6      2017, you effectively told her what you had told

7      Jeff Howard?

8  A.  That is correct.

9  Q.  All right.  And we just reviewed in Exhibit 9 what

10     you told Jeff Howard; is that right?

11 A.  Rephrase that?

12 Q.  Yes.  As far as what you told Ashley Campo, it was

13     the same information you had shared with Jeff

14     Howard?

15 A.  Yes.

16 Q.  All right.  And is it fair to say that Jeff Howard's

17     note about your discussion with him accurately

18     reflects the discussion you had with him and the

19     report that you made to him?

20 A.  I'm sorry, you'll have to rephrase that again.

21 Q.  Sure.  Thank you.  That's exactly what we need.  So,

22     thank you for once again pointing that out.

23         As far as what you reported to Ashley Campo --

24 A.  Yes.

25 Q.  -- it's the same information that you reported to

Page 66

```
1        Jeff Howard --
2   A.   Correct.
3   Q.   -- is that fair to say?
4        Okay.  And we reviewed Jeff's recollection of
5        the conversation from his note, and if I understand
6        correctly that seems to be a fair and accurate
7        representation of your discussion with him and what
8        occurred?
9   A.   Yes.
10  Q.   Okay.  So you essentially then just reported the
11       same thing to Ashley Campo that you reported to Jeff
12       Howard?
13  A.   Yes.
14  Q.   Okay.  And what was Ashley's response to you when
15       you made that report?
16  A.   I made that report at that time Ashley was not aware
17       because Jeff had not -- I had talked to Ashley
18       before Jeff did.
19  Q.   Okay.  So then Ashley subsequently goes and talks to
20       Jeff?
21  A.   That's correct.
22  Q.   All right.  And do you know what, if any, actions
23       Ashley took after the discussion with you with
24       respect to Bruce Grover or Jeff Howard --
25  A.   I do not.
```

Page 67

```
1   Q.   Okay.  And with respect to -- so, then if I
2        understand correctly, after this -- after Bruce
3        Grover apologizes to you, things continued -- things
4        work out just fine in the workplace until August of
5        2017?
6   A.   Correct.
7   Q.   Okay.  And in August of 2017, some conduct by
8        Mr. Grover re-emerges?
9   A.   That is correct.
10  Q.   All right.  And if I understand correctly, you
11       ultimately decided to resign from employment before
12       you actually explained to Ashley Campo or anyone
13       else what the new conduct was by Mr. Grover?
14       MR. FISCHER:  Objection to the form of the
15       question.
16       BY MR. O'BRIEN:
17  Q.   All right.  If I understand correctly -- if I
18       understand correctly, new conduct by Mr. Grover
19       emerged in August of 2017 that you found to be
20       harassing and discriminatory; is that right?
21  A.   Correct.
22  Q.   All right.  And instead of attempting to try to deal
23       with it internally, you ultimately decided to leave
24       Hannaford's employment?
25       MR. FISCHER:  Objection to the form.  You can
```

Page 68

```
1        answer the question.
2   A.   Correct.
3        BY MR. O'BRIEN:
4   Q.   All right.  And on August 25th of 2017, you e-mailed
5        the associate relations manager for the store and
6        informed her of your desire to depart Hannaford's
7        employment?
8   A.   I e-mailed Ashley.
9        (Exhibit 10, E-mail Chain, August 25, 2017,
10       marked for identification.)
11       BY MR. O'BRIEN:
12  Q.   Okay.  I'm going to show you what's been marked as
13       Exhibit 10, which is an e-mail chain related to your
14       departure from employment.  And the first e-mail at
15       the top appears to be from you.  And at the outset
16       let me ask you, occasionally on the e-mails we see
17       the name George S. Pelvin or Spelvin?
18  A.   George Spelvin.
19  Q.   George Spelvin.  Is that your home e-mail address?
20  A.   Yes.
21  Q.   Okay.  So when we see that name appearing, that's an
22       e-mail emanating from you in your home or --
23  A.   Yes.
24  Q.   Okay.  All right.  So this first e-mail is dated
25       Friday, August 25th, 2017, at 4:58 a.m.; is that
```

Page 69

```
1        correct?
2   A.   Yes.
3   Q.   And it's from you, and it's addressed to, it looks
4        like, Terri Dube at Hannaford, who's the associate
5        relations manager, and it says:  Hello, After much
6        consideration and thought I have decided to leave
7        Hampton Hannaford.  My last day will be Friday,
8        September 1st, 2017.  Tim Record.  Did I read that
9        correctly?
10  A.   Yes.
11  Q.   All right.  And you sent it early on Friday morning,
12       it appears?
13  A.   Yes.
14  Q.   And then it looks like perhaps you forwarded it as
15       well to Bruce Grover and Ashley?  The second --
16  A.   Yes.
17  Q.   Okay.  And then the last e-mail on this page appears
18       to be a response from Ashley on Friday, August 25th,
19       2017, at 8:28 a.m.  And it says:  Hi Tim, I am very
20       sorry to hear that.  I would like to touch base with
21       you next time we are working together if you are
22       okay with that.  Please feel free to reach out to me
23       anytime you need to.  Thank you.  Did I read that
24       correctly?
25  A.   Yes.
```

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
70..73

Page 70

1  Q.  All right.  And do you remember receiving this
2      e-mail?
3  A.  Yes.
4  Q.  Okay.  Okay.  And if I understand correctly, on
5      Saturday, August 26th, 2017, you met with Ashley
6      Campo and discussed your desire to leave Hannaford's
7      employment?
8  A.  I'm sorry, on what date was that?
9  Q.  You sent the -- you sent the resignation e-mail on
10     August 25th, and on August 26th you met with Ashley
11     Campo; do you remember that?  I'm just -- I'll show
12     you -- do you remember --
13 A.  I'm not familiar with what day -- I know she -- I'm
14     sorry.  She was on vacation and she came back --
15 Q.  Okay.
16 A.  -- so I did send -- yeah, I recall this, but I can't
17     remember what date we had met with her when she got
18     back from vacation.
19         (Exhibit 11, Conversation Recap, August 26,
20     2017, marked for identification.)
21 BY MR. O'BRIEN:
22 Q.  Okay.  All right.  I'm going to show you what's been
23     marked as Deposition Exhibit Number 11.  This is a
24     recap of the discussion that Ashley had with you on
25     August 26 of 2017, and I just wanted to follow up on

Page 71

1      this with you.
2          It indicates that she met with you on
3      August 26th of 2017 to talk about the one-week
4      notice that she had received from you via the e-mail
5      the previous day.  Do you recall sitting down with
6      her?
7  A.  Yes.
8  Q.  Okay.  And it starts:  Tim told me that he was no
9      longer comfortable working with Bruce as his
10     manager, and after talking with his family he has
11     decided to leave.  Did I read that accurately and is
12     that correct?  Did I read that correctly and is that
13     accurate?
14 A.  That is.
15 Q.  Okay.  The next sentence says:  At this time, Tim
16     told me he has another job as a manager trainee at
17     the Golden Harvest in Kittery, Maine.  Did I read
18     that correctly and is that accurate?
19 A.  Yes.
20 Q.  Okay.  It continues:  Tim asked me if HR was ever
21     contacted when Bruce made an inappropriate remark to
22     Tim regarding his sexual preference when he first
23     started back in February.  Did I read that correctly
24     and is that accurate?
25 A.  Yes.

Page 72

1  Q.  Okay.  I told Tim that HR was not contacted as some
2      time had passed before I found out about the
3      situation.  Did I read that correctly and is that
4      accurate?
5  A.  Yes.
6  Q.  I reminded Tim -- excuse me.  I reminded Tim that I
7      did follow up on the situation, and then followed up
8      with him to make sure that he was comfortable with
9      Bruce's apology and the outcome of how the situation
10     was handled, and Tim told me he was fine.  Did I
11     read that correctly and is that accurate?
12         MR. FISCHER:  Objection to form.
13 A.  Yes.
14 BY MR. O'BRIEN:
15 Q.  Okay.  The next paragraph states:  From there Tim --
16     I think it should be started to tell me some recent
17     events of why -- I guess it should be he is not
18     comfortable working with Bruce.  Did I read it
19     correctly with those changes and is that accurate?
20 A.  Yes.
21 Q.  Okay.  Tim claimed that on Sunday, August 20th, he
22     was straightening out a mat in front of the seafood
23     scale and Bruce was near the department, along with
24     our center store manager, Kyle.  Did I read that
25     correctly and is that accurate?

Page 73

1  A.  Yes.
2  Q.  Tim stated that when he bent over Bruce made a face
3      and covered his private parts towards Kyle.  Did I
4      read that correctly and is that accurate?
5  A.  Yes.
6  Q.  Okay.  On the next paragraph, it states:  The
7      previous week, parentheses, W/E 8/19, closed
8      parentheses, Tim stated he was putting things away
9      in the department and Bruce came over and started
10     asking him questions of why things were not done and
11     put away.  Did I read that correctly and is that
12     accurate?
13 A.  Yes.
14 Q.  All right.  It continues:  Tim stated that Bruce's
15     tone was very aggressive.  Did I read that correctly
16     and is that accurate?
17 A.  Yes.
18 Q.  Tim said that Kyle was in produce blocking cut fruit
19     and Tim said to Kyle, quote, quotation marks, do you
20     hear the way he is speaking to me, question mark,
21     closed quote.  Kyle replied that he was staying out
22     of it.  Did I read that correctly and is that
23     accurate?
24 A.  Yes.
25 Q.  Okay.  The next paragraph states:  Tim stated that

Page 74

1    he requested his breaks at 9:00 a.m. recently due to
2    needing to take medication.  Did I read that
3    correctly and is that accurate?
4  A.  Yes.
5  Q.  Tim stated that Bruce did not cover his breaks until
6    well after 9:00 a.m. on three separate days W/E
7    8/19.  Did I read that correctly and is that
8    accurate?
9  A.  Yes.
10 Q.  It continues:  Tim said when he went upstairs on his
11   break Bruce was in the manager office playing on his
12   phone.  Tim says Bruce is often on his phone in the
13   office when he should be working.  Did I read that
14   correctly and is that accurate?
15 A.  Yes.
16 Q.  All right.  Tim also stated on the same week that
17   Bruce has been making him wait until 6 hours to take
18   a lunch.  Did I read that correctly and is that
19   accurate?
20 A.  Yes.
21 Q.  Okay.  The next paragraph states -- it should be --
22   there's a typo here, but I'll read it:  Tim claimed
23   that when he was doing fresh inventory in July that
24   Bruce had him performing inventory by himself.  Did
25   I read that correctly and is that accurate?

Page 75

1  A.  Yes.
2  Q.  Okay.  Tim stated he had to do inventory, train a
3    new person and wait on customers.  Did I read that
4    correctly and is that accurate?
5  A.  Yes.
6  Q.  Tim stated when he approached Bruce about this that
7    Bruce's response was, quote:  You don't have to be a
8    bitch about it, period, end quote.  Did I read that
9    correctly and is that accurate?
10 A.  Yes.
11 Q.  Before we go onto the next one, if I remember
12   correctly from our prior discussion earlier, I think
13   you had said that the bitch comment occurred in
14   August.  Could this -- could she have written this
15   down wrong, as being -- it references July?
16       MR. FISCHER:  Objection to the form.
17 A.  I couldn't tell you.
18       BY MR. O'BRIEN:
19 Q.  Okay.  But you clearly remember the bitch comment
20   from being in August; is that fair to say?
21 A.  Yes.
22 Q.  Okay.  The next paragraph states:  The last piece of
23   information that Tim wanted to share with me was
24   last week, parentheses, W/E 8/19, closed
25   parentheses, Bruce was preparing his anniversary

Page 76

1    dinner while the department was behind and
2    associates were upset by this.  Did I read that
3    correctly and is that accurate?
4  A.  That's correct.
5  Q.  Okay.  The next paragraph states:  When I asked Tim
6    why he didn't tell me any of this previously, he
7    stated he just had too much going on with the
8    passing of his mother.  Did I read that correctly
9    and is that accurate?
10 A.  You did read it correctly, but I don't recall this.
11 Q.  Okay.  It continues:  I apologized to Tim for him
12   feeling this way and us not knowing about it.  Did I
13   read that correctly and is that accurate?
14 A.  Yes.
15 Q.  And then it concludes:  I told him I will be looking
16   into his concerns and speaking with Bruce when he
17   returns from vacation next week.  Did I read that
18   correctly and is that accurate?
19 A.  Yes.
20 Q.  All right.  The passing of a mother is always a
21   difficult thing, and, you know, we certainly extend
22   our sympathies in that regard, but the passing of
23   your mom has come up once or twice in the documents,
24   I'm just wondering when that was, if you can recall?
25 A.  It was February -- February 14th.

Page 77

1  Q.  2017?
2  A.  Yes.
3       (Exhibit 12, E-mail, August 31, 2017, marked
4    for identification.)
5       BY MR. O'BRIEN:
6  Q.  Okay.  All right.  Well, thank you for sharing that,
7    and I apologize for bringing it up, but I just
8    thought it was important to get -- to try to put
9    some context around that.
10      Okay.  Next I'm going to show you what's being
11   marked as your Deposition Exhibit Number 12, which
12   appears to be an e-mail from you that it looks like
13   maybe you sent it to yourself and printed out and
14   gave to Ashley Campo, if I understand correctly; is
15   that right?
16 A.  Correct.
17 Q.  Okay.  And it's dated August 31st of 2017; is that
18   right?
19 A.  Yes.
20 Q.  And is it fair to say that you gave a copy of this
21   to Ashley Campo on or about August 31st of 2017?
22 A.  Yes.
23 Q.  All right.  And she had asked you to itemize -- I'll
24   withdraw that question.
25      If I understand correctly, she had asked you to

Timothy Record
October 03, 2019

Page 78

1    place in writing the issues, the specific issues
2    that you had had with Bruce Grover in August of
3    2017; is that right?
4  A.  Yes.
5  Q.  Okay.  And as a result of that you placed -- you
6    made these notes in this e-mail; is that correct?
7  A.  Yes.
8  Q.  All right.  And after making these notes, it looks
9    as if you signed the bottom of the document prior to
10   giving it to Ashley Campo?
11 A.  Yes.
12 Q.  Okay.  All right.  And the issues that you
13   identified was that the gay harassment had continued
14   in a couple of ways.  First, by placing the mat in
15   front of the scale and the bitch comment; is that
16   correct?
17 A.  Yes.
18 Q.  Okay.  And we just covered them in detail in that
19   last note, so if there's nothing else we'll just
20   keep moving on here.  Is that fair to say, we've
21   covered that in detail?  Yes?
22 A.  Yes.
23 Q.  Okay.  Thanks.  Next, you identified the concern
24   that Mr. Grover had belittled you in front of Kyle,
25   and that was also covered in that last item that we

Page 79

1    had identified; is that correct?
2  A.  Correct.
3  Q.  Okay.  Next, it indicates that Mr. Grover had
4    ignored requests for breaks for you to take your
5    medication; is that correct?
6  A.  Yes.
7  Q.  Right.  And, again, that prior deposition exhibit
8    had identified your desire to take breaks at 9:00
9    a.m. for your medication; is that correct?
10 A.  Yes.
11 Q.  All right.  And that on at least three occasions he
12   had had you work past nine o'clock before taking a
13   break?
14 A.  Could you rephrase that?
15 Q.  If I understand correctly, he had had you work past
16   nine o'clock on three different dates, which I
17   assume to be the 17th, 18th and 20th --
18 A.  That's correct.
19 Q.  -- of August; is that correct?
20 A.  Correct.
21 Q.  Okay.  And your note here is, all at least 3 hours
22   and 50 minutes before I had a break?
23 A.  Correct.
24 Q.  Okay.  And then next Mr. Grover told you that you
25   could have lunch at the six-hour mark of the time

Page 80

1    period you were at work, which you believe was
2    against standard practice --
3  A.  Yes.
4  Q.  -- is that correct?  And that was that prior week as
5    well?
6  A.  Yes.
7  Q.  Okay.  And then, in addition, you had issues with
8    what you characterize as his -- Mr. Grover's absurd
9    management behavior; is that correct?
10 A.  Correct.
11 Q.  All right.  And the first item that you identified
12   is that Mr. Grover was apparently on the internet
13   looking to find Kyle a girlfriend on company time;
14   is that right?
15 A.  Yes.
16 Q.  Okay.  And was that also that prior week in August?
17 A.  Yes.
18 Q.  Okay.  What is the reference to John Garland in
19   parentheses; do you remember?
20 A.  I believe that John was in the room at the same
21   time.
22 Q.  Oh, you were just identifying him as a witness?
23 A.  Yes.
24 Q.  Okay.  Next, and we covered this in a prior
25   deposition exhibit, he was apparently making --

Page 81

1    Mr. Grover was making an anniversary dinner in the
2    department instead of helping associates who needed
3    assistance, such as Pam Proctor?
4  A.  Yes.
5  Q.  Okay.  And that also had been that prior week?
6  A.  Yes.
7  Q.  Okay.  And next, he had you doing inventory,
8    training new associates, and waiting on customers
9    all at the same time, and that also had occurred in
10   August of 2017 as well?
11 A.  Yes.
12 Q.  Okay.  And then finally, Mr. Grover leaves early
13   without ever saying goodbye to the associates and
14   asking them if they need any help whatsoever; is
15   that correct?
16 A.  Yes.
17 Q.  Okay.  And so these summarized -- I'll withdraw that
18   question.
19    So this document represents the alleged
20   harassing and discriminating conduct and bad
21   behavior by Mr. Grover that you reported to -- I'll
22   withdraw that question.
23    These instances that we've -- that are set
24   forth on this deposition exhibit represent the
25   harassing and discriminatory conduct by Mr. Grover

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
82..85

Page 82

1    and related absurd management behavior by Mr. Grover
2    that occurred in August of 2017?
3           MR. FISCHER:  Objection to form.
4    A.  Could you rephrase that?
5    Q.  Thank you.
6           The notes that you have on Deposition Exhibit
7    Number 12 that you prepared represent the harassing
8    and discriminatory conduct and absurd management
9    behavior by Mr. Grover that occurred in August of
10   2017?
11   A.  Correct.
12   Q.  Thanks.
13          After submitting this report to -- I'll
14   withdraw that question.
15          After submitting a copy of the e-mail dated
16   August 31st, 2017, to Ms. Campo, is it fair to say
17   that you don't have any direct knowledge of what, if
18   any, action she took after receiving this
19   information?
20   A.  I do not.
21   Q.  Okay.  And if I understand correctly, it was this
22   conduct in August of 2017 that led you to conclude
23   that continuing to work at Hannaford would not be
24   possible?
25   A.  Correct.

Page 83

1    Q.  And as a result of this conduct in 2017 -- in August
2    of 2017, you opted to leave Hannaford's employment
3    and take a position with -- initially, with Golden
4    Harvest?
5    A.  Correct.
6           MR. FISCHER:  Objection to form.
7    BY MR. O'BRIEN:
8    Q.  And then after Golden Harvest you obtained a
9    position at McKinnon's Supermarket?
10   A.  Yes.
11          MR. O'BRIEN:  Okay.  Okay.  This is probably
12   a good time to take a break for lunch.
13          MR. FISCHER:  Yeah, sounds good.
14          (A lunch break was taken.)
15          (Exhibit 13, Medical Records from Jeffrey M.
16   Wagner, Ph.D., marked for identification.)
17   BY MR. O'BRIEN:
18   Q.  Good afternoon, Mr. Record.
19   A.  Good afternoon.
20   Q.  I've placed in front of you Deposition Exhibit
21   Number 12, which is a report that was prepared by
22   Dr. Wagner.  Actually there's two of them.  The
23   second one is shorter.  And the first one is dated
24   January 10 of 2018.  Can you tell me when you first
25   began treating with Dr. Wagner?  Or if you are

Page 84

1    treating with Dr. Wagner?
2    A.  Could you rephrase that, please?
3    Q.  Sure.  Let's go back.
4    A.  Yeah.
5    Q.  Okay.
6    A.  All right.
7    Q.  And then we'll walk into that one.  So thank you.
8           All right.  Any time prior to your departure
9    from Hannaford have you ever received treatment or
10   counseling from a mental healthcare provider, a
11   social worker, a licensed clinical social worker, a
12   psychologist, a psychiatrist, for any mental health
13   related issues?
14   A.  As a teenager.
15   Q.  Okay.  And just in general, what was that related
16   to?
17   A.  Coming out of the closet at age 17.
18   Q.  Okay.  Other than the counseling treatment
19   associated -- or, you know, the services that you
20   received associated with that, has there been any
21   other time that you've received treatment for any
22   mental health related issues?
23   A.  No.
24   Q.  Okay.  And as far as since your departure from
25   Hannaford, have you been seeing any mental health

Page 85

1    counselors, licensed clinical social workers, a
2    psychologist, psychiatrist or anything along those
3    lines?
4    A.  Yes.
5    Q.  Okay.  Who and when?
6    A.  Dr. Wagner.
7    Q.  Okay.
8    A.  And starting in, I think it was December of 2018, I
9    think it was the first time, and then January, I was
10   seeing him once a month.
11   Q.  Starting in January of '19?
12   A.  Yeah.
13   Q.  Okay.  In December of 2018 who did you see?
14   A.  Dr. Wagner.
15   Q.  Okay.  And since then, since December of 2018, how
16   many times have you seen Dr. Wagner?
17   A.  I think I've seen him four times total.
18   Q.  Okay.  The records that we have, and we understand
19   they're not the complete records, indicate that you
20   saw him on January 10th of 2018 and November 29th of
21   2018.  Does that --
22   A.  Yes.
23   Q.  -- refresh your recollection as to the time periods
24   in which you saw Dr. Wagner?
25   A.  Yes.

Page 86

1    Q.   All right.  Is it fair to say you've only seen him
2         on two occasions?  Or have you seen him on more?
3    A.   Could you rephrase that?
4    Q.   Okay.  The records that we have at present, and we
5         know they're not the complete records --
6    A.   Yes.  Yes.
7    Q.   -- reflect you seeing Dr. Wagner on January 10th of
8         2018 and November 29th of 2018.  Do you recall any
9         other dates on which you saw Dr. Wagner?
10   A.   No.
11   Q.   Okay.  Have you treated with any other mental health
12        provider at all other than Dr. Wagner?
13   A.   Mental health?
14   Q.   Yes.
15   A.   No.
16   Q.   Okay.  And if I understand correctly, as far as this
17        case goes, you're alleging that you suffered some
18        emotional distress related damages?
19   A.   Yes.
20   Q.   Okay.  All right.  And have you been -- is there any
21        type of medication you're taking for any sort of
22        mental health condition that you have?
23   A.   Lexapro.
24   Q.   Lexapro.  And what are you taking that for?
25   A.   Sleeplessness, sleepless -- sleeplessness.

Page 87

1    Q.   And how long have you been taking that?
2    A.   Two months.
3    Q.   Okay.  Prior to taking Lexapro did you take any
4         other medication?
5    A.   No.
6    Q.   Okay.  Could you describe for me what types of
7         emotional distress you feel that you've suffered
8         from since your departure from Hannaford?
9    A.   My -- pretty much sadness, loss of sleep.
10        Self-worth, I think, just the --
11   Q.   And previously we focused on your mental health
12        providers.  Have you received any mental health
13        related treatment from a primary care physician?
14   A.   I'm due to have a physical.  I had a -- I have an
15        appointment for a physical that I had to reschedule.
16        That's at the end of this month.
17   Q.   Okay.
18   A.   But the healthcare provider put me on Lexapro.
19   Q.   Okay.  But other than -- I'll withdraw the question.
20        But if I understand correctly, you had no need
21        to go to your primary healthcare provider for any
22        issues arising out of your separation from
23        Hannaford?
24        MR. FISCHER:  Objection to the form of the
25        question.

Page 88

1    A.   Could you rephrase that?
2    BY MR. O'BRIEN:
3    Q.   Sure.  Basically, you didn't have to go to your
4         regular doctor for any issues that you're
5         experiencing as a result of your separation from
6         Hannaford?
7         MR. FISCHER:  Objection to the form of that
8         question.
9    A.   Correct.
10   BY MR. O'BRIEN:
11   Q.   Okay.  And who referred you to Dr. Wagner?
12   A.   My attorneys.
13   Q.   Okay.  Had you treated with Dr. Wagner at any point
14        prior to that referral?
15   A.   No.
16   Q.   All right.  And -- okay.  Is there anything else
17        about your mental health since your departure from
18        Hannaford that you attribute to Hannaford that you
19        haven't told us about today?
20   A.   No.
21        (Exhibit 14, Memo by Kyle Lasher, 8/13/17,
22        marked for identification.)
23   BY MR. O'BRIEN:
24   Q.   Okay.  Mr. Record, I'm showing you what's been
25        marked as your Deposition Exhibit Number 14, and I

Page 89

1         have a couple of questions for you.  This is a memo
2         written up by Kyle Lasher.  And about halfway down
3         it states:  On August 17, 2017, I was stocking the
4         meat case.  During that time, Tim had walked from
5         the seafood to the meat department three to four
6         times.  I believe the first time I said good morning
7         to Tim.  On the third or fourth time Tim walked up
8         to me and said, thank you for stocking the pickles
9         today, with a smile.  Do you remember that
10        conversation with Kyle Lasher?
11   A.   No.
12   Q.   What was Kyle Lasher's role at the store, if you can
13        recall?
14   A.   I believe he was a grocery manager.
15   Q.   Okay.  The next paragraph says:  On several
16        occasions when I have been working on the computer
17        in the manager's office, Tim would come in to get
18        his lunchbox out of the filing cabinet.  At that
19        time, he would touch my arm or as he would reach
20        down to open the bottom drawer, tap my leg and say,
21        oh, excuse me, I need to get into there.
22        Do you remember any of those occasions in which
23        you went into the office, the manager's office and
24        Mr. Lasher was in the manager's office?
25   A.   No.

Page 90

1   Q.   Do you remember coming into contact with his body at
2        any point in time?
3   A.   No.
4   Q.   Okay.  If you skip down a couple paragraphs, it
5        says:  Earlier this year when I was doing my center
6        store walk, Tim approached me and said, I had a
7        dream about you last night.  My response was, oh,
8        that's nice, and continued with my store walk.  This
9        was an uncomfortable conversation.
10        Do you recall that conversation with
11        Mr. Lasher?
12   A.   Yes.
13   Q.   And did I -- is the way I described it, is that
14        accurate as to what occurred?
15   A.   No.
16   Q.   What else occurred or what's inaccurate?
17   A.   That whole thing is inaccurate.
18   Q.   The entire paragraph is accurate?
19   A.   Could you rephrase that?
20   Q.   Yeah.  I'll start by rereading it.  Earlier -- the
21        paragraph states:  Earlier this year when I was
22        doing my center store walk, Tim approached me and
23        said, I had a dream about you last night.  My
24        response was, oh, that's nice, and continued with my
25        store walk.  Did I read that correctly?

Page 91

1   A.   You did read that correctly.
2   Q.   And is that an accurate recollection of the
3        events --
4   A.   Not to my recollection.
5   Q.   Okay.  What do you recall having transpired in
6        connection with that?
7   A.   My recollection of the dream?
8   Q.   Yes.
9   A.   My recollection of the dream is that we had -- I had
10        a dream that we were hiking.
11   Q.   Okay.
12   A.   Hiking.
13   Q.   And so you shared with him that you had a dream
14        about the fact that you and he were on a hike
15        together?
16        MR. FISCHER:  Objection to form.
17   A.   It was like on a trail, it was a dream.
18   Q.   Okay.
19   A.   Yeah.
20   Q.   But you -- so, you shared with him the fact that you
21        had had a dream about the two of you hiking
22        together; is that fair to say?
23   A.   Yes.
24   Q.   Okay.  And you shared that with him in the store?
25   A.   Yes.

Page 92

1   Q.   Okay.  Was there any further discussion that you can
2        recall?
3   A.   There was not.
4   Q.   Have you had any other discussions with Mr. Lasher
5        about any of your dreams?
6   A.   No.
7        (Exhibit 15, Series of E-mails, September 2017,
8        marked for identification.)
9   BY MR. O'BRIEN:
10   Q.   Okay.  Mr. Record, I'm showing you what's been
11        marked as your Deposition Exhibit Number 15, which
12        is a series of e-mails.  If we can look at the first
13        two pages.  And many of these e-mails are in reverse
14        order, but if we look at the bottom of the first
15        page it appears to be an e-mail from you to Ashley
16        Campo, dated September 11 of 2017; is that correct?
17   A.   Yes.
18   Q.   And it says:  Hello Ashley, I'd like to take you up
19        on your offer.  I wanted to see if you have time to
20        talk tomorrow about returning to Hannaford.  Please
21        let me know if you have time.  Tim Record.  Did I
22        read that correctly?
23   A.   You did.
24   Q.   All right.  And is it fair to say you can recall
25        sending her this e-mail?

Page 93

1   A.   Yes.
2   Q.   And you sent her this e-mail, I take it, in response
3        to her offer to have you return to employment at
4        Hannaford?
5   A.   With a possible return.
6   Q.   Okay.  All right.  And your language is, I'd like to
7        take you up on your offer; is that right?
8   A.   Could you rephrase that?
9   Q.   In your e-mail you use the words, I'd like to take
10        you up on your offer; is that right?
11   A.   To discuss.
12   Q.   Okay.  And the next e-mail appears to be a response
13        from Ashley Campo to you, proposing when you may be
14        able to meet; is that correct, on September 11?
15        Just right above your initial e-mail at the bottom
16        of the page.  I'm sorry.
17   A.   This one?
18   Q.   Yes, right there.
19   A.   I'm sorry, could you ask your question again?
20   Q.   Yes.  It appears as if Ashley responded to your
21        initial e-mail of September 11 by proposing some
22        dates and times --
23   A.   Yes.
24   Q.   -- for you to meet?
25   A.   Oops, sorry.

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
94..97

Page 94

1   Q.   Is that correct?
2   A.   It is correct.
3   Q.   Okay.  And then immediately above that, it appears
4        as if on September 13th of 2017 you responded to her
5        and stated:  Hi Ashley, Can I come talk to you on
6        Saturday, the next day I have off?  I would like to
7        return to Hannaford full-time if my position was
8        still left open.  Let me know what time Saturday we
9        can talk.  I hope I'm open.  Thank you.  Did I read
10       that correctly?
11  A.   Yes.
12  Q.   And that's the e-mail that you sent to Ashley and
13       it's an accurate recitation of the contents of that
14       e-mail?
15  A.   Yes.
16  Q.   Okay.  And then later on Wednesday, September 13th,
17       Ashley responded to you indicating that you're
18       definitely welcome to stop by, but the position has
19       been filled, but that you can apply for any
20       full-time positions that are available.  And she
21       believed that there were quite a few open.  And do
22       you remember receiving that e-mail from her?
23  A.   Yes.
24  Q.   Okay.  Okay.  We can skip to the next series of
25       e-mails.  And, again, it's -- for this sequence

Page 95

1        it's -- it will be two pages, the beginning of the
2        initial e-mail on this e-mail exchange is right at
3        the bottom of the first page, which indicates that
4        it's an e-mail from you on September -- way at the
5        bottom.  Let me just see that for one second.  Thank
6        you.  Yeah, right here.  Sorry.  Right at the
7        bottom, and then we'll go to the second page.
8   A.   Okay.
9   Q.   It's an e-mail from you dated September 19, 2017.
10       And if we go to the next page, it's shows that it's
11       going to Ashley Campo.  And in it you say:  Good
12       morning Ashley, I actually have Saturday off.  Can
13       we meet anytime you want, it's convenient for you.
14       I still would like to get a job full time to keep
15       all my benefits, vacation and time that I built.
16       Thank you so much.  Have a great day, Tim.  And so
17       that's the e-mail that you sent to Ms. Campo?
18  A.   Yes.
19  Q.   All right.  And that e-mail was in response to her
20       e-mail early in the day on September 19, in which
21       she stated:  I wanted to check in and see where you
22       may be at with things.  I wanted to see if you
23       wanted to stay on part time still, and if you need
24       help or still interested to apply for full-time
25       roles within the company.  I would still be more

Page 96

1        than happy to meet with you.  Did I read that
2        correctly?
3   A.   Yes.
4   Q.   All right.  And you can recall receiving that and
5        responding in the manner that we previously
6        described?
7   A.   Yes.
8   Q.   Okay.  And then if we can go back to the first page
9        of this sequence.  Going up from the bottom -- oh,
10       I'm sorry, the first page of this particular
11       sequence.  Going up from the bottom, it looks like
12       on September 19, Ashley Campo responded to you,
13       providing you some possible dates to meet, and then
14       you responded to her about when you believed that
15       you could meet.  And your response to her was on
16       September 20th.  So is it fair to say that Ashley
17       reached out to you again on September 19, proposing
18       some dates and times to get together, and then on
19       September 20th you responded to Ashley on when you
20       could meet with her?
21  A.   Yes.
22  Q.   Okay.  And then if we go to the top e-mail, on
23       September 21st Ashley responded to you that, you
24       know, unfortunately she had to leave because of the
25       closing on her house had been --

Page 97

1   A.   Yes.
2   Q.   -- scheduled for that day.  And do you recall
3        receiving that?
4   A.   Yes.
5            (Exhibit 16, Transcript of Voicemail Message,
6        September 21, 2017, marked for identification.)
7   BY MR. O'BRIEN:
8   Q.   Okay.  Okay.  We're going to put a hold on that
9        particular document.  I'm going to give you a
10       different exhibit and then we'll come back to that.
11       I'm providing you what's been marked Deposition
12       Exhibit Number 16, which is a transcript of a
13       voicemail message that you left for Ashley in
14       response to her e-mail.  Do you recall leaving a
15       voicemail message for her?
16  A.   Yes.
17  Q.   Okay.  In addition to providing you with a
18       transcript, I'm going to go ahead and play it, but I
19       will -- the court reporter may not be able to pick
20       it up off of this and that's why I have marked this
21       as a deposition exhibit.  Hi Ashley, it's Tim.  I
22       just got your message.  It is noon and I
23       understand you're closing on your house, so that's
24       exciting, but let -- could you just text me or
25       e-mail me and let me know when you're available.  I

Page 98

1   don't want to be terminated.  I want to get back to
2   Hannaford, but I need your help to do that.
3   Hopefully, you know, my pay is not going to change
4   or anything like that, but I did want to, you know,
5   take you up on your offer to get back in there and
6   stay.  So if -- just let me know if I can talk to
7   Terri or something.  I have Saturday off, if I could
8   talk to anybody at Hannaford, then I will contact
9   them and get in touch.  Thank you so much for your
10  help.  Talk to you later.  Bye.
11       Okay.  Did you recognize the voice on that
12  e-mail?
13       MR. FISCHER:  Voicemail.
14  BY MR. O'BRIEN:
15  Q.  On the voicemail, thank you.
16  A.  Yes.
17  Q.  All right.  And it's fair to say that that was your
18  voice there?
19  A.  Yes.
20  Q.  And that was the message that you left for Ashley on
21  September 21st --
22  A.  Yes.
23  Q.  -- 2017?  Is that correct?
24  A.  Yes.
25  Q.  Okay.  The document that I've placed in front of

Page 99

1   you, is that a fair and accurate transcription of
2   the voicemail?
3   A.  Yes.
4   Q.  Okay.  Okay.  So now we can switch back to the
5   previous exhibit.  And we can flip to the next set
6   of e-mails in the sequence.  And this will be --
7   it's a two-page -- well, it's effectively a one-page
8   sequence.  If we -- if we look at the bottom of --
9   of this section, right here, there's an e-mail from
10  Ashley Campo to you dated September 27, 2017 at 9:20
11  a.m.  And it's -- it says:  I called and left you a
12  message on Monday, but have not heard back from you.
13  Are you still interested in deli part-time?  If so,
14  did you want to start next week?  Also, what is your
15  availability and any upcoming requests off that you
16  need?  And then you responded later in the day on
17  September 27th and stated:  I've decided -- Hi
18  Ashley, I've decided to take a full-time position
19  elsewhere.  Thank you.  Tim Record.  Did I read that
20  accurately?
21  A.  Yes.
22  Q.  All right.  And that indeed is your response to her
23  attempt to reach out to you again about coming back
24  to work at Hannaford?
25  A.  Yes.

Page 100

1   Q.  Okay.  And then in response to that, at the top of
2   this page, Ashley responded:  I understand you
3   needing to take a full-time position.  At this point
4   would you like us to terminate your employment with
5   Hannaford?  Did I read that correctly?
6   A.  Yes.
7   Q.  And did you -- and do you recall responding to that?
8   A.  I do not.
9   Q.  Okay.  Prior to that e-mail exchange, do you
10  remember going into Hannaford and meeting with Terri
11  Dube and perhaps Steve Gary to discuss possible
12  openings?
13  A.  Yes.
14  Q.  All right.  And at that point in time they pointed
15  out a number of openings that were on a full-time
16  basis in and around the Hampton and Portsmouth area;
17  do you recall that?
18  A.  Yes.
19  Q.  There was one in Rochester, one in Raymond, one in
20  Dover Fields, one in Portsmouth, and one in the
21  Hampton store; do you recall that?
22  A.  Yes.
23  Q.  Okay.  All right.  But at that point in time you
24  chose not to proceed with any of those
25  opportunities; is that fair to say?

Page 101

1   A.  Wait, could you rephrase that?
2   Q.  Yes.  At that point -- when you had reviewed all
3   those openings, you opted not to pursue employment
4   in any one of those positions at that point in time?
5       MR. FISCHER:  Objection to form.
6   A.  Right.
7   Q.  Was it --
8       MR. FISCHER:  He answered the question
9   though.
10  A.  Correct.
11  Q.  Correct?  Okay.  All right.
12      (Exhibit 17, Letter from Theresa Dube,
13  September 30, 2017, marked for identification.)
14  BY MR. O'BRIEN:
15  Q.  Next I'm going to show you what's been marked as
16  your Deposition Exhibit Number 17, which is a letter
17  from Terri Dube, the associate relations manager for
18  the Hampton store, and it indicates -- it states --
19  I'll withdraw that.
20      It is a letter from Terri Dube, the associates
21  relations manager at the Hampton store, dated
22  September 30, 2017, addressed to you, and it states:
23  In the last communication with Ashley, you stated
24  that you had accepted a full-time position outside
25  of Hannaford.  I wish to offer congratulations on

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
102..105

Page 102

1    that. On Wednesday, September 27, 2017, she asked
2    if we should terminate your employment with
3    Hannaford. Did I read that correctly?
4    A.   Yes.
5    Q.   Okay. And do you remember receiving this letter?
6    A.   Yes.
7    Q.   Okay. And then the next paragraph states: As of
8    September 30, 2017, you still haven't responded. If
9    we don't hear from you by October 12th, 2017, we
10   will process your termination of employment with
11   Hannaford. Did I read that correctly?
12   A.   Yes.
13   Q.   And it's fair to say that you didn't respond to this
14   letter; is that correct?
15   A.   Yes.
16   Q.   Okay. Just going back to the allegations of
17   harassment and discrimination that you're bringing
18   forth against Hannaford, if I understand correctly,
19   in paragraph -- in the Exhibit Number 8, which is
20   the charge of discrimination, in paragraph A, 6A, B
21   and C, you indicated that these instances occurred
22   in the first three weeks of Mr. Grover's employment
23   in February and March of 2017; is that correct?
24        MR. FISCHER: Objection to the form of the
25   question. You can answer.

Page 103

1    A.   Yes.
2    BY MR. O'BRIEN:
3    Q.   Okay. And then paragraphs 6D and E took place in
4    August of 2017?
5    A.   Could you rephrase that?
6    Q.   Yes. The incidents referenced in paragraph 6D and
7    6E occurred in August of 2017?
8    A.   Yes.
9    Q.   All right. And just so that I'm clear, there are no
10   other allegations of harassment or discrimination
11   until from April -- I'll withdraw that question.
12        Other than the allegations of discrimination
13   and harassment that you've set forth in that
14   paragraph six, I understand that there are no other
15   allegations of harassing or discriminatory treatment
16   that you allege that Hannaford or Mr. Grover engaged
17   in?
18        MR. FISCHER: Objection to the form. You can
19   answer the question.
20   A.   Correct.
21   BY MR. O'BRIEN:
22   Q.   Okay. And with respect to the allegations that you
23   were subjected to derogatory, demeaning or
24   effeminate language by Mr. Grover, that focuses in
25   on the instance of him referring to you as a bitch

Page 104

1    in August of 2017?
2        MR. FISCHER: Objection to the form of the
3    question.
4    A.   Could you rephrase that?
5    BY MR. O'BRIEN:
6    Q.   Sure. And as far as your allegation that you were
7    subjected to derogatory, demeaning and/or effeminate
8    language, you're referring to Mr. Grover's use of
9    the word bitch in reference to you in August of
10   2017?
11        MR. FISCHER: Same objection.
12   A.   Correct.
13   BY MR. O'BRIEN:
14   Q.   All right. I just want to make sure that there's no
15   other instances that we need to ask you questions
16   about and that's why I asked that in that manner.
17   Do you understand that?
18   A.   I do.
19   Q.   Okay. And having heard that your answer remains the
20   same?
21   A.   Correct.
22   Q.   Okay. Excuse me. I'm just going to turn off the
23   sound on this.
24        After you had the discussion with Ashley Campo
25   in April of 2017 and you shared with her the report

Page 105

1    that you had made to Jeff Howard, it's my
2    understanding that, although brief, there are a
3    couple of follow-up discussions that you had with
4    Ms. Campo in which she asked you how things were
5    going and you responded something along the lines
6    of, well, nothing else has happened yet; is that
7    fair to say?
8    A.   Could you rephrase that?
9    Q.   Yes.
10   A.   Okay.
11   Q.   After you made the report to Ms. Campo in April of
12   2017, which was similar to the report you made to
13   Mr. Howard, Ms. Campo followed up with you on a
14   couple of occasions to ask you how things were
15   going; is that fair to say?
16   A.   No.
17   Q.   No? Let me rephrase it then. Is it fair to say
18   that there were a couple of occasions in which
19   Ms. Campo asked you how things were going after you
20   made the report in April of 2017?
21   A.   Once.
22   Q.   Once? Okay. And in that conversation when she
23   followed up with you, you informed her that nothing
24   had happened as of yet?
25   A.   That needs to be rephrased, but yes.

Page 106

1    Q.   Okay.  Is it fair to say that when you -- when she
2         met with you and asked you how things were going
3         with Mr. Grover -- I'll withdraw.  Let me rephrase
4         the question.
5              Is it fair to say that when she met with you
6         after April of 2017, she asked you how things were
7         going with Mr. Grover?
8    A.   It's not fair to say.
9    Q.   Okay.  Did she ask you just in general how things
10        were going?
11   A.   In passing.
12   Q.   Okay.  That's -- so it's the meeting is the issue?
13        Okay.  I understand.  Is it fair to say that on at
14        least one occasion Ms. Campo and you briefly
15        discussed how things were going?
16   A.   In passing.
17   Q.   Okay.  And you would characterize that as in
18        passing, but it did occur?  She did pose that
19        question?
20   A.   I walked by her office.
21   Q.   Right.  So you walked --
22   A.   In passing.
23   Q.   Okay.  So as you're walking by her office she asked
24        you how things were going with Mr. Grover; is that
25        fair to say?

Page 107

1    A.   She asked me if anything has happened.
2    Q.   Okay.
3    A.   And I said, not yet.
4    Q.   Okay.  Perfect.
5    A.   Okay.
6    Q.   Actually, thank you.  All right.  Good.
7              I just want to go back in time.  You initially
8         began working for Hannaford at the Hampton store,
9         and in and around 2010 you applied for a transfer
10        and promotion to a different store and position as
11        the evening operations manager in the Portsmouth
12        store; is that correct?
13   A.   I interviewed for a job.
14   Q.   Right.  But as part of that process I assume that
15        you had to submit an application?
16   A.   Yes.
17   Q.   Okay.  And it's fair to say that in order to move
18        from one store to another or from position to
19        position the ordinary process is you'd submit an
20        application for that transfer and promotion?
21   A.   Yes.
22            (Exhibit 18, Series of Notes, marked for
23        identification.)
24   BY MR. O'BRIEN:
25   Q.   Okay.  Next I'm going show you what's been marked as

Page 108

1         your Deposition Exhibit Number 18, which is a series
2         of notes that had been provided by your attorney to
3         us in the course of discovery, and I'd just like to
4         just walk through these notes with you.  The first
5         one appears to have your business card from the
6         Hampton store at one point in time?
7    A.   Yes.
8    Q.   Okay.  I can't make out what the photo or depiction
9         is on this particular page.  Do you have any idea
10        what that is?
11   A.   It's a picture of me.
12   Q.   It's a picture of you?
13   A.   Yes.
14   Q.   Okay.  And could you describe it, because I can't
15        make it out, what is it depicting?
16   A.   It's a photo of me with friends that we took when I
17        graduated college.
18   Q.   Okay.  Is it supposed to represent -- again, you
19        can't really make it out.  Is it supposed to
20        represent anything --
21   A.   No.
22   Q.   Okay.  So it's a photo of you at college, okay.  Is
23        there -- is there any --
24   A.   When I graduated college.
25   Q.   When you graduated college.  And we all know time

Page 109

1         passes, but is there any particular reason that it
2         was included in this information?
3    A.   It was in an old journal that I had that had no
4         writing in it at the time.
5    Q.   Okay.  All right.  And as I reviewed the journal, it
6         seems as if the majority of the handwritten entries
7         were made after you had left Hannaford and perhaps
8         after you had first seen Dr. Wagner in January of
9         2018?
10   A.   I believe it was January 2019.
11   Q.   January of 2019?
12   A.   Yeah.
13   Q.   Okay.  And so these handwritten notations are just
14        your reflections back on your experiences over
15        time --
16   A.   My meetings with Dr. Wagner.
17   Q.   Okay.  So this was part of his protocol or treatment
18        for you, to reflect back on things that had occurred
19        in your past and to memorialize them in the present,
20        rather than -- and so that these weren't written --
21   A.   Could you rephrase?
22   Q.   Yes.  The bottom line --
23            MR. FISCHER:  Let him finish the question
24        before --
25            THE DEPONENT:  I'm sorry.

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
110..113

---

Page 110

1       MR. FISCHER:  -- you interject.
2   BY MR. O'BRIEN:
3   Q.  So if I understand correctly these were not written
4       when you were an employee of Hannaford?
5   A.  No.
6   Q.  Okay.  That's all right.  Sometimes lawyers have
7       confusing, long-winded questions and I appreciate
8       your patience.
9           Okay.  One of the documents that you did
10      include in here is the Service Star of the Year for
11      2015.  Would you mind just providing us an overview
12      of what led to you being awarded the Service Star of
13      the Year and what it meant from your perspective?
14      It looks like it was for 2015 when you were an
15      assistant seafood manager.
16  A.  I'm sorry, could you repeat the question?
17  Q.  Yes.  I understand that you were awarded a Service
18      Star of the Year for your role as an assistant
19      seafood manager for 2015, and I was wondering if you
20      could just provide us a quick capsule summary of how
21      it came about and what that process entailed?
22  A.  Ashley nominated me for Service Star of the Year.
23  Q.  Okay.  All right.  And when she did so did she give
24      you any explanation of why she was doing it at that
25      point in time?

---

Page 111

1   A.  I believe it's in here.
2   Q.  Okay.  So it's fair to say Ashley knew you well --
3       Ashley Campo knew you well and obviously she thought
4       highly of you as an individual and an employee?
5           MR. FISCHER:  Objection to form.
6   A.  I'm not sure.  I couldn't speak for that.
7   BY MR. O'BRIEN:
8   Q.  But it's fair to say that Ashley had worked with you
9       for quite a number of years?  Is that fair to say
10      that Ashley had worked with you for quite a number
11      of --
12  A.  She worked with -- yeah.
13  Q.  And that because you had worked together for so many
14      years she knew your work ethic and performance
15      ability?
16  A.  Yes.
17  Q.  All right.  And in 2015, I take it that it was a
18      compliment to be recognized as the Service Star of
19      the Year?
20  A.  A compliment?
21  Q.  It's a recognition --
22  A.  Yes, it's a recognition.
23  Q.  -- I assume --
24  A.  It's a recognition, yes.
25  Q.  Right.

---

Page 112

1   A.  Yes.
2   Q.  It's a complimentary recognition by the store
3       manager, Ashley Campo, and the company; is that
4       fair to say?
5   A.  Yes.
6   Q.  Okay.  It's a good thing, for lack of a better word;
7       is that right?
8   A.  Yes.
9   Q.  Okay, good.
10          MR. O'BRIEN:  All right.  For any of these
11      places that are blocked out, you know,
12      occasionally you'll see it blocked out, would that
13      be attorney-client privilege?
14          MR. FISCHER:  Yeah.  And they were --
15          MR. O'BRIEN:  Yeah, it's fine.
16          MR. FISCHER:  It's innocuous; business card,
17      stuff like that.
18          MR. O'BRIEN:  Yes, absolutely.  No problem.
19          MR. O'BRIEN:  I can do a privilege log.
20          MR. O'BRIEN:  No, we're good on that.  Yes.
21  BY MR. O'BRIEN:
22  Q.  There is one page that I just wanted to get a fuller
23      understanding of.  It's this one.  It's like
24      three-quarters of the way through.
25          MR. FISCHER:  I'll apologize for the Bates

---

Page 113

1       stamp.  I don't know how that happened.  It was
2       not intentionally.
3           MR. O'BRIEN:  Oh, yeah.  No, no problem.
4   BY MR. O'BRIEN:
5   Q.  Do you have -- that's the one.
6   A.  That's it, okay.
7   Q.  Okay.  So, I just need to -- I think I know what it
8       means, but it would be probably helpful for you to
9       just confirm it.  On this page it appears to say:
10      Own, own the words, O-W-N, own the words.  African
11      American owns N-word.  N being the capital N.  Gays
12      own gay.  Describes group of people who are not
13      straight.  And then underneath the word gay is the
14      word queer in a box.  And then an arrow saying to a
15      phrase, anyone who is not straight.  And then in
16      parentheses it says, you can refer to yourself,
17      closed parentheses.  My friends at Hannaford did not
18      violate my civil rights.
19          Okay.  So I -- I take from this -- why don't
20      you describe what you meant by it.  I think I know
21      what you meant, but go ahead and tell me what you
22      meant by this.
23  A.  Well, I -- it was just working with Dr. Wagner about
24      why people use the words that they use.
25  Q.  Okay, right.  Okay.  And --

---

**BOYCE & LEIGHTON, LLC**
**207-883-0378**

Page 114

1   A.   And --
2   Q.   -- is it fair to say that your observation was that
3        African Americans, they can use the N-word because
4        they're -- they're black and African American, and
5        if they choose to use the slang -- a slang reference
6        they can use it, and that, similarly, gays can use
7        whatever language they want to refer to themselves
8        in the same manner?  Is that what you're saying?
9            MR. FISCHER:  I'm going to object to the form
10       of that question, but you can answer it.
11  A.   Could you rephrase that?  I'm not -- I'm confused as
12       to what your question is.
13       BY MR. O'BRIEN:
14  Q.   I'm trying to understand, you know, what your -- the
15       point of this, and that's why I'm saying are you
16       basically saying, to cut to the chase, gays can
17       refer to themselves as gay or other reference -- or
18       other references, appropriate references in an
19       easier, more comfortable fashion than individuals
20       who are straight referring to gays?
21  A.   No.
22  Q.   No, okay.
23  A.   No.
24  Q.   Okay.  What are you referring to?
25  A.   This was going -- this was going through why people

Page 115

1        do this, like why they -- why they do it, you know,
2        that's with Dr. Wagner, was we were discussing was
3        why people do this in general.
4   Q.   Okay.
5   A.   Like why they think that people could say their own
6        words for whatever, and it -- you know, it was
7        just -- it was just a dialogue or a potential
8        dialogue --
9   Q.   Right.
10  A.   -- as to why people even do that.
11  Q.   And then it sounds like the reference to the friends
12       at Hannaford, you're referring to those that you
13       trusted and were friendly with?
14  A.   Yes.
15  Q.   And anything in particular other than that?
16  A.   No.
17  Q.   Okay.  If we could skip two pages later, it says, I
18       value my friendships with my Hannaford co-workers,
19       parentheses, Pam, Dan, Stephen, because we had
20       conversations about many things.  Our friendships
21       were built on respect and trust.  Did I read that
22       correctly?
23  A.   Yes.
24  Q.   Okay.  And these were the -- this is the friendships
25       and respect and trust that you described previously?

Page 116

1   A.   Correct.
2            MR. O'BRIEN:  Right.  Okay.  Why don't we
3        take just a short break.  I just have a few
4        follow-ups, I think.
5            MR. FISCHER:  Okay.  Great.
6        (A short break was taken.)
7        BY MR. O'BRIEN:
8   Q.   Okay.  Back on.  Just a few remaining questions,
9        Mr. Record.  So, if I understand correctly, the only
10       reports of the harassment and discrimination that
11       you believe you suffered, you made the first two
12       reports to Jeff Howard and Ashley Campo in April of
13       2017; is that correct?
14  A.   Correct.
15  Q.   Okay.  And then after you tendered your resignation
16       on August 25th of 2017, you reported to Ashley
17       Campo -- or in the course of a discussion with
18       Ashley Campo, you identified the sexual harassment
19       and inappropriate management behavior that you
20       attributed to Bruce Grover as having occurred in
21       August of 2017?
22  A.   Correct.
23  Q.   Okay.  And between -- and you've described for us
24       all of the alleged harassing conduct which occurred
25       between February and April of 2017, which are

Page 117

1        referenced in paragraph 6A, B and C of Exhibit 8?
2            MR. FISCHER:  I'll object to the form, but
3        you can answer the question.
4   A.   I'm sorry, could you say that again?
5        BY MR. O'BRIEN:
6   Q.   Sure.
7   A.   I'm sorry, I didn't have this.
8   Q.   Oh, no problem.  Take your time.  So if I understand
9        correctly, you've described for us today all of the
10       alleged sexual harassment that occurred between
11       February of 2017 and your report to Mr. Howard and
12       Ms. Campo in April 2017, and it's all premised upon
13       what's described in paragraph 6A, B and C of Exhibit
14       Number 8?
15  A.   Correct.
16  Q.   All right.  And there's no other alleged sexual
17       harassment during that time period that took place?
18  A.   Correct.
19  Q.   Okay.  And then, as I understand it, there was no
20       harassing conduct until August of 2017?
21  A.   Correct.
22  Q.   All right.  And in August of 2017, there was both
23       harassing conduct and inappropriate managerial
24       behavior exhibited by Mr. Grover, which is reflected
25       in paragraphs 6D and 6E of the Exhibit Number 8?

Page 118

1   A.   Correct.

2            MR. FISCHER:  Objection to the form of the

3        question.

4        BY MR. O'BRIEN:

5   Q.   And other than that, and the other instances that

6        you've described in the August 31st e-mail that you

7        provided to Ms. Campo, you've told us all of the

8        alleged harassing -- alleged harassing and

9        discriminatory or retaliatory behavior that took

10       place in August of 2017?

11  A.   Could you rephrase that?

12  Q.   Sure.  Paragraphs 6D and 6E contains -- sets forth

13       incidents of alleged harassing behavior that took

14       place in August of 2017; is that correct?

15  A.   Correct.

16  Q.   All right.  And then in addition to what's

17       referenced there, you've described for us in your

18       e-mail to Ashley Campo dated August 31st of 2017,

19       you incorporated those incidents and you also

20       described some additional incidents, including

21       absurd management behavior that you attributed to

22       Mr. Grover in August of 2017; is that correct?

23  A.   Correct.

24  Q.   All right.  And other than what you've described for

25       us with respect to those two sources, you've shared

Page 119

1        with us today all of the alleged harassing behavior,

2        including all of the alleged discriminatory behavior

3        and all of the alleged retaliatory behavior that

4        took place in August of 2017?

5            MR. FISCHER:  Objection to form.  You can

6        answer.

7   A.   Correct.

8        BY MR. O'BRIEN:

9   Q.   All right.  Okay.  And if I understand correctly,

10       solely based on the conduct which occurred in August

11       of 2017 that led you to decide that you could no

12       longer continue to work at Hannaford and you had to

13       seek employment elsewhere?

14           MR. FISCHER:  Objection to form.

15  A.   Could you rephrase that?

16       BY MR. O'BRIEN:

17  Q.   As far as your decision -- the question revolves

18       around your decision to leave Hannaford, and if I

19       understand correctly, because of the conduct that

20       Mr. Grover perpetrated upon you in August of 2017,

21       is it fair to say that you concluded that you could

22       no longer work at Hannaford because of that conduct

23       and that you had no choice but to leave?

24  A.   Because of Bruce Grover, yes.

25  Q.   Right.  Okay.  And, in particular, it was the

Page 120

1        conduct that emerged in August of 2017 that

2        precipitated your departure?

3   A.   That we --

4            MR. FISCHER:  Objection to form.

5        BY MR. O'BRIEN:

6   Q.   You can go ahead and answer.

7   A.   That re-emerged.

8   Q.   Right.

9   A.   Right.

10  Q.   So you left so that -- thank you for that

11       clarification.  So you left Hannaford in August of

12       2017 because there had been some conduct by

13       Mr. Grover between February and March of 2017, and

14       then when it re-emerged and there were additional

15       different issues with Mr. Grover in August of 2017,

16       you chose to leave because of that re-emergence?

17  A.   Correct.

18           MR. O'BRIEN:  Okay.  Subject to additional

19       notes being produced by Dr. Wagner --

20           MR. FISCHER:  Yes.

21           MR. O'BRIEN:  -- I'd just, you know, like to

22       reserve keeping this deposition open subject to

23       that.

24           MR. FISCHER:  Absolutely.

25           MR. O'BRIEN:  Yes.  Under that I have no

Page 121

1        questions right now.

2            MR. FISCHER:  I just have two points that I

3        want to address briefly.

4            EXAMINATION BY MR. FISCHER:

5   Q.   Do you recall receiving a coaching memo that

6        characterized you as placing your hand on another

7        employee's chest?

8   A.   Yes.

9   Q.   Okay.  What was the gender of that other employee?

10  A.   Female.

11  Q.   Do you recall making contact with that other

12       employee's body?

13  A.   Yes.

14  Q.   Okay.  Would you agree with the characterization of

15       that contact as being made with the other employee's

16       breast?

17  A.   No.

18  Q.   How would you characterize that contact?

19  A.   Tapping her collarbone.

20  Q.   Okay.  Did you have a PCP in 2017?

21  A.   No.

22  Q.   Did you have a PCP in 2018?

23  A.   No.

24  Q.   Are you currently seeing any physician?

25  A.   Not a physician.

Page 122

1  Q.  Okay.  Did you recently have a doctor's appointment?

2  A.  Yes, with a nurse practitioner.

3  Q.  Okay.  Approximately when did that appointment take

4       place?

5  A.  September 16.

6  Q.  So, today, coming to this deposition, you and I

7       drove up together, correct?

8  A.  Yes.

9  Q.  Okay.  Now, is there any reason that we -- that you

10      did not drive up by yourself?

11 A.  I get anxious driving long distances.

12 Q.  Okay.  And how long has that been going on?

13 A.  About 10 years.

14      MR. FISCHER:  Okay.  That's it.

15      MR. O'BRIEN:  Okay.  I have no further

16 questions.  Thank you.

17      (The deposition was concluded at 2:12 P.M.)

18

19

20

21

22

23

24

25

Page 123

1            SIGNATURE PAGE

2  TO BE COMPLETED BY DEPONENT:

3       I, _____ , have read the

4  foregoing pages of my testimony or have had the foregoing

5  pages of my testimony read to me and have noted any changes

6  in form or substance of my testimony together with their

7  respective corrections and the reasons therefor, on the

8  following _____ Errata Sheet(s).

9       (Signature) _____

10      (Date) _____

11 _____

12 TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:

13      I, _____ , a Notary

14 Public/Attorney in and for the State of Maine, hereby

15 acknowledge that the above-named deponent personally

16 appeared before me, swore to the truth of the foregoing

17 statements and affixed his/her signature above as his/her

18 own true act and deed.

19

20           (Signature) _____

21           (Date) _____

22

23 My Commission Expires: _____

24

25

Page 124

1                CERTIFICATE

2       I, Amy J. Linscott, RPR, a Notary Public in and

3  for the State of Maine, hereby certify that on October 03,

4  2019, the within-named deponent, TIMOTHY RECORD, was sworn

5  to testify to the truth, the whole truth, and nothing but

6  the truth, in the aforementioned cause of action.

7

8       I further certify that this deposition was

9  stenographically reported by me and later reduced to print

10 through Computer-Aided Transcription, and the foregoing is

11 a full and true record of the testimony given by the

12 deponent.

13

14      I further certify that I am a disinterested

15 person in the event or outcome of the above-named cause of

16 action.

17

18      IN WITNESS WHEREOF, I subscribe my hand and affix

19 my seal this date:  October 11, 2019

20

21           _____

22

23           Amy J. Linscott, Notary Public

24 Dated at East Millinocket, Maine

25 My Commission Expires:  May 14, 2020

Page 125

1  ERRATA SHEET FOR THE TRANSCRIPT OF:

   TIMOTHY RECORD - 10/03/2019

2  Corrections:

3  Pg. Ln. Now Reads        Should Read        Reasons

4  ___ ___ _____   _____   _____

5  ___ ___ _____   _____   _____

6  ___ ___ _____   _____   _____

7  ___ ___ _____   _____   _____

8  ___ ___ _____   _____   _____

9  ___ ___ _____   _____   _____

10 ___ ___ _____   _____   _____

11 ___ ___ _____   _____   _____

12 ___ ___ _____   _____   _____

13 ___ ___ _____   _____   _____

14 ___ ___ _____   _____   _____

15 ___ ___ _____   _____   _____

16 ___ ___ _____   _____   _____

17 ___ ___ _____   _____   _____

18 ___ ___ _____   _____   _____

19 ___ ___ _____   _____   _____

20

21 _____

   Signature of TIMOTHY RECORD

22

23

24 _____

   Signature of Notary

25

Page 126

                    BOYCE & LEIGHTON
                  31 Guillemette Street
                   Sanford, Maine 04073
                     (207) 883-0378

October 15, 2019
CHRISTOPHER J. FISCHER, ESQ.
Boynton, Waldron, Doleac, Woodman & Scott
82 Court Street
Portsmouth, New Hampshire  03801
RE:  RECORD V. HANNAFORD BROS. CO.
Enclosed please find your copy of the deposition of
TIMOTHY RECORD, taken in the above-mentioned action on
October 3, 2019.  Also enclosed is the original
signature page and a sheet for corrections.
Please have Mr. Record read your copy of the
deposition and sign the original signature page before
a Notary Public.  If there are any corrections he
wishes to make, they should be made on the enclosed
correction sheet.  Please do not mark on the deposition
transcript.
Please send a copy of the signed original signature
page and correction sheet to other counsel within 30
days.
Thank you.
Amy J. Linscott
Boyce & Leighton, LLC
cc:  Timothy J. O'Brien, Esq.

## $

**$16** 29:13,17,25

**$18.50** 30:1

## 1

**1** 13:18,22

**1-800** 15:9

**1/13/15** 35:9

**10** 44:21 68:9,13 83:24 122:13

**10th** 85:20 86:7

**11** 70:19,23 92:16 93:14,21

**11:22** 43:7

**12** 77:3,11 82:7 83:21

**12th** 102:9

**13** 41:15,17 83:15

**13th** 27:4 94:4,16

**14** 8:19 88:21,25

**14th** 76:25

**15** 35:1 92:7,11

**15th** 27:4 28:4

**16** 23:25 28:6 40:25 97:5,12 122:5

**17** 57:19 84:17 89:3 101:12,16

**17th** 79:17

**18** 29:24 107:22 108:1

**18th** 79:17

**19** 85:11 95:9,20 96:12,17

**19th** 58:7

**1st** 69:8

## 2

**2** 22:20,24

**2007** 6:18 33:15

**2009** 7:6 21:8,9

**201** 15:14

**2010** 8:2 107:9

**2011** 8:5 32:20 33:11,24 34:5,9

**2014** 8:19

**2015** 8:25 9:10 12:22 35:1 36:24 38:8,16 39:16 40:16,25 41:10,16 42:16 110:11,14, 19 111:17

**2017** 9:6 10:11 11:3 20:3,17 21:2 23:25 24:5,6 26:1, 15 27:4 29:4,8,12 44:4,20 52:8 53:14 59:8,15,21,22 60:12,13,22 61:8 63:22 64:23 65:6 67:5,7,19 68:4,9, 25 69:8,19 70:5, 20,25 71:3 77:1,3, 17,21 78:3 81:10 82:2,10,16,22 83:1,2 89:3 92:7, 16 94:4 95:9 97:6 98:23 99:10 101:13,22 102:1,8, 9,23 103:4,7 104:1,10,25 105:12,20 106:6 116:13,16,21,25 117:11,12,20,22 118:10,14,18,22 119:4,11,20 120:1, 12,13,15 121:20

**2018** 29:24 83:24 85:8,13,15,20,21 86:8 109:9 121:22

**2019** 109:10,11

**20th** 58:7 72:21 79:17 96:16,19

**21** 97:6

**21st** 33:24 96:23 98:21

**23rd** 34:9

**24/7** 17:12,16

**25** 68:9

**25th** 36:24 38:8 68:4,25 69:18 70:10 116:16

**26** 70:19,25

**26th** 70:5,10 71:3

**27** 99:10 102:1

**27th** 99:17

**28** 32:20

**29** 26:1 29:3,12

**29th** 29:7 44:4 85:20 86:8

**2:12** 122:17

**2nd** 39:16

## 3

**3** 26:8,12 27:3 79:21

**30** 101:13,22 102:8

**31** 77:3

**31st** 77:17,21 82:16 118:6,18

## 4

**4** 28:22 29:1

**4/16/15** 40:19

**4/2/15** 39:6

**40** 29:20

**43** 32:10

**4:58** 68:25

## 5

**5** 32:17,23

**50** 79:22

## 6

**6** 24:5,6 26:15 39:5,10 61:8 74:17

**6A** 102:20 117:1, 13

**6D** 103:3,6 117:25 118:12

**6E** 103:7 117:25 118:12

## 7

**7** 40:18,23

**7/25/17** 25:11

**7/6/17** 23:20

**766** 18:16

**773** 18:20,21,22

## 8

**8** 43:16,21 61:12 64:21 102:19 117:1,14,25

**8/13/17** 88:21

**8/19** 73:7 74:7 75:24

**800** 17:13

**8:28** 69:19

## 9

**9** 61:7,11,13 65:9

**9:00** 74:1,6 79:8

**9:20** 99:10

## A

**A-C-U-N-A** 45:12

**a.m.** 68:25 69:19 74:1,6 79:9 99:11

**ability** 6:3,7 111:15

**absolutely** 112:18 120:24

**absurd** 80:8 82:1, 8 118:21

**abusive** 52:20 53:1 58:25

**accept** 64:7,11

**accepted** 63:6 64:15 101:24

**access** 16:11 17:11

**accommodate** 5:23

**accuracy** 5:16

**accurate** 30:2,4,7 44:14 52:10 53:8, 22 54:18 55:22 58:1 61:19 62:2,6, 10,14,22 63:4,9 66:6 71:13,18,24 72:4,11,19,25 73:4,12,16,23 74:3,8,14,19,25 75:4,9 76:3,9,13, 18 90:14,18 91:2 94:13 99:1

**accurately** 65:17 71:11 99:20

**act** 58:1

**action** 82:18

**actions** 66:22

**Acuna** 11:14 45:9, 10,11 46:9 48:1 51:15

**addition** 13:10 15:6 80:7 97:17 118:16

**additional** 30:11, 24 118:20 120:14, 18

**address** 18:2,11 68:19 121:3

**addressed** 69:3 101:22

**African** 113:10 114:3,4

**afternoon** 5:22 83:18,19

**age** 84:17

**aggressive** 73:15

**agree** 121:14

**agreed** 28:19

**agreement** 28:20

**ahead** 7:22 97:18 113:21 120:6

**allegation** 104:6

**allegations** 102:16 103:10,12, 15,22

**allege** 103:16

**alleged** 63:13 81:19 116:24 117:10,16 118:8, 13 119:1,2,3

**allegedly** 53:10

**alleging** 86:17

**allowing** 14:4

**Alternatively** 15:7

**AMCS** 41:20

**America** 17:19 40:18

**American** 113:11 114:4

**Americans** 114:3

**AMOCS** 35:10

**AMOCS's** 35:18

**and/or** 7:23 13:12 14:18 104:7

**anniversary** 75:25 81:1

**annual** 13:8,9 15:17 38:24 39:10

**anonymity** 18:6

**answering** 46:17

**anxious** 122:11

**anytime** 69:23 95:13

**apologize** 39:4 46:18 62:18 77:7 112:25

**apologized** 62:23 64:1,3,4,5 76:11

**apologizes** 67:3

**apology** 63:6 64:7,11 72:9

**apparently** 80:12, 25

**Appeal** 19:3,9,21

**appearing** 68:21

**appears** 20:16 22:25 23:5,20 29:2 33:11 38:1 39:16 40:24 44:3 63:25 68:15 69:12,17 77:12 92:15 93:12, 20 94:3 108:5 113:9

**application** 107:15,20

**applied** 8:3,20 107:9

**apply** 94:19 95:24

**appointment** 87:15 122:1,3

**Appraisal** 39:6

**apprehensive** 52:22

**approach** 5:18,24

**approached** 75:6 90:6,22

**approximately** 44:21 122:3

**April** 8:25 9:10 12:22 20:3,17 21:2 39:16 40:25 41:10, 15,17 42:16 59:15, 22 60:8,13,22 61:15 63:16,22 64:23 65:5 103:11 104:25 105:11,20 106:6 116:12,25 117:12

**Archibald** 46:12 48:2 53:12

**area** 58:13,22 100:16

**areas** 11:20

**arising** 87:22

**arm** 89:19

**arrow** 113:14

**Ashley** 20:1,2,5, 11,14,17,25 32:22 33:7,8,10,22 34:8, 18 46:11 59:2,14, 22 60:23 64:22,24 65:2,5,12,23 66:11,16,17,19,23 67:12 68:8 69:15, 18 70:5,10,24 77:14,21 78:10 92:15,18 93:13,20 94:5,12,17 95:11, 12 96:12,16,19,23 97:13,21 98:20 99:10,18 100:2 101:23 104:24 110:22 111:2,3,8, 10 112:3 116:12, 16,18 118:18

**Ashley's** 66:14

**assistance** 81:3

**assistant** 7:7 8:15,21 9:1,5,9,17, 23 10:2,19 30:2,3 35:11 36:25 52:6 110:15,18

**associate** 14:25 15:3 35:22 68:5 69:4 101:17

**associate's** 39:12,14

**associates** 10:22 11:4,9 15:7 21:12 37:5,7,12 40:11 41:19,23 42:4,7 76:2 81:2,8,13 101:20

**assume** 13:11 23:8 26:2,4 35:10 79:17 107:14 111:23

**attached** 39:2,3

**attempt** 99:23

**attempted** 22:17

**attempting** 57:25 67:22

**attention** 8:1 13:25 16:17 38:23 41:18 44:2,16,18

**attorney** 5:5 31:20 108:2

**attorney-client** 112:13

**attorneys** 7:22 88:12

**attribute** 88:18

**attributed** 116:20 118:21

**August** 56:7,13, 15,18,20 57:1,3, 10,11,12,13,19 58:6,7,8 60:6 67:4, 7,19 68:4,9,25 69:18 70:5,10,19, 25 71:3 72:21 75:14,20 77:3,17, 21 78:2 79:19 80:16 81:10 82:2, 9,16,22 83:1 89:3 103:4,7 104:1,9 116:16,21 117:20, 22 118:6,10,14,18, 22 119:4,10,20 120:1,11,15

**availability** 99:15

**awarded** 110:12, 17

**aware** 44:25 45:4, 7,18,20,21 46:4 47:2 48:10 51:2,5 66:16

**― B ―**

**back** 8:21 16:19 23:17 32:15,17 44:17 52:4 55:5 61:12 64:20 70:14, 18 71:23 84:3 96:8 97:10 98:1,5 99:4, 12,23 102:16

107:7 109:14,18 116:8

**background** 6:13

**bad** 81:20

**baguette** 53:25 54:7 55:6,14

**banner's** 17:20

**base** 69:20

**baseball** 53:21

**based** 11:24 26:17 119:10

**basically** 88:3 114:16

**basis** 13:8,9 30:14 31:16 50:25 64:8 100:16

**Bates** 18:16 112:25

**Beeson** 22:1

**began** 6:16 26:18 83:25 107:8

**begin** 6:12

**beginning** 95:1

**begins** 37:10

**behavior** 41:1 42:24 43:3 59:12 60:16 80:9 81:21 82:1,9 116:19 117:24 118:9,13, 21 119:1,2,3

**behaviors** 42:11

**beings** 7:21

**belabor** 31:22

**believed** 60:15 94:21 96:14

**belittled** 78:24

**bending** 57:22

**beneath** 57:23

**benefits** 30:18,21, 24 31:23 95:15

**bent** 73:2

**bit** 41:3 61:12

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
Index: bitch..consistently

**bitch** 55:19,25
56:5,10 57:2,8,17
75:8,13,19 78:15
103:25 104:9

**black** 114:4

**blank** 34:24

**blocked** 112:11,
12

**blocking** 73:18

**body** 90:1 121:12

**Boston** 38:1

**bottom** 26:14 29:3
43:2 78:9 89:20
92:14 93:15 95:3,
5,7 96:9,11 99:8
109:22

**box** 41:5 44:19
113:14

**bread** 53:25

**break** 5:21 19:18
43:7,11 63:17
74:11 79:13,22
83:12,14 116:3,6

**breakdown** 60:8

**breaks** 74:1,5
79:4,8

**breast** 121:16

**briefly** 106:14
121:3

**bring** 7:25

**bringing** 77:7
102:17

**Bros** 5:5 6:16

**brought** 41:17

**Bruce** 10:7,14,20,
23 20:6 21:1 52:8
61:22,24 62:16,17,
21,23 63:3 64:1,4
65:3 66:24 67:2
69:15 71:9,21
72:18,23 73:2,9
74:5,11,12,17,24
75:6,25 76:16 78:2
116:20 119:24

**Bruce's** 63:6 72:9
73:14 75:7

**brushing** 42:7

**build** 37:6

**built** 95:15 115:21

**business** 108:5
112:16

**Bye** 98:10

---

**C**

**cabinet** 89:18

**call** 55:24

**called** 99:11

**calling** 15:9 55:19

**Campo** 20:11,14,
25 33:8,10,23
34:18 46:11 59:2,
15,22 60:13,23
61:3 64:23 65:5,
12,23 66:11 67:12
70:6,11 77:14,21
78:10 82:16 92:16
93:13 95:11,17
96:12 99:10
104:24 105:4,11,
13,19 106:14
111:3 112:3
116:12,17,18
117:12 118:7,18

**candid** 49:2

**capital** 13:13
113:11

**caps** 35:10

**capsule** 110:20

**card** 108:5 112:16

**care** 87:13

**carefully** 44:13

**case** 20:15 32:7
86:17 89:4

**categories** 39:22,
25

**caused** 27:19
40:10

**causing** 37:6

**center** 72:24 90:5,
22

**chain** 68:9,13

**change** 98:3

**characterization**
121:14

**characterize**
27:10 34:11 80:8
106:17 121:18

**characterized**
121:6

**charge** 43:17,22
44:13 102:20

**chase** 114:16

**check** 95:21

**checked** 41:5

**chest** 35:18 121:7

**choice** 119:23

**choose** 114:5

**chose** 100:24
120:16

**Christmas** 31:25

**circle** 23:17

**civil** 113:18

**claimed** 72:21
74:22

**clarification** 46:1
120:11

**clear** 7:16 19:2
103:9

**clinical** 84:11 85:1

**clipboard** 58:12,
17

**close** 42:6

**closed** 73:7,21
75:24 113:17

**closet** 84:17

**closing** 96:25
97:23

**co-workers** 21:20
44:25 45:3,7 46:4
47:10 50:2 51:7,11
115:18

**coach** 37:5

**coaching** 27:9,10
28:4 32:23 33:2,4
34:12,17,25 36:9,
11,18,23 37:21,24
38:2,7,16,20 121:5

**coaching-type**
34:2

**collarbone**
121:19

**college** 108:17,22,
24,25

**colon** 16:23 17:12,
16,24

**comfortable**
48:23 50:21 71:9
72:8,18 114:19

**comma** 23:18,19
35:5

**commenced** 26:5
29:6

**commencement**
60:10

**comment** 55:12
56:5 57:1 75:13,19
78:15

**comments** 41:24

**Commission**
43:17,23

**communication**
101:23

**company** 13:1
28:15 80:13 95:25
112:3

**company's** 13:12,
16 42:24

**compensated**
30:13

**complained**
60:23

**complaint** 20:15

**complete** 85:19
86:5

**completely** 12:7

**compliance** 17:8,
24

**compliment**
111:18,20

**complimentary**
112:2

**Compo** 34:8

**comprehend** 6:4

**computer** 89:16

**concern** 16:22
78:23

**concerns** 15:7
26:23 76:16

**conclude** 82:22

**concluded**
119:21 122:17

**concludes** 76:15

**condition** 6:3
63:7 64:12,15
86:22

**conditions** 64:10

**conduct** 60:24
62:25 64:2,4 67:7,
13,18 81:20,25
82:8,22 83:1
116:24 117:20,23
119:10,19,22
120:1,12

**conducting** 42:12

**confidentiality**
18:7

**confirm** 113:9

**confused** 19:16
20:8 114:11

**confusing** 110:7

**confusion** 37:7

**congratulations**
101:25

**conjunction**
42:22

**connection** 36:4
91:6

**consideration**
69:6

**consistently**
40:12

**consists** 43:24

**constituted** 60:15

**contact** 17:23 35:5 90:1 98:8 121:11,15,18

**contacted** 71:21 72:1

**contents** 94:13

**context** 48:20 62:20 77:9

**continue** 30:9,13 61:24 119:12

**continued** 8:18, 24 9:4 67:3 78:13 90:8,24

**continues** 61:22 62:4,8,12,16 71:20 73:14 74:10 76:11

**continuing** 82:23

**convenient** 95:13

**conversation** 32:21,23 33:22,23 34:8 35:9 61:16,19 62:21 66:5 70:19 89:10 90:9,10 105:22

**conversations** 115:20

**copy** 37:21 38:15 42:24 77:20 82:15

**core** 48:4

**corner** 35:4 40:25 43:3 44:3,5

**correct** 6:19 7:9 11:1 12:23 15:21 20:19,22,23 21:3, 21,23,24 22:4 23:11 24:7 25:3,7, 9,16 26:7 28:21 29:4,13 33:9 37:2 43:5 44:10 45:1,2, 13 48:17,22 50:17 52:3,10,11,15 53:2 54:1,24 56:8,16 58:20,23 59:2,9 60:18,25 61:1,6 63:10,23 64:13,18, 19 65:1,8 66:2,21

67:6,9,21 68:2 69:1 71:12 76:4 77:16 78:6,16 79:1,2,5,9,18,19, 20,23 80:4,9,10 81:15 82:11,25 83:5 88:9 92:16 93:14 94:1,2 98:23 101:10,11 102:14, 23 103:20 104:12, 21 107:12 116:1, 13,14,22 117:15, 18,21 118:1,14,15, 22,23 119:7 120:17 122:7

**correctly** 6:15 7:6 8:2,18 10:25 15:4, 10 16:23 17:1,5,9, 14,17,21 18:3,8 23:6,21 25:12 26:2 28:8 29:6 32:12 35:6,14,18,23 36:2 37:1,8,13 38:9 40:13 41:21 42:2, 8,13,23 52:23 53:14,24 56:10,25 58:11 61:17,25 62:6,10,13 63:4,8, 20 64:24 66:6 67:2,10,17,18 69:9,24 70:4 71:12,18,23 72:3, 11,19,25 73:4,11, 15,22 74:3,7,14, 18,25 75:4,9,12 76:3,8,10,13,18 77:14,25 79:15 82:21 86:16 87:20 90:25 91:1 92:22 94:10 96:2 100:5 102:3,11,18 110:3 115:22 116:9 117:9 119:9,19

**counseling** 40:19,24 41:1,4,5, 8 42:16,20,22 84:10,18

**counselors** 85:1

**couple** 14:10 23:2 78:14 89:1 90:4 105:3,14,18

**court** 20:16 97:19

**cover** 74:5

**covered** 59:16 73:3 78:18,21,25 80:24

**CUNNINGHAM** 18:20 39:2

**customer** 8:21 12:15 35:11

**customers** 75:3 81:8

**cut** 73:18 114:16

---

### D

**damages** 86:18

**Dan** 11:14 45:9,10 46:9 48:1 51:15 115:19

**dash** 16:20 23:20

**date** 23:20 26:15, 18 29:3,12 30:6 41:15 52:18 70:8, 17

**dated** 27:3 35:1 36:24 38:7 39:16 40:25 44:4 68:24 77:17 82:15 83:23 92:16 95:9 99:10 101:21 118:18

**dates** 79:16 86:9 93:22 96:13,18

**David** 46:12 48:2 53:12

**day** 26:1 69:7 70:13 71:5 94:6 95:16,20 97:2 99:16

**days** 30:23 32:4 74:6

**deal** 67:22

**dealing** 34:10

**deals** 38:18

**December** 85:8, 13,15

**decide** 119:11

**decided** 67:11,23 69:6 71:11 99:17,

18

**decision** 119:17, 18

**declare** 44:9

**declined** 54:14

**deductible** 31:15

**Delhaize** 17:19,23 40:18

**deli** 6:17,20 7:7,10 99:13

**delivered** 38:2

**demeaning** 55:18 56:11 57:9,16 103:23 104:7

**depart** 68:6

**departed** 9:6,21 19:7

**department** 6:18, 20 9:1,5,9,23 10:3, 17,18,21,22,24 11:2,5,8,10 12:6, 11,12,14,21 40:10 52:6,9,13 54:10 55:2 57:23 59:8 61:16,20 72:23 73:9 76:1 81:2 89:5

**departure** 22:18 27:18 32:18 68:14 84:8,24 87:8 88:17 120:2

**depicting** 108:15

**depiction** 108:8

**DEPONENT** 7:19 43:12 109:25

**deposed** 5:2

**deposition** 13:22 22:24 29:1,23 32:16 36:22 38:6 39:10 40:23 43:21 61:11,13 64:20 70:23 77:11 79:7 80:25 81:24 82:6 83:20 88:25 92:11 97:11,21 101:16 108:1 120:22 122:6,17

**derogatory** 55:18 56:11 57:9,16 103:23 104:7

**describe** 10:16 27:22 30:18 49:15 50:1 53:1 87:6 108:14 113:20

**describes** 58:24 113:12

**description** 41:14,16

**deserve** 21:14

**desire** 68:6 70:6 79:8

**detail** 78:18,21

**dialogue** 115:7,8

**difficult** 76:21

**dinner** 76:1 81:1

**direct** 17:2,3,4 52:14 82:17

**director** 15:2

**disclosed** 47:6

**discovery** 108:3

**discriminating** 59:11 81:20

**discrimination** 14:18,20 43:17,22 63:14 102:17,20 103:10,12 116:10

**discriminatory** 52:19 59:17,20 60:15 67:20 81:25 82:8 103:15 118:9 119:2

**discuss** 16:25 17:2,4,7 93:11 100:11

**discussed** 28:11 70:6 106:15

**discussing** 115:2

**discussion** 24:10, 16,19,22 27:21,22, 24 28:1,10,13 34:15 37:23 38:20 42:18 55:10,15 62:24 63:25 64:6,

22,24 65:17,18
66:7,23 70:24
75:12 92:1 104:24
116:17

**discussions**
34:18 49:6,11,14
50:1,9,11,12,14,19
92:4 105:3

**distances** 122:11

**distress** 86:18
87:7

**district** 15:2

**Diversity** 15:13

**doctor** 88:4

**doctor's** 122:1

**document** 28:25
29:11 32:20 34:7,
21,24,25 36:22
37:16 38:6,12,23
39:22 43:25 52:5
78:9 81:19 97:9
98:25

**Documentation**
32:24

**documents** 27:2,
3 28:22 32:16
76:23 110:9

**Dodge** 11:14
45:15 46:9 48:1
51:15

**Don** 11:14

**door** 18:15 19:3,8,
21,23,24 20:10
21:5,22 22:14,17

**Dover** 100:20

**drama** 40:10

**drawer** 89:20

**dream** 90:7,23
91:7,9,10,13,17,21

**dreams** 92:5

**drive** 122:10

**driving** 122:11

**drove** 122:7

**Dube** 46:11 69:4
100:11 101:12,17,

20

**due** 74:1 87:14

**duties** 27:7

———————————

**E**

**e-mail** 18:2 68:9,
13,14,19,22,24
69:17 70:2,9 71:4
77:3,12 78:6 82:15
92:15,25 93:2,9,
12,15,21 94:12,14,
22 95:2,4,9,17,19,
20 96:22 97:14,25
98:12 99:9 100:9
118:6,18

**e-mailed** 68:4,8

**e-mails** 68:16
92:7,12,13 94:25
99:6

**earlier** 75:12 90:5,
20,21

**early** 69:11 81:12
95:20

**easier** 114:19

**easily** 31:21

**eat** 54:18

**eating** 62:9

**EEOC** 20:16

**effectively** 65:6
99:7

**effeminate** 55:19
56:11 57:9,17
103:24 104:7

**eighth** 39:25

**elect** 31:6

**emanating** 68:22

**emerged** 67:19
120:1

**emotional** 86:18
87:7

**employed** 30:16

**employee** 14:14
19:19,25 20:9 21:4
26:8,13 30:19

53:6,10 57:25
110:4 111:4 121:9

**employee's**
121:7,12,15

**employees** 47:23

**employment** 9:6
22:12,16 25:15,22
26:5,18 27:15
28:18 29:7 33:14
34:19 43:16,23
50:23 54:22 56:1
58:5 59:7 60:10,11
67:11,24 68:7,14
70:7 83:2 93:3
100:4 101:3 102:2,
10,22 119:13

**enabling** 18:6

**encounter** 35:17

**end** 37:5,7,12
41:19 75:8 87:16

**engaged** 35:9
103:16

**enhanced** 32:2

**ensure** 42:11

**entailed** 110:21

**entire** 90:18

**entitled** 13:25
16:20 26:12 29:23
34:25 35:4 36:23
38:8

**entries** 109:6

**environment**
37:11 52:20

**Equal** 15:22 43:16,
23

**escalated** 35:13

**essentially** 66:10

**ethic** 111:14

**Ethics** 17:24

**evaluation** 38:25
39:11,19 40:16

**evening** 8:4 20:4
33:25 34:10 61:4,
14 63:21 107:11

**events** 72:17 91:3

**EXAMINATION**
5:3 121:4

**examined** 5:2

**exchange** 95:2
100:9

**exciting** 97:24

**excuse** 72:6 89:21
104:22

**exhibit** 13:18,22
22:20,24 26:8,12,
22 27:2,3 28:22
29:1,23 32:16,23
33:21 36:22 38:6
39:4,5,10 40:18,23
43:4,16,21 61:7,
11,13 64:21 65:9
68:9,13 70:19,23
77:3,11 79:7 80:25
81:24 82:6 83:15,
20 88:21,25 92:7,
11 97:5,10,12,21
99:5 101:12,16
102:19 107:22
108:1 117:1,13,25

**exhibited** 59:12
117:24

**expectations**
33:25 37:4 38:9

**experiences**
109:14

**experiencing**
88:5

**explained** 65:2
67:12

**explanation**
110:24

**extend** 76:21

———————————

**F**

**F-A-R-A-H** 8:13

**face** 73:2

**fact** 91:14,20

**faggot** 49:23

**fair** 5:9,18,24
11:18 12:24 19:7,

11,20 22:8 23:23
25:14 26:25 27:8,
13 28:17 33:1
34:1,11,17 37:20
38:15 39:23 40:15
41:7 44:12 47:5,9
48:5,8,9,11,23
49:5,11 50:4,8,21
52:1 54:20 63:11
64:9 65:16 66:3,6
75:20 77:20 78:20
82:16 86:1 91:22
92:24 96:16 98:17
99:1 100:25
102:13 105:7,15,
17 106:1,5,8,13,25
107:17 111:2,8,9
112:4 114:2
119:21

**fairly** 40:12

**familiar** 13:15
15:14,24 16:1,10,
11 70:13

**family** 71:10

**Farah** 8:9,11,12

**Farrell** 8:10

**fashion** 114:19

**favoritism** 40:9

**fax** 18:1

**February** 10:11
11:3 38:8,16 52:8
53:13 59:8,21
60:10,11 71:23
76:25 102:23
116:25 117:11
120:13

**feel** 41:19,23,25
42:1,5 69:22 87:7

**feeling** 76:12

**feet** 53:7

**felt** 50:24

**Female** 121:10

**Fields** 100:20

**file** 26:23

**filed** 20:15 43:22

**filing** 89:18

**filled** 94:19

**final** 18:14 25:25 29:22

**finally** 81:12

**find** 80:13

**fine** 64:14 67:4 72:10 112:15

**finish** 7:15 109:23

**finished** 46:17

**FISCHER** 7:14 9:18 11:21 14:2,6 18:12,16,19,22,24 19:14 21:10 24:1 39:1 43:10,13 45:23 46:6,16,21 47:18 49:8,16 51:4,22 53:15 54:23 56:2,21 57:5 58:15 59:3,23 67:14,25 72:12 75:16 82:3 83:6,13 87:24 88:7 91:16 98:13 101:5,8 102:24 103:18 104:2,11 109:23 110:1 111:5 112:14,16,19,25 114:9 116:5 117:2 118:2 119:5,14 120:4,20,24 121:2, 4 122:14

**fit** 28:12,14

**flip** 99:5

**floor** 53:19

**focus** 46:3

**focused** 87:11

**focuses** 103:24

**follow** 7:25 70:25 72:7

**follow-up** 23:17 27:23 31:19 105:3

**follow-ups** 116:4

**form** 9:18 11:21 19:14 21:10 24:1 35:9 40:11,19,24 47:19 49:8,16 51:4,22 53:15

54:23 56:2 57:5 58:15 59:3,23 67:14,25 72:12 75:16 82:3 83:6 87:24 88:7 91:16 101:5 102:24 103:18 104:2 111:5 114:9 117:2 118:2 119:5,14 120:4

**formed** 40:8

**Forty** 29:18

**Forty-three** 32:11

**forwarded** 69:14

**foster** 37:11

**found** 67:19 72:2

**fourth** 39:25 89:7

**free** 50:24 69:22

**Frequently** 16:20

**fresh** 74:23

**Friday** 68:25 69:7, 11,18

**friendly** 47:10,15, 24 115:13

**friends** 50:16 108:16 113:17 115:11

**friendship** 48:16, 20

**friendships** 48:12,13,15,18 115:18,20,24

**front** 37:4,7,12 39:11 41:19 54:2, 7,10 55:2 72:22 78:15,24 83:20 98:25

**fruit** 73:18

**frustration** 37:6

**full** 5:16 95:14

**full-time** 30:1 94:7,20 95:24 99:18 100:3,15 101:24

**fuller** 112:22

**fully** 5:15 6:4,8 13:17 44:14

**funny** 62:17

---

**G**

**Garland** 80:18

**Gary** 46:11,13 100:11

**gave** 7:24 77:14, 20

**gay** 21:12,13 44:25 48:6 49:6,12,15 51:18 78:13 113:12,13 114:17

**gays** 113:11 114:6,16,20

**gender** 121:9

**general** 84:15 106:9 115:3

**generic** 6:6

**genitals** 53:21,25

**gentleman** 11:6

**George** 68:17,18, 19

**gestures** 57:24

**girlfriend** 80:13

**give** 97:9 110:23

**giving** 78:10

**global** 6:15

**globally** 12:13

**Glover** 60:16

**God** 21:12,13

**Golden** 23:5,9,18, 24 24:14,17 25:2 26:8,12,19,23,24 27:5,7,11,15,19 32:8,14 71:17 83:3,8

**good** 5:4 28:12,14 43:6 83:12,13,18, 19 89:6 95:11 107:6 112:6,9,20

**goodbye** 81:13

**graduated** 108:17,24,25

**Gray** 11:15 48:1 51:15

**great** 7:2,21 95:16 116:5

**grocery** 89:14

**groin** 58:13,22

**group** 113:12

**Group's** 17:23

**Grover** 10:8,14, 20,23 20:7 21:1 52:8,14,17,18 53:10,19,20 54:12, 16 55:11,15,17 57:24 58:11 59:1, 7,12 61:22 62:22, 23 64:1,4 65:3 66:24 67:3,8,13,18 69:15 78:2,24 79:3,24 80:12 81:1,12,21,25 82:1,9 103:16,24 106:3,7,24 116:20 117:24 118:22 119:20,24 120:13, 15

**Grover's** 52:21 54:21 58:4 60:11, 24 63:13 80:8 102:22 104:8

**guess** 72:17

**guidance** 7:24

---

**H**

**half** 44:19

**halfway** 89:2

**Hamilton** 36:20

**Hampshire** 52:7, 23

**Hampton** 6:16 7:7 8:22 9:2 21:17,19 33:14 52:6,23 69:7 100:16,21 101:18, 21 107:8 108:6

**hand** 35:17 54:6 121:6

**handled** 72:10

**hands** 35:22 58:12,19,21

**handwritten** 22:20 23:1 27:3 109:6,13

**Hannaford** 5:5 6:16 11:18 12:1, 10,25 14:13 15:15, 25 16:2,8,12,15 19:5,8,12,20 22:18 32:15 39:5 44:20 49:2 50:15 52:7,8, 22 53:6 69:4,7 82:23 84:9,25 87:8,23 88:6,18 92:20 93:4 94:7 98:2,8 99:24 100:5,10 101:25 102:3,11,18 103:16 107:8 109:7 110:4 113:17 115:12,18 119:12,18,22 120:11

**Hannaford's** 67:24 68:6 70:6 83:2

**happen** 6:25 64:12,16

**happened** 105:6, 24 107:1 113:1

**happy** 5:9,23 96:1

**harassing** 58:25 59:11,17,20 60:15 67:20 81:20,25 82:7 103:15 116:24 117:20,23 118:8,13 119:1

**harassment** 14:18,20 52:21 53:1 60:24 63:14 78:13 102:17 103:10,13 116:10, 18 117:10,17

**Harvest** 23:5,9,18, 25 24:14,17 25:2 26:8,13,19,23,25

27:5,8,11,16,19,20
32:8,14 71:17
83:4,8

**head** 53:8

**heads** 5:13

**health** 31:2,6,7,9,
12,16 84:12,22,25
86:11,13,22 87:11,
12 88:17

**healthcare** 84:10
87:18,21

**hear** 69:20 73:20
102:9

**heard** 99:12
104:19

**helpful** 113:8

**helping** 81:2

**highly** 111:4

**hike** 91:14

**hiking** 91:10,12,21

**Hilary** 36:20

**hire** 29:11 60:4

**hired** 9:16 10:11
52:8,17

**History** 29:23

**hold** 97:8

**holidays** 31:24
32:1

**home** 68:19,22

**hope** 94:9

**hostile** 52:19,20

**hour** 29:13,17,25
30:1

**hourly** 29:25
30:14

**hours** 29:15,20
32:8,10,11 53:20
74:17 79:21

**house** 96:25 97:23

**Howard** 20:5,18
21:2 59:14,21
60:12 61:4,7,14
62:21,24 63:12,13,

21,25 64:25 65:4,
7,10,14 66:1,12,24
105:1,13 116:12
117:11

**Howard's** 65:16

**HR** 63:8 71:20 72:1

**human** 7:21 17:8

---

**I**

**I-SHARE** 13:12,
13,16 15:9,10
16:5,15,18,20
17:11

**idea** 108:9

**identification**
13:19 22:21 26:9
28:23 32:24 39:7
40:20 43:18 61:8
68:10 70:20 77:4
83:16 88:22 92:8
97:6 101:13
107:23

**identified** 10:4
47:1,23 49:1
78:13,23 79:1,8
80:11 116:18

**identify** 20:13

**identifying** 80:22

**immediately**
25:5,8 44:8 52:17
94:3

**impact** 6:7

**important** 77:8

**inaccurate** 90:16,
17

**inappropriate**
71:21 116:19
117:23

**incident** 34:16
36:5,8 41:14,15,16
58:3

**incidents** 59:16
103:6 118:13,19,
20

**include** 110:10

**included** 15:17,20
62:8 109:2

**including** 118:20
119:2

**Inclusion** 15:13

**inclusive** 37:11

**incorporated**
118:19

**increase** 30:6

**increases** 30:11

**indicating** 26:23
94:17

**individual** 9:16
10:7 38:2 64:8
111:4

**individually** 12:9

**individuals** 10:4
14:24 47:1,6 48:21
49:1 114:19

**inflection** 54:17
55:20,21

**information**
13:12 48:5,9,19
51:8,12 52:1
65:13,25 75:23
82:19 109:2

**informed** 41:23
68:6 105:23

**initial** 20:4 60:16
64:25 93:15,21
95:2

**initially** 20:18 21:1
59:14 83:3 107:7

**initials** 43:2

**innocuous**
112:16

**instance** 103:25

**instances** 81:23
102:21 104:15
118:5

**insurance** 31:2,7,
10,13,17

**intent** 55:21

**intentional** 52:21

**intentionally**
113:2

**interested** 95:24
99:13

**interject** 7:14 14:8
110:1

**internally** 67:23

**internet** 80:12

**interrupt** 46:18
57:20

**interview** 24:25
25:4,21

**interviewed**
107:13

**interviewing** 25:1

**interviews** 25:24

**intranet** 17:19,20

**invades** 42:5

**inventories**
12:17,20

**inventory** 74:23,
24 75:2 81:7

**involving** 50:5,10

**issue** 31:22 33:3
34:4 106:12

**issues** 6:14 27:6
50:5 60:14 78:1,12
80:7 84:13,22
87:22 88:4 120:15

**item** 78:25 80:11

**itemize** 77:23

---

**J**

**January** 8:5 35:1
36:24 83:24 85:9,
11,20 86:7 109:8,
10,11

**Jared** 25:11,17,19

**Jeff** 20:5,18 21:2
59:13,21 61:4,7,14
62:21,24 63:12,13,
21,24 64:25 65:3,
7,10,13,16 66:1,
11,17,18,20,24

105:1 116:12

**Jeff's** 66:4

**Jeffrey** 83:15

**Jen** 46:11

**Jim** 23:15 24:10,14
25:1

**job** 23:20 25:5,8,
24 28:11,12,14
71:16 95:14
107:13

**Joe** 11:14 45:15
46:9 48:1 51:15

**John** 80:18,20

**joke** 50:9

**joked** 50:5

**jokes** 50:18,24
51:3

**journal** 109:3,5

**July** 23:25 24:6
32:20 74:23 75:15

**jump** 7:22

**June** 8:19

---

**K**

**keeping** 120:22

**kills** 21:12

**Kittery** 71:17

**knew** 47:23 111:2,
3,14

**knowing** 76:12

**knowledge** 82:17

**Kyle** 58:10 72:24
73:3,18,19,21
78:24 80:13 88:21
89:2,10,12

---

**L**

**lack** 112:6

**language** 93:6
103:24 104:8
114:7

**Lasher** 58:10 88:21 89:2,10,24 90:11 92:4

**Lasher's** 89:12

**Lavigne** 8:9,10,14

**lawyers** 110:6

**leader** 6:17

**leading** 37:4

**leave** 27:19 28:20 67:23 69:6 70:6 71:11 83:2 96:24 119:18,23 120:16

**leaves** 81:12

**leaving** 97:14

**led** 27:18 82:22 110:12 119:11

**left** 19:12 22:12,16 27:15 28:18 94:8 97:13 98:20 99:11 109:7 120:10,11

**left-hand** 44:3,5

**leg** 89:20

**legal** 17:8

**length** 16:6

**letter** 101:12,16,20 102:5,14

**Lexapro** 6:6 86:23,24 87:3,18

**licensed** 84:11 85:1

**limit** 6:3

**Linda** 11:6 46:13

**Linda's** 46:13

**Lindsey** 38:1

**lines** 31:21 85:3 105:5

**listen** 6:3,7

**loaf** 53:25

**local** 17:7

**log** 112:19

**long** 7:2 9:13 30:22 87:1 122:11, 12

**long-winded** 110:7

**longer** 9:17 71:9 119:12,22

**looked** 23:3

**loss** 87:9

**lot** 23:6,10 24:9,10, 11,14,15,17 45:18

**lower** 44:5,19

**lunch** 43:8 74:18 79:25 83:12,14

**lunchbox** 89:18

---

**M**

**M-C-C-U-B-R-A-Y** 7:1

**made** 20:4,5,17 22:9 30:19 41:24, 25 50:19 52:22 55:12 57:24 59:13 61:4 63:12,20,24 64:15 65:19 66:15, 16 71:21 73:2 78:6 105:1,11,12,20 109:7 116:11 121:15

**maiden** 33:7

**Maine** 71:17

**maintains** 13:1

**majority** 109:6

**make** 21:22,25 22:5 31:19 44:13 53:10 59:10,15 63:18 72:8 104:14 108:8,15,19

**making** 20:10,18 74:17 78:8 80:25 81:1 121:11

**management** 12:5 14:25 80:9 82:1,8 116:19 118:21

**manager** 6:21 7:2, 7,11 8:4,7,16,21 9:1,5,8,9,17,22,23 10:2,20,23 20:5 22:3 25:19,20 27:5 30:2,3 34:1,11 35:11 36:25 52:6, 9,13 60:23 61:5,15 63:22 68:5 69:5 71:10,16 72:24 74:11 89:14 101:17,21 107:11 110:15,19 112:3

**manager's** 89:17, 23,24

**managerial** 117:23

**managers** 10:1

**manner** 27:6 35:23 96:5 104:16 114:8

**March** 29:24 53:13 102:23 120:13

**mark** 73:20 79:25

**marked** 13:18,21 22:20,23 26:9,11 28:23 29:1 32:16, 24 39:6,9 40:19,22 43:17,20 61:8,11 68:10,12 70:20,23 77:3,11 83:16 88:22,25 92:8,11 97:6,11,20 101:13, 15 107:22,25

**Market** 29:7

**Markets** 28:22

**marks** 73:19

**mat** 57:22 72:22 78:14

**matter** 5:6 15:18 20:14,24 24:21 38:20 42:19 51:3, 21

**Mccubrey** 6:22,24 46:12 48:2

**Mckinnon's** 25:10,15 26:1,5 28:22 29:7,16 30:19 32:9,15 83:9

**Mcpherson** 46:12

**means** 113:8

**meant** 23:8 110:13 113:20,21,22

**meat** 10:18,21,23 11:10 25:19 52:9, 13 54:18 55:2 57:23 62:9 89:4,5

**meats** 54:15

**medical** 6:2 83:15

**medication** 6:2 74:2 79:5,9 86:21 87:4

**meet** 93:14,24 95:13 96:1,13,15, 20

**meeting** 25:11,21, 23 33:17 37:4 38:8 100:10 106:12

**meetings** 109:16

**meets** 39:24

**member** 14:25

**memo** 28:4 32:24 33:2,4 34:2,12,15 35:1 36:9,11,19,23 37:21,24 38:2,7,16 42:20,23 88:21 89:1 121:5

**memorialize** 109:19

**memorialized** 34:15

**memos** 27:9,11

**mental** 84:10,12, 22,25 86:11,13,22 87:11,12 88:17

**message** 35:8 97:5,13,15,22 98:20 99:12

**met** 33:16 65:5 70:5,10,17 71:2 106:2,5

**methods** 18:6

**middle** 41:2

**mind** 45:6 110:11

**minutes** 79:22

**mm-hmm** 5:10,14 59:18

**mom** 76:23

**Monday** 99:12

**month** 85:10 87:16

**months** 56:6,7 87:2

**morning** 5:4,22 69:11 89:6 95:12

**mother** 76:8,20

**move** 6:13 18:10 32:14 55:8 60:21 107:17

**moved** 8:25 29:24

**moving** 78:20

**mutual** 28:20

---

**N**

**N-WORD** 113:11 114:3

**named** 11:6 48:2

**names** 11:12 25:17 46:14 55:19

**natural** 7:21

**nature** 25:23

**nearby** 57:24

**needed** 62:18 81:2

**needing** 74:2 100:3

**network** 17:11

**nice** 90:8,24

**night** 63:2 90:7,23

**nods** 5:13

**nominated** 110:22

**noon** 97:22

**Notary** 5:1

**notations** 109:13

**note** 23:4,16,18 24:8 25:10,14,25 61:7,13 65:17 66:5 78:19 79:21

**notes** 22:20 23:1, 24 26:22 27:3 78:6,8 82:6 107:22 108:2,4 120:19

**notice** 71:4

**Notify** 14:23

**November** 33:24 34:4,9 44:4 61:8 85:20 86:8

**number** 13:22 15:9,14 16:25 17:3,7,11,13,25 18:1 22:24 26:12 29:1 32:17 39:10 40:23 43:21 44:21, 24 52:5,12,16 53:3 61:11,12,13 64:21 70:23 77:11 82:7 83:21 88:25 92:11 97:12 100:15 101:16 102:19 108:1 111:9,10 117:14,25

**nurse** 122:2

**O**

**O'BRIEN** 5:3,4 7:20 9:19,20 11:23,25 13:20 14:4,7 18:14,17, 21,23,25 19:17 21:15 22:22 24:4 26:10 28:24 32:25 39:3,8 40:21 43:6, 15,19 45:25 46:2, 20,24,25 47:21 49:10,19 51:6 53:17 54:25 56:4, 23,24 57:7 59:6 61:9 67:16 68:3,11 70:21 72:14 75:18 77:5 83:7,11,17 88:2,10,23 92:9 97:7 98:14 101:14 103:2,21 104:5,13 107:24 110:2 111:7 112:10,15,

18,20,21 113:3,4 114:13 116:2,7 117:5 118:4 119:8, 16 120:5,18,21,25 122:15

**O-W-N** 113:10

**object** 19:14 21:10 47:19 114:9 117:2

**objection** 9:18 11:21,24 24:1 49:8,16 51:4,22 53:15 54:23 56:2 57:5 58:15 59:3,23 67:14,25 72:12 75:16 82:3 83:6 87:24 88:7 91:16 101:5 102:24 103:18 104:2,11 111:5 118:2 119:5, 14 120:4

**observation** 114:2

**obtained** 9:10 83:8

**obvious** 54:17 55:20

**occasion** 106:14

**occasionally** 68:16 112:12

**occasions** 79:11 86:2 89:16,22 105:14,18

**occur** 50:14 55:1 58:3,4 106:18

**occurred** 21:9 27:23 54:3,20 58:8 60:6 64:24 66:8 75:13 81:9 82:2,9 90:14,16 102:21 103:7 109:18 116:20,24 117:10 119:10

**October** 6:18 102:9

**offensive** 52:19

**offer** 31:2 92:19 93:3,7,10 98:5 101:25

**offered** 8:3 25:5,8

**offering** 54:15

**office** 17:24 74:11, 13 89:17,23,24 106:20,23

**one-page** 99:7

**one-week** 71:3

**onward** 11:3

**Oops** 93:25

**open** 18:15 19:2,3, 8,21,23,24 20:10 21:5,22 22:14,17 49:2 89:20 94:8,9, 21 120:22

**open-ended** 46:22

**openings** 100:12, 15 101:3

**openly** 47:6 55:18

**operations** 8:4 12:5 20:4 33:25 34:11 61:4,14 63:21 107:11

**opportunities** 25:22 37:5 100:25

**Opportunity** 15:22 43:16,23

**opposed** 24:6

**opted** 83:2 101:3

**option** 43:9

**options** 16:22

**order** 92:14 107:17

**ordering** 12:15

**ordinarily** 32:9

**ordinary** 107:19

**organizational** 10:16

**orientation** 45:1, 4,8,20 46:4 47:3,7, 24 48:6,11,21 50:6,10 51:12

**outcome** 72:9

**outset** 6:1 68:15

**overheard** 51:2

**overt** 52:21

**overview** 110:11

**owner** 23:13 24:13

**owns** 113:11

**P**

**P.M.** 122:17

**packet** 34:22 38:24

**pages** 16:6,19 17:20 26:21 43:24 92:13 95:1 115:17

**paid** 29:16

**Pam** 11:15 45:9,14 46:9 48:1 81:3 115:19

**paragraph** 37:10 40:5,7 52:12,16,25 53:2,5,18 54:14 55:17 56:19,21,23, 25 57:4,21 59:25 60:21 64:21 72:15 73:6,25 74:21 75:22 76:5 89:15 90:18,21 102:7,19, 20 103:6,14 117:1, 13

**paragraphs** 90:4 103:3 117:25 118:12

**parentheses** 73:7,8 75:24,25 80:19 113:16,17 115:19

**parking** 23:6,9 24:9,10,11,14,15, 17

**part** 27:25 95:23 107:14 109:17

**part-time** 99:13

**parted** 28:16

**Partial** 12:18

**partially** 39:24

**particulars** 44:18

**parts** 19:18 73:3

**passed** 72:2

**passes** 109:1

**passing** 76:8,20, 22 106:11,16,18, 22

**past** 10:14 61:15 79:12,15 109:19

**patience** 110:8

**Patrick** 25:11,17, 19

**pay** 29:11,13 30:4, 9 31:8,12 32:2 98:3

**PCP** 121:20,22

**Pelvin** 68:17

**penalty** 44:9

**people** 21:13,14 45:18 48:4,25 51:16 113:12,24 114:25 115:3,5,10

**people's** 46:14

**perception** 40:9

**Perfect** 107:4

**perform** 58:1

**performance** 26:24 27:11 33:2 34:10 36:25 38:19, 24 39:5,11,18 40:16,18,24 42:15 111:14

**performing** 27:7 74:24

**period** 9:13 10:6 60:7,9,16 75:8 80:1 117:17

**periods** 85:23

**perjury** 44:9

**perpetrated** 119:20

**person** 75:3

**personal** 41:1 42:5,24 43:3 51:8,

11,21 52:2

**personnel** 26:22

**perspective** 6:15
110:13

**pertains** 25:14
26:4

**Ph.d.** 83:16

**phone** 17:12,25
74:12

**photo** 108:8,16,22

**phrase** 113:15

**physical** 35:5
87:14,15

**physician** 87:13
121:24,25

**pick** 97:19

**pickles** 89:8

**picture** 108:11,12

**piece** 75:22

**pillow** 53:8

**place** 14:13 19:5
35:22 37:16 56:13,
19 57:22 58:18
78:1 103:3 117:17
118:10,14 119:4
122:4

**places** 112:11

**placing** 78:14
121:6

**plan** 31:10

**play** 97:18

**playing** 74:11

**point** 5:21 7:13
8:7,16 21:16 28:18
35:16,21 39:19
43:9 55:11 58:13,
22 63:18 88:13
90:2 100:3,14,23
101:2,4 108:6
110:25 114:15

**pointed** 100:14

**pointing** 65:22

**points** 121:2

**policies** 12:25
13:3,18,23

**policy** 13:16,25
14:10,13,17 15:8,
12,13,14,22,24
16:2,5,10,12,15,18
18:11,12,14,15
19:2,3,4,9,13,21,
23,24 20:10 21:5,
22 22:14,17 26:8,
13 36:1,6 42:25
43:3

**Portsmouth** 8:4
21:17 33:18
100:16,20 107:11

**pose** 5:8,13
106:18

**posing** 6:5 18:17

**position** 7:6 8:3,
19,24 9:4,10,15
10:11 22:2 25:1
83:3,9 94:7,18
99:18 100:3
101:24 107:10,18,
19

**positions** 94:20
101:4

**positive** 37:11

**potential** 115:7

**practice** 80:2

**practitioner**
122:2

**precipitated**
120:2

**preference** 71:22

**premised** 117:12

**prepared** 61:7,14
82:7 83:21

**preparing** 75:25

**present** 53:7 55:3,
5 58:9 86:4 109:19

**president** 15:3

**pretty** 51:16 87:9

**previous** 71:5
73:7 99:5

**previously** 76:6
87:11 96:5 115:25

**primary** 87:13,21

**printed** 77:13

**prior** 10:13 26:17
32:17 59:1 61:2
75:12 78:9 79:7
80:4,16,24 81:5
84:8 87:3 88:14
100:9

**private** 50:9,11,
12,14,19 73:3

**privilege** 112:13,
19

**problem** 5:8
112:18 113:3
117:8

**procedures** 12:15
14:17

**proceed** 100:24

**proceeding** 14:9

**process** 102:10
107:14,19 110:21

**Proctor** 11:15
45:9 46:9 48:1
81:3

**produce** 73:18

**produced** 120:19

**professional** 40:9

**program** 13:13,16
16:5

**promoted** 7:6
30:1 33:18

**promotion**
107:10,20

**proposing** 93:13,
21 96:17

**protocol** 109:17

**provide** 11:13
43:9 110:20

**provided** 36:18
37:24 42:24 108:2
118:7

**provider** 84:10
86:12 87:18,21

**providers** 87:12

**providing** 96:13
97:11,17 110:11

**psychiatrist**
84:12 85:2

**psychologist**
84:12 85:2

**Public** 5:2

**purportedly** 27:4

**purporting** 34:9

**pursue** 101:3

**push** 43:8,13

**put** 73:11 77:8
87:18 97:8

**putting** 73:8

**Q**

**queer** 49:21
113:14

**question** 7:5,15,
17,23 9:19 11:22,
23 14:3 16:21,22
19:1,10,15 20:8
21:11 22:15 23:3
24:15 26:13 27:1
30:17 32:6,13
45:21,23 46:18,22
47:19,22 49:9,17
51:25 55:9 59:4,24
62:22 65:4 67:15
68:1 73:20 77:24
81:18,22 82:14
87:19,25 88:8
93:19 101:8
102:25 103:11,19
104:3 106:4,19
109:23 110:16
114:10,12 117:3
118:3 119:17

**questions** 5:6,7,
13 6:5,9,13 14:10
16:20 18:18 23:2,
17 73:10 89:1
104:15 110:7
116:8 121:1
122:16

**quick** 110:20

**quickly** 13:24

**quotation** 73:19

**quote** 73:19,21
75:7,8

**R**

**Raise** 29:23

**rate** 29:11,13,17,
25 30:4,9,12 32:2

**rating** 39:24

**ratings** 39:23

**Ray** 6:22 11:7
46:12 48:2

**Raymond** 100:19

**re-emerged**
120:7,14

**re-emergence**
120:16

**re-emerges** 67:8

**reach** 69:22 89:19
99:23

**reached** 96:17

**read** 15:4,10 16:23
17:1,4,9,13,17,20
18:3,8 23:6,21,23
24:5 25:11 26:2
35:5,14,18,23
36:2,25 37:8,12
38:9 40:12 41:21
42:1,8,13 44:12
52:23 61:17,24
62:5,9,13 63:4,8
69:8,23 71:11,12,
17,23 72:3,11,18,
24 73:4,11,15,22
74:2,7,13,18,22,25
75:3,8 76:2,8,10,
13,17 90:25 91:1
92:22 94:9 96:1
99:19 100:5 102:3,
11 115:21

**reads** 35:8,16,20,
25

**reason** 41:1 109:1
122:9

**recall** 6:20 8:8

Timothy Record
October 03, 2019

TIMOTHY RECORD vs HANNAFORD BROS.
Index: recap..scale

9:11 10:5 11:9,12
13:14 15:19 16:3,
11,14,16 22:7,19
28:1,8 29:21
31:14,18 33:5,17
34:4,14,16,17
36:4,8,11,18 37:23
39:18 40:15 42:15
45:5,7,20 50:3,18
55:4 58:18 70:16
71:5 76:10,24 86:8
89:13 90:10 91:5
92:2,24 96:4 97:2,
14 100:7,17,21
121:5,11

**recap** 70:19,24

**receive** 12:1,4,10
30:10,25 31:23
32:1

**received** 11:19
12:14,24 13:7,11
15:18 20:6 30:6,10
37:21 38:15 39:23,
24 71:4 84:9,20,21
87:12

**receiving** 21:1
36:5,11 39:18
40:15 41:7 42:15
70:1 82:18 94:22
96:4 97:3 102:5
121:5

**recent** 72:16

**recently** 74:1
122:1

**recitation** 94:13

**recognition**
111:21,22,24
112:2

**recognize** 14:12
16:1 43:24 98:11

**recognized**
111:18

**recollection** 66:4
85:23 91:2,4,7,9

**record** 5:1,4 7:16
14:2 18:12 19:2
32:21,23 33:21
34:7 36:15 37:17
39:6,13 40:19
41:20 43:20 56:22

61:10,17 69:8
83:18 88:24 92:10,
21 99:19 116:9

**records** 83:15
85:18,19 86:4,5

**refer** 25:18 49:5,20
55:18 113:16
114:7,17

**reference** 56:5,17
62:9 80:18 104:9
114:5,17 115:11

**referenced** 103:6
117:1 118:17

**references** 33:23
75:15 114:18

**referral** 88:14

**referred** 49:12,23
56:12 57:16 88:11

**referring** 46:10
56:10,22 103:25
104:8 114:20,24
115:12

**refers** 56:19,25
57:4 64:22

**reflect** 86:7
109:18

**reflected** 5:15
117:24

**reflections**
109:14

**reflects** 65:18

**refresh** 85:23

**regard** 76:22

**region** 15:4

**regular** 88:4

**related** 68:13 82:1
84:13,15,22 86:18
87:13

**relations** 15:1,3
68:5 69:5 101:17,
21

**relationships**
37:6 40:8,11

**remaining** 116:8

**remains** 104:19

**remark** 53:11
71:21

**remarked** 21:12
53:5

**Remarking** 53:6

**remarks** 41:24
62:5

**remember** 8:15
9:12,14,24 11:16
16:7 19:4 23:12,14
24:9,12,18,21
38:18,19 40:8 41:7
42:18 46:13,14
48:3 70:1,11,12,17
75:11,19 80:19
89:9,22 90:1 94:22
100:10 102:5

**reminded** 72:6

**Renee** 48:3

**repeat** 110:16

**rephrase** 5:9
11:23 24:12 50:7
51:9,23 59:5 63:15
65:4,11,20 79:14
82:4 84:2 86:3
88:1 90:19 93:8
101:1 103:5 104:4
105:8,17 106:3
109:21 114:11
118:11 119:15

**rephrased** 105:25

**replied** 73:21

**report** 14:20 15:7
16:21 18:7 20:4,5,
10,14,17,18,24
21:23,25 22:9
59:1,13,21 60:12
61:4 63:12,21,24
64:25 65:3,19
66:15,16 82:13
83:21 104:25
105:11,12,20
117:11

**reported** 9:22
10:7 21:2 65:23,25
66:10,11 81:21
116:16

**reporter** 18:7
97:19

**reporting** 10:18,
19 14:17 18:6
20:1,2 61:2,3

**reports** 22:5 63:12
116:10,12

**represent** 81:24
82:7 108:18,20

**representation**
66:7

**representative**
15:1 17:8

**represents** 33:1
81:19

**requested** 74:1

**requests** 31:20
79:4 99:15

**rereading** 90:20

**reschedule** 87:15

**reserve** 120:22

**resign** 67:11

**resignation** 70:9
116:15

**resigned** 52:18

**resources** 17:8

**respect** 13:3,7,10,
25 14:9,12 22:18
24:8 33:24 35:4
36:1,5 37:23 55:10
66:24 67:1 103:22
115:21,25 118:25

**respond** 5:12 6:4
7:16,17 102:13

**responded** 93:20
94:4,17 96:12,14,
19,23 99:16 100:2
102:8 105:5

**responding** 96:5
100:7

**response** 46:22
66:14 69:18 75:7
90:7,24 93:2,12
95:19 96:15 97:14
99:22 100:1

**responses** 5:17

**responsive** 6:8

**restate** 19:16 27:1

**result** 25:4 28:13
62:23 64:6 78:5
83:1 88:5

**resulted** 36:8

**results** 42:6

**Retail** 39:5

**retaliatory** 118:9
119:3

**return** 93:3,5 94:7

**returning** 92:20

**returns** 76:17

**reverse** 92:13

**review** 14:5 23:16
36:1

**reviewed** 65:9
66:4 101:2 109:5

**reviewing** 14:11
16:7,10

**revolves** 23:4
119:17

**right-hand** 35:4
40:25 43:2

**rights** 21:14
113:18

**Robin** 22:1,8

**Rochester** 100:19

**role** 36:25 89:12
110:18

**roles** 95:25

**room** 35:13 80:20

**S**

**sadness** 87:9

**samples** 54:16

**Saturday** 70:5
94:6,8 95:12 98:7

**scale** 57:23 72:23
78:15

**BOYCE & LEIGHTON, LLC**
**207-883-0378**

**scheduled** 97:2

**seafood** 9:1,5,9, 23 10:3,17,20,22, 24 11:2,4,8 12:4,5, 11,12,14,21 52:6 54:10 61:16,20 72:22 89:5 110:15, 19

**section** 99:9

**secure** 18:1,6

**seek** 119:13

**seeking** 25:15,22, 24

**selected** 8:20

**Self-worth** 87:10

**send** 70:16

**sending** 92:25

**sentence** 14:19, 21 35:16,20,25 37:3 40:6 71:15

**separate** 74:6

**separation** 87:22 88:5

**separators** 34:23, 24

**September** 24:5 25:25 26:15 27:4 28:4,6 29:3,7,12 69:8 92:7,16 93:14,21 94:4,16 95:4,9,20 96:12, 16,17,19,23 97:6 98:21 99:10,17 101:13,22 102:1,8 122:5

**sequence** 94:25 96:9,11 99:6,8

**series** 5:6 13:18, 23 92:7,12 94:24 107:22 108:1

**service** 6:17 8:21 12:15 35:11 110:10,12,17,22 111:18

**services** 84:19

**set** 32:15 43:12

81:23 99:5 103:13

**sets** 118:12

**sexual** 45:1,4,8,20 46:4 47:2,6,24 48:6,10,21 50:5,10 51:12 58:1 62:5 63:13 71:22 116:18 117:10,16

**share** 48:18 50:24 51:8,11,21 75:23

**shared** 48:5,19 52:1 65:13 91:13, 20,24 104:25 118:25

**sharing** 77:6

**Shaw** 32:22 33:7

**short** 43:7 116:3,6

**shorter** 53:7 83:23

**show** 13:21 22:23 26:11 28:25 39:9 68:12 70:11,22 77:10 101:15 107:25

**showing** 40:22 43:20 61:10 88:24 92:10

**shows** 95:10

**side** 54:4,5

**signature** 26:14 29:2 36:14,15 37:17 38:12 39:12, 13,14 44:4,6,8

**signed** 33:22 78:9

**signify** 55:21

**signing** 44:13

**similar** 105:12

**similarly** 114:6

**simply** 46:3

**sitting** 71:5

**situation** 72:3,7,9

**six-hour** 79:25

**skip** 90:4 94:24 115:17

**slang** 114:5

**sleep** 87:9

**sleepless** 86:25

**sleeplessness** 86:25

**smile** 89:9

**social** 84:11 85:1

**solely** 56:20,25 119:10

**sort** 86:21

**sound** 104:23

**sounds** 64:7 83:13 115:11

**sources** 118:25

**space** 42:5

**speak** 23:9 111:6

**speaking** 73:20 76:16

**specific** 17:20 78:1

**spell** 6:25

**Spelvin** 68:17,18, 19

**spoke** 23:12 24:13

**stamp** 113:1

**stamped** 18:16

**standard** 80:2

**standing** 42:6 54:4,5

**Star** 110:10,12,18, 22 111:18

**start** 90:20 99:14

**started** 8:5 33:13 59:7,13 71:23 72:16 73:9

**starting** 54:12 85:8,11

**starts** 71:8

**state** 27:25

**stated** 21:13 42:4 61:23 73:2,8,14,25 74:5,16 75:2,6

76:7 94:5 95:21 99:17 101:23

**statement** 44:9

**statements** 21:23 22:6

**states** 18:5 40:7 52:16 54:14 57:22 60:22 61:15 72:15 73:6,25 74:21 75:22 76:5 89:3 90:21 101:18,22 102:7

**stay** 95:23 98:6

**staying** 73:21

**step** 41:4,8 42:16

**Stephen** 11:14 48:1 51:15 115:19

**Steve** 27:21 28:2 46:11,13 100:11

**stocking** 89:3,8

**stop** 94:18

**store** 6:17 7:7 8:5, 7,15,22 9:2 15:1 21:16,18,19 22:3 25:19 30:3 32:8 33:14,19 50:15 52:7 53:20 54:16 60:23 68:5 72:24 89:12 90:6,8,22,25 91:24 100:21 101:18,21 107:8, 10,12,18 108:6 112:2

**straight** 113:13,15 114:20

**straightening** 72:22

**structure** 10:17, 18,19

**stuff** 112:17

**subject** 11:20 15:18 20:14,24 24:21 34:14 36:24 38:19 42:19 51:3, 21 120:18,22

**subjected** 52:18 53:2 103:23 104:7

**submit** 107:15,19

**submitting** 82:13, 15

**subsequently** 59:14 60:12 66:19

**substance** 27:24 28:9

**substantive** 6:14 34:25 36:22 38:6, 23

**suffered** 86:17 87:7 116:11

**suggest** 57:25

**summarized** 81:17

**summary** 110:20

**Sunday** 72:21

**Supermarket** 25:15 26:6 30:20 83:9

**supervisor** 16:25 17:2,3,4 42:12,19 52:14

**supplied** 31:21

**supposed** 108:18, 19

**switch** 99:4

**sworn** 5:1

**swung** 54:6

**sympathies** 76:22

---

**T**

**table** 14:3 45:23

**taking** 6:2,6 37:5 79:12 86:21,24 87:1,3

**talk** 23:5 63:3 71:3 92:20 94:5,9 98:6, 8,10

**talked** 23:24 24:9 62:16 63:2 66:17

**talking** 7:18 18:13

20:3 48:15 71:10

**talks** 66:19

**Tanya** 9:14,21
41:17

**tap** 89:20

**tapped** 53:20,24
54:7 55:14

**tapping** 55:6
121:19

**team** 6:17

**teenager** 84:14

**telling** 45:6

**tendency** 7:22

**tendered** 116:15

**tenure** 11:18 12:1
19:5

**term** 57:8,17

**terminate** 100:4
102:2

**terminated** 98:1

**termination**
102:10

**terminology**
57:15

**terms** 49:15,25

**Terri** 46:11 69:4
98:7 100:10
101:17,20

**testimony** 26:17

**text** 97:24

**Thanksgiving**
31:25

**Theresa** 101:12

**thing** 5:11 66:11
76:21 90:17 112:6

**things** 64:14 67:3
73:8,10 95:22
105:4,14,19 106:2,
6,9,15,24 109:18
115:20

**thought** 69:6 77:8
111:3

**three-quarters**
112:24

**till** 35:13

**Tim** 5:4 7:15,17
35:9,17,20,25
36:15 37:3,10,17
40:7,10,19 41:20,
24 42:1,5,7,10
61:17,23 62:9,12,
18 63:2,6 69:8,19
71:8,15,20,22
72:1,6,10,15,21
73:2,8,14,18,19,25
74:5,10,12,16,22
75:2,6,23 76:5,11
89:4,7,17 90:6,22
92:21 95:16 97:21
99:19

**time** 6:21 7:13 8:8,
16 9:13 10:6
15:15,24 16:2,8,15
19:11 20:13 21:4,
17 22:2,13,16
28:18 31:14 39:19
43:9 55:11 57:8,15
58:14,22 59:12,13
60:7,9,16 64:14,17
66:16 69:21 71:15
72:2 79:25 80:13,
21 81:9 83:12
84:8,21 85:9,23
89:4,6,7,19 90:2
92:19,21 94:8
95:14,15,23
100:14,23 101:4
107:7 108:6,25
109:4,15 110:25
117:8,17

**timeframe** 60:17

**times** 42:13 85:16,
17 89:6 93:22
96:18

**Timothy** 5:1 39:6,
13

**tired** 62:5

**today** 5:7 6:5,9
30:10,14 88:19
89:9 117:9 119:1
122:6

**told** 59:19 62:12,
17 65:6,10,12

71:8,16 72:1,10
76:15 79:24 88:19
118:7

**toll-free** 17:12

**tomorrow** 92:20

**tone** 54:17 73:15

**top** 36:14,17 41:3
68:15 96:22 100:1

**topics** 50:10

**total** 85:17

**touch** 69:20 89:19
98:9

**trail** 91:17

**train** 75:2

**trainee** 71:16

**training** 11:19
12:2,4,10,14,18,25
13:7,10,12 15:18,
20 81:8

**transcript** 5:15
97:5,12,18

**transcription**
99:1

**transfer** 107:9,20

**transpired** 65:3
91:5

**treat** 40:12

**treated** 86:11
88:13

**treating** 83:25
84:1

**treatment** 20:6,25
53:1 59:1 84:9,18,
21 87:13 103:15
109:17

**true** 44:10

**trust** 48:4,25
115:21,25

**trusted** 47:11,12,
16,17,25 50:16
51:7,20 115:13

**trusting** 49:2
50:22

**turn** 13:24 14:16
15:12 16:4,17
29:10,22 33:20
34:22 36:13,21
37:15 38:5,11,22
39:21 40:2,5 44:2,
16,18 52:4 104:22

**turning** 64:20

**two-page** 99:7

**type** 12:9 33:1
41:4 63:18 86:21

**types** 50:18 87:6

**typewritten** 35:8
40:3

**typo** 74:22

---

**U**

**ultimately** 8:3
27:15 67:11,23

**unacceptable**
62:18

**uncomfortable**
41:20 42:1 90:9

**underneath** 23:19
113:13

**understand** 5:7
6:4,8,15 7:5 8:2,18
10:25 19:10 26:17
29:6 32:12 35:20
42:10,23 46:21
53:14,24 56:10,25
58:11 59:11 61:3
63:16,20 64:23
66:5 67:2,10,17,18
70:4 77:14,25
79:15 82:21 85:18
86:16 87:20 97:23
100:2 102:18
103:14 104:17
106:13 110:3,17
114:14 116:9
117:8,19 119:9,19

**understanding**
105:2 112:23

**unnecessary**
40:10

**unprofessional**
41:25 42:11

**upcoming** 99:15

**upper** 35:2 40:25

**upset** 76:2

**upstairs** 74:10

**utilize** 19:8,13
22:14,17

**utilized** 21:5,22
22:13

---

**V**

**vacation** 30:21,22
70:14,18 76:17
95:15

**vendor** 54:15

**verbal** 41:4

**verbalize** 5:16

**verbally** 5:12

**version** 6:6

**vice** 15:2

**violate** 113:18

**violations** 15:8

**vis-a-vis** 10:17

**voice** 98:11,18

**voicemail** 97:5,
13,15 98:13,15
99:2

**voluntarily** 28:17

---

**W**

**W/e** 73:7 74:6
75:24

**Wagner** 83:16,22,
25 84:1 85:6,14,
16,24 86:7,9,12
88:11,13 109:8,16
113:23 115:2
120:19

**wait** 7:15 74:17
75:3 101:1

**waiting** 81:8

**walk** 13:23 32:19
63:17 84:7 90:6,8,

22,25 108:4

**walked** 55:16
61:22 89:4,7
106:20,21

**walking** 106:23

**wanted** 59:15
70:25 75:23 92:19
95:21,22,23
112:22

**Waters** 11:14

**ways** 14:20 28:16
78:14

**web** 17:16

**Wednesday**
94:16 102:1

**week** 29:15,20
32:4,8 53:16
54:11,13,21 55:25
56:1 57:3 58:7
73:7 74:16 75:24
76:17 80:4,16 81:5
99:14

**weeks** 29:19 58:4
60:4 102:22

**whatsoever**
81:14

**withdraw** 9:19
22:10,14 30:16
32:12 51:24 55:9
56:18 77:24 81:17,
22 82:14 87:19
101:19 103:11
106:3

**woman** 11:6 48:2

**wondering** 76:24
110:19

**word** 104:9 112:6
113:13,14

**words** 93:9
113:10,24 115:6

**work** 25:5 29:20
32:1,4,9,10 52:20
54:12 67:4 79:12,
15 80:1 82:23
99:24 111:14
119:12,22

**worked** 9:16 10:1,

13 11:9 12:21
50:23 111:8,10,12,
13

**worker** 84:11

**workers** 85:1

**working** 6:16 11:4
21:16 29:16 41:20
42:1 52:5,22 61:24
69:21 71:9 72:18
74:13 89:16 107:8
113:23

**workplace** 13:4,7,
11 14:1,9,12 35:5,
21 36:1,6 67:4

**writing** 78:1 109:4

**written** 75:14 89:2
109:20 110:3

**wrong** 75:15

**www.ethicspoint.
com.** 17:16

---

**Y**

---

**year** 30:21 90:5,21
110:10,13,18,22
111:19

**yearly** 31:16

**years** 7:4 32:17
44:21 111:9,14
122:13



# Respect in the Workplace – Harassment, Discrimination and Retaliation Prohibited

## All Delhaize America, LLC Associates

Delhaize America seeks to provide its associates with a work environment that encourages efficient, productive and creative work. Delhaize America will not tolerate verbal or physical conduct by any associate (or other person) which illegally discriminates, harasses, disrupts or interferes with the work performance of an associate or which creates an intimidating, offensive or hostile work environment.

Delhaize America prohibits all illegal discrimination, including harassment of any associate in the workplace, for any illegal discriminatory reason, such as age, gender identity or expression, race, national origin, physical abilities, religious beliefs, sexual orientation and other characteristics or categories protected by law. Harassment can take many forms and includes behavior that annoys, offends, threatens, disturbs others or which creates an unpleasant or hostile environment. Such behavior can be either verbal or physical. Examples of harassment may include, among other things, bullying, humiliating, taunting, disparaging, degrading, provoking or making inappropriate references to others.

Sexual harassment is among the types of discrimination and harassment prohibited by this Anti-Harassment/Anti-Discrimination Policy. Sexual harassment includes unwelcome sexual advances and requests for sexual favors. Other unwelcome conduct which may constitute harassment includes, but is not limited to, the following:

a) **Verbal:** repeated sexual innuendo's, sexual epithets, derogatory slurs, off-color jokes, propositions threats or suggestive or insulting sounds;

b) **Visual/Non-Verbal:** derogatory posters, cartoons or drawings; suggestive objects or pictures; graphic commentaries; leering; or obscene gestures;

c) **Physical:** unwanted physical contact, including touching, interference with an individual's normal work movement or assault; and

Other: making or threatening reprisals as a result of a response to discrimination including harassment.

Such verbal and physical conduct may constitute harassment when:

a) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

b) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or

c) Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

**NOTE: ALL ASSOCIATES, SUPERVISORY OR NON-SUPERVISORY, ARE PROHIBITED FROM ENGAGING IN THE ABOVE-DESCRIBED CONDUCT.**

January 1, 2011



Delhaize America strongly discourages consenting romantic or sexual relationships between members of the organization when one person has a direct/indirect reporting relationship to the other. The trust and respect which associates have for supervisors and managers can make it difficult for them to comfortably reject sexual advances; associates may even feel flattered by the attention. But managers have the power to give or withhold rewards such as praise, raises and recommendations, which can mean that their romantic or sexual relationship with an associate may not be truly consensual.

If a manager (supervisor) becomes romantically or sexually involved with a subordinate, that manager (supervisor) must discuss the situation immediately with management so that appropriate arrangements can be made to remove him or her from any decisions affecting the subordinate as soon as possible. Which may include transferring the member of management to another department.

## Procedure for Reporting Harassment and/or Discrimination

When an associate feels he or she is being harassed or discriminated against in any fashion, he or she must report the incident promptly. There are several ways to report harassment or discrimination:

a) Notify any of the following individuals:

- a member of management;
- the Associate Relations representative for his/her store or district or
- the Director or Vice President of Associate Relations for his/her region .

b) Alternatively, associates may report any concerns or possible violations of this or any other policy by calling I-Share (**1-855  5 ISHARE**).

Managers, who see, suspect or receive complaints or become aware of harassment or discrimination must inform the Associate Relations representative for his/her store , district or department immediately.

Once an allegation of harassment or discrimination is brought to the attention of one of the individuals noted above, or made through the I-Share tools, a fact-finding investigation will be launched promptly. If necessary, intermediate measures may be taken before completing the investigation to ensure that further discrimination, including harassment, does not occur. Delhaize America will protect the confidentiality of the allegations to the extent possible when dealing with and investigating such charges; only individuals directly involved in an investigation and those having a legitimate "need to know" will be informed of the existence or facts of an investigation, except to the extent required by law.

Any associate who is found, after appropriate investigation, to have engaged in illegal discrimination, including harassment of any kind toward another associate, a customer or a supplier to Delhaize America will be subject to appropriate disciplinary action, up to and including termination of employment. Delhaize America will also consider taking any such action as may be appropriate against any non-associate engaging in the illegal discrimination, including harassment of an associate.

## Anti-Retaliation

Delhaize America will not take any action in retaliation against any associate who, in good faith and with a genuine belief that he/she has been discriminated against or harassed, brings or voices a complaint pursuant to this policy. In addition, Delhaize America will not tolerate any retaliatory acts by other individuals. Retaliation is a serious violation of the company's policy and the law, and should be reported immediately. Any persons found to have retaliated against a Delhaize America associate because such associate (1) made a good faith discrimination complaint, (2) participated honestly and in good faith in any investigation into a discrimination complaint, and/or (3) opposed acts of illegal discrimination in the workplace, will be subject to discipline, up to and including termination.

Individuals who knowingly bring false charges of discrimination, including harassment, against another Delhaize America associate or other individual shall be subject to discipline, up to and including termination.

January 1, 2011



## 201 - Diversity and Inclusion

**Policy Title:** #201 - Diversity and Inclusion

**Applicable To:** Entire Hannaford Organization

**Policy Statement:**

At Hannaford we are committed to diversity and inclusion in the workplace. Our culture thrives on mutual respect, teamwork and productivity in the workplace among people who are diverse in work background, experience, education, age, gender, race, national origin, physical abilities, religious belief, sexual orientation and other real and perceived differences.

We believe that diversity and inclusion create a distinct competitive advantage and can produce a more innovative and responsive organization. We also recognize our responsibility to the communities we serve and the value of a diverse workforce in those communities where we live and do business.

We are committed to a culture where differences are accepted, valued and used to enhance the business and support the organization's objectives. Differences become a source of strength and creativity for the business. Inclusion means creating an environment that welcomes all who can do the job and that seeks to eliminate any tendency of bias or stereotype. A diverse, highly participatory culture provides a competitive advantage and is a prerequisite for the high performance organization our future requires.

Accordingly, Hannaford provides equal opportunity in employment to all associates and applicants for employment. No person shall be discriminated against in employment because of his or her race, religion, color, sex, age, veteran status, national origin, sexual orientation, gender identity and gender expression or on the basis of his or her disability. Hannaford does, however, reserve the right to consider and make hiring and continued employment decisions on the basis of any bona fide occupational qualification. Further, any associate who is found, after appropriate investigation, to have engaged in discriminatory behavior of any kind with another associate, a customer or a supplier to Hannaford Bros. Co. will be subject to appropriate disciplinary action, up to and including termination of employment.

For more information please send an email to PolicyCommittee@hannaford.com

### Your Total Rewards@Work          POLICIES

**Delhaize America Equal Opportunity**

Applicable To: All Delhaize America Associates

Original Policy Date: October 2, 2006

The Company provides equal employment opportunity without regard to sex (e.g., gender, pregnancy, childbirth or related medical conditions), race, religion, color, national origin, ancestry, age, physical or mental disability, sexual orientation, gender identity, family care leave status, veteran status or any other basis protected by federal, state or local law. In addition, we are committed to fair and equitable treatment of each and every associate and strive to promote diversity within our workforce, recognizing that our continued growth and business success depends on the development and utilization of the full range of the Company's human resources.

We assure that all applicants for employment and all associates are given equal consideration based solely on job-related factors, such as qualifications, experience, performance and availability. Such equal consideration applies to all employment actions. As an integral part of our Employment Opportunity Policy, the Company maintains a working environment free of all forms of unlawful harassment, including sexual harassment, by anyone having contact with associates – including customers and suppliers. For additional information on the Company's policy against harassment, discrimination and retaliation, see the Company's separate policy on "Respect in the Workplace."

Associates are expected to act in strict conformity with this policy and to recognize that the effective application of equal opportunity in employment must involve more than a nondiscriminatory policy statement. It is, and must forever continue to be, our culture.

Special Note: Management must promptly notify Associate Relations of any concern or complaint by applicants for employment, associates or customers relating to this policy

    

Hannaford - 000759

# I SHARE

**I SHARE tools are toll-free, 24/7, multilingual and totally confidential**

## Integrity

is about being honest with ourselves, our colleagues, suppliers, customers, and communities. Courage is about doing the right thing even when it's not easy. Delhaize America's **I SHARE** program provides tools that make it easier for you to speak up at any moment if you see something in conflict with integrity.

Delhaize America is committed to **"the right way, every day,"™** which includes complying with all laws and regulations that apply to our business. Failing to follow the law can result in substantial harm to our reputation and may even lead to civil or criminal penalties. Your courage to share protects us from such risks.

Each and every Delhaize America associate has a responsibility to protect the reputation and success of our Company by reporting any suspected unethical or illegal activity. The way you protect us all from such risks is by speaking up as soon as you become aware of any breach of law or company policy. It's our corporate responsibility to provide a safe way for you to do so and to keep your concerns confidential while we listen to, and take action on, your input.



**I SHARE** is sponsored by the Delhaize Group Office of Compliance and Ethics. You can view or download Delhaize Group's Guide for Ethical Business Conduct on your local intranet or at www.delhaizegroup.com.

People resources:

Self-service resources:

## DELHAIZE 食品 AMERICA

○ bloom　bottom dollar　　　　 Reid's　



# I SHARE
I am courageous | I act with integrity
**DELHAIZE 獅子 AMERICA**

## I SHARE – Frequently Asked Questions

**How do I report a concern or ask a question?**
You have many options:
1. Discuss with your direct supervisor
2. Discuss with your local Human Resources, Legal or Compliance representative
3. Access the **I SHARE** network as follows:
   a   toll-free 24/7 by phone:  1-855-5-**I SHARE (47-4273)**
   b.  on the web 24/7 at:      www.EthicsPoint.com
   c.  through the Delhaize America intranet or your specific banner's intranet pages
4. Contact Delhaize Group's Office of Compliance and Ethics:
   a.  by phone:              011 32 2 412 86 59
   b.  by secure fax:         011 32 2 412 83 89
   c.  by email:              compliance@delhaizegroup.com

Each of these reporting methods is secure, enabling anonymity of the reporter and confidentiality of the report.

**Where can I get a copy of the Guide for Ethical Business Conduct?**
The full Guide – available in French, English, Dutch, Greek, Romanian or Bahasa Indonesian – can be viewed or downloaded on the web at www.delhaizegroup.com.

**Can I report anonymously?**
Yes, associates may choose to remain anonymous, and the information they report will be kept confidential. However, we would encourage associates to identify themselves when reporting their concerns.

**What if I fear retaliation?**
The company will not retaliate against anyone who, in good faith, properly reports a possible violation of law or company policy. Nor will the Company tolerate harassment or intimidation of any associate who reports a suspected violation or participates in an investigation of a suspected violation. Good faith does not mean you have to be right, but it does mean you are providing all of the information you have and that you believe to be true.

**What happens when I make a report?**
Reports are entered directly on the secure EthicsPoint system to ensure confidentiality. EthicsPoint makes these reports available only to specific individuals within the company who are responsible for investigating and resolving each report. Each of these report recipients are trained in keeping these reports confidential and are committed to ensure reports are not inadvertently shared with implicated parties, their peers or subordinates.

After reporting a concern through **I SHARE**, you will be assigned a report ID and password. When you make a report, you will be asked to log in or call back within three to five business days to provide any additional information that may be needed from you during the investigation process. In this secure environment, you can provide answers to requests for more details or track progress. Your reports of unethical or illegal behaviors (which can be reported in a variety of languages) will be fully investigated and appropriate action will be taken.

     

Hannaford - 000765



**I SHARE**
I am courageous | I act with integrity
**DELHAIZE 食品 AMERICA**

**What types of situations or concerns should I report?**

If you become aware of a situation that may involve a violation of the Guide for Ethical Business Conduct or any other internal or external law, regulation or policy, or if you are asked or instructed by management or your supervisor to do something that violates any law, regulation, company policy or the Guide, you have a duty to your colleagues and the Company to properly report the potential violation.

A sample of concerns you might report through **I SHARE** are:

- Accounting, auditing and financial reporting concerns
- Workplace environment concerns, including harassment, discrimination, off the clock hours, retaliation, or reports of threats and violence
- Dishonesty, such as retail grazing, improper cash handling, product sliding, and underage alcohol or tobacco sales
- Improper use or theft of corporate assets or information
- Inappropriate relationships with government agencies, vendors or business organizations
- Acceptance or giving of improper gifts, services or other benefits
- Other violations of laws, regulations or company policies

      

Hannaford - 000766

Case 1:19-cv-00034-LM  Document 25-2  Filed 07/29/20  Page 55 of 113

**Your Total Rewards@Work**          **POLICIES**

# Open Door and Appeal

## All Delhaize America, LLC Associates

Across Delhaize America, it is our mission to provide a positive work environment that contributes to job satisfaction and responsiveness to associate concerns. We wish to maintain open, effective communication among associates and to ensure that all associates are provided with fair and thoughtful treatment. The open door and appeal policy is designed to provide you with a process for discussion of job or work related issues in a confidential and productive manner. We believe that early discussion with the person closest to the issue is always the best place to seek understanding and to work towards a mutually beneficial outcome. The policy is designed to promote solutions to individual associates' problems. The policy is not intended to challenge or change established policies, procedures, or rates of pay.

You are encouraged to discuss any concerns, comments, questions or suggestions you may have with your immediate supervisor as soon as such an issue arises. We also welcome you, when necessary or appropriate, to progress through your area's line of supervision up to the functional Vice President.

In situations where you feel uncomfortable or unable to discuss an issue with your direct supervisor or within your line of supervision, you may choose to discuss your issue with any member of the Human Resources Department and/or any manager of Delhaize America. You will be treated fairly, your issue will be addressed in a timely manner and your right to take advantage of this policy will be protected. If progression through this process does not satisfactorily address your concerns, comments, questions, or suggestions you may decide to proceed to a more formal appeal process through which your issues can be stated, thoroughly explored and fairly and efficiently addressed. Not all issues are eligible for the appeal process. Your supervisor and/or your Human Resources representative will assist you in understanding and implementing the required steps in a formal appeal process.

The Appeal Process will result in

1. Affirm your management's decision, or
2. Overrule your management's decision, or
3. Recommend an alternative course of action.

**Step A**  If you have been unable to resolve your concerns with your manager or others closest to the issue you may enter into the appeal process by submitting your concern in writing to the Director of Operations or Functional equivalent in your department within twenty-one (21) calendar days of your first discussion. This level of management will thoroughly investigate your concerns and make every effort to resolve the issue at their level.

We will render a decision within the twenty-one (21) calendar days of receipt of your letter unless unforeseen circumstances arise. In the case of unforeseen circumstances you will be notified of when you can expect to hear the outcome of the investigation of your appeal. If your concern has resulted in the termination of your employment, your demotion, or reduction in your base pay and you do not receive an answer that you feel is fair and equitable, then you may proceed to Step B

**Step B**  Submit your concern in writing to the level of management above the level to which you submitted your concern in Step A within twenty-one (21) calendar days of your receipt of the Step A decision. Usually the appropriate level of management to whom to submit your concern is the regional Vice President of Retail Operations or Functional Vice President (as applicable).

The Functional Vice President, along with the Director of Human Resources or their designee, will carefully review your concern and will respond to you in writing within twenty-one (21) calendar days of the receipt of the response to your concern

The Vice Presidents' or designee's decision to affirm or overrule your management's decision is final

The Open Door and Appeal Policy provides a useful tool for the resolution of individual associate concerns. Delhaize America encourages associates to utilize the policy when necessary

    

Hannaford - 000773



Golden HARVEST
TALK IN
PARKING LOT

GoldEN HARVEST
By T.S
71517 4:30

McKinnons
meeting
7/25/17
JARED + PATRICK

SEPTEMBER
29th 2017 1st
DAY OT McKinnons

RE


**EXHIBIT**

tabbies

_Record #2_
_10/3/19_

## GOLDEN HARVEST EMPLOYEE POLICY

1.    Arrive at scheduled time.

2.    Zero tolerance for theft of any kind. Immediate termination

3.    Come to work with good attitude.

4.    Use caution and be courteous to other drivers on the
      road  You represent The Golden Harvest in our
      vehicles,

5.    No smoking in trucks.

6.    No profanity.

7.    No personal phone calls unless emergency.

8.    No Cell Phones to be  ON  or to be used at work.

9.    No smoking except on designated break.

10    Review employee handbook for additional rules and
      guidelines.

Employee _____    9/6/2017
                            Date

Witness _____    9/6/17
                           Date

RECORD

EXHIBIT
Record #3
10/3/19

9/13/17

Re: Tim Record

Started to train
Tim on register today.
After 2 hours he
told me he was
overwhelmed and that
he not be put back
on. I told him that
that was one of the things
he was hired for and
that he would need to learn
it. — Steve Holler - Golden Harvest

7/15/17

Re: Tim Record

While going through Tims dry line setup this morning I found a ton of rotten peppers on the stand. I spoke w/ him and told him he needs to be aware of the quality of product he's putting up. I also brought to his attention that I've already been over this with him and needs to pay closer attention

- Stew Holla · Golden House



# McKINNON'S MARKETS

McKinnon Bros., Inc.···
McKinnon's Butcher Shop-North, Inc.
McKinnon's Marketplace, LLC
McKinnon's Southgate LLC
73 Holten St.
Danvers, MA 01923
Telephone (978) 774-0479   Fax (978) 750-8496
Email: tmoore@mckinnonsmarkets.com

August 31, 2017

TO:      ALL EMPLOYEES

FROM:   Management

RE:      McKinnon's Company Policies

This notice is being issued as a reminder to rules regarding employee shopping:

1. All shopping is to be done after your shift is over and you are off the clock (afternoon shift shopping is to be done at least call before registers shut down).

2. Beverages and food purchases made for breaks must have the receipt attached.

3. Employees are not allowed to ring through family members or personal friends. Under no circumstances should any employee ring themselves through for a purchase.

4. Please advise all family members or personal friends to use another lane if shopping during your shift.

5. No employee shall price their own merchandise or price merchandise for family or friends.

Please sign below that you have read and understand these store policies.

**Any employee that violates these rules will be terminated - no exceptions.**

*I have read and understand McKinnon's Shopping Policies*

Signed: _____     Date: 9/29/2017

Print Name: _____

Witness: _____

RECORD <<

EXHIBIT
tabbies
Record #4
10/3/19

## McKinnon's Markets

### New Hire Rate of Pay

Employee name: _Timothy G. Record_

Date: _9/29/2017_

Rate of pay: $ _16.00_

Pay period is _Bi-weekly_

Payday is _Friday_

Benefits offered: _N/A_

_Timothy G. Record_

Signature of employee    (THIS FORM MUST BE SECURED IN ENVELOPE AFTER SIGNING)

### Changes in Rate of Pay

Date: _____

Rate of pay: $ _____

Signature of employee

### Changes in Rate of Pay

Date: _____

Rate of pay: $ _____

Signature of employee

RECORD <<001>>

## Raise History

| Change Date | Job Code | Old Rate | New Rate | Changed By | Comment |
|---|---|---|---|---|---|
| 03/18/2018 | Default Rate | 16.00 | 18.50 | SUPERVISOR | Promoted to FT Asst Manager + $2.50 raise. |

TIMOTHY G. RECORD

McKinnon's Southgate, LLC

July 16, 2019 7:20 PM
RECORD <<001>>

Record of Conversation

On Thursday July 28,2011 Ashley Shaw sat with Tim Record to review mytask. Tim has already been trained on mytask but is struggling to complete tasks on time. Tim and I reviewed how to close out the HOOD VMI Order Summary and I went over the expectation that this task should be fully completed daily.

Tim and I also reviewed looking at tasks ahead of time so the Store Manager and ASM can close out the task in a timely manner. Currently Tim is primarily looking at tasks on the day that it is due. If Tim does not get a chance to close out the task ahead of time then he needs to fully complete the task once his portion is closed out if the task is due that day. The expectation is that Tim has an understanding of mytask and can complete tasks in a timely manner.

*Ashley Shaw*

EXHIBIT

Record #5
10/3/19

Record of Conversation

On Monday November 21, 2011 Ashley Campo sat down with Timothy Record to review some of the expectations of being an EOM manager.

I talked to Tim about making sure he is carrying himself in a professional manner so that associates and managers will respect him and know that he is in charge when he is in the building.. Tim needs to understand that he is the third in charge in the store and that managers are not taking him seriously.

Tim needs to make sure he is passing on any concerning communication that comes up in the departments at night to the department manager in a timely manner. Included in this Tim needs to direct associates to talk to the department managers if he is hearing about problems or concerns that are long term. Tim then needs to give the department managers a heads up about the conversation and then follow up to make sure the conversations happens instead of Tim taking on the problem or issue himself.

If Tim does not show improvement in these areas it may result in an action plan.


Ashley Campo

Ashley Campo

Record of Conversation

On Wednesday November 23,2011 Tim Record and Ashley Campo sat down to discuss some of Tim's concerns with how he is performing as an EOM.

I explained to Tim that he needs to pay more attention to his surroundings when he is in the building. An example that I gave Tim is that he was unaware of fund a feast boxes that were located in the back of the store for atleast four days. Tim walks the store daily and should have noticed the boxes.

Tim and I talked about what times he should be productive in the store and what times he should be managing. (In a normal situation) Tim should be running the store after the last MOD during the day leaves. Tim needs to separate himself from always helping the center store clerks stock after 5pm because he is missing opportunities with key items throughout the store.

Tim needs to be confident in the decisions he makes while working. Tim does not always need to seek approval before making an educated decision. He needs to learn to work independently and to be able to identify what needs to get done when he comes in for the day as well as put a plan in place to get those opportunity areas taken care of in a timely manner.

If Tim does not show improvement in these opportunity areas this may result in an action plan.


*Ashley Campo*
Ashley Campo

# DELHAIZE 🐾 AMERICA

## Coaching Memo

83/9

**To:** Tim Record      **Date:** 1/15/15

**Subject:** Respect in the Workplace, physical contact

### Message

On 1/13/15 Tim engaged in a conversation with the other AMOCS in the till room, that became escalated.

At some point during this encounter, Tim placed his hand on the AMOCS's chest.

Tim needs to understand that at no point is it appropriate for the workplace to place your hands on another

associate, regardless of the manner. Tim is being given the Respect in the Workplace policy to review.

In the future, if Tim is in a situation where a conversation in not professional and under control, he is to

remove himself from the situation and ask for assistance from a 3rd party to finish addressing the situation.

Appropriate 3rd parties are his direct supervisor, ARM, EOM, ASM or SM

Future violations of company policy, standard practice or unacceptable behavior in the workplace, will result

in further performance counseling up to and including termination.

# DELHAIZE 🐾 AMERICA

## Coaching Memo

Signed: _I WILL Record_

Location/Dept: Front End
Assistant MOCS.

### Response

# DELHAIZE AMERICA

## Coaching Memo

Signed: _[signature]_

Date: 1/21/15

# DELHAIZE 🐾 AMERICA

# Coaching Memo

**To:** Tim Record          **Date:** 1/25/15

**Subject:** Performance in Assistant Manager Role

## Message

Tim is not meeting all of the expectations of leading the Front End and taking opportunities to coach

associates and build relationships. This is causing frustration and confusion among Front End associates.

Tim needs to foster a positive and inclusive environment to all Front End associates. Tim needs to be aware

f the perception of favoritism and needs to take opportunities to build relationships with all associates.

Part of the Asst. Manager role is also to provide recognition of accomplishments and offer constructive

counseling necessary to all Front End associates.

When Tim is on the sales floor, he needs to use good judgement in the delegation, assignment, and follow-up

required for the efficient performance of the department. Tim also needs to maintain solid communication in

the department. He needs to be service leading, despite what the breaksheet says, every day he is on the sales

floor. When the other Asst. Manager is also on the sales floor, they will work together to maintain efficiency

l the Front End.

Rev: 07/14
HR - DRA

# DELHAIZE 🦁 AMERICA

## Coaching Memo

**Signed:** (illegible)

**Location/Dept:** #8319 | FE

## Response

# DELHAIZE 🦁 AMERICA

## Coaching Memo

**Signed:** Lindsey Boston

**Date:** 1/29/15

# DELHAIZE 🐾 AMERICA

## Coaching Memo

**To:** Tim Record

**Date :** 02/25/15

**Subject :** Not Meeting Expectations

---

### Message

Tim failed to meet expectations set by the Manager of Customer Service. On February 5, 2015, an

e-mail was sent to Tim which noted all of the tasks he and the other AMCS needed to complete. These tasks

included handing back vacation planners to associates, training associates on the new fresh bags, checking

Task Management daily and completing tasks when appropriate, having all associates complete their portion of

the yearly review, and keeping up with documentations as necessary and giving them to associates in a timely

manner. None of these tasks were completed in the two-and-a-half week timeframe Tim and the other AMCS

had to complete them. This is unaccceptable behavior by the Assistant Manager of Customer Service.

Also, the Customer Service department reported over 31 hours of hours over goal for week ending

February 21, 2015. The acceptable amount of hours over goal is zero. Furthermore, Tim failed to notify either

the Store Manager or the Assistant Store Manager about the amount of hours over goal the department was

incurring throughout the week.

Tim needs to take both initiative and ownership in his role. If he has a questions about how to

complete a task, he needs to ask for help. He needs to complete all tasks assigned to him in a timely manner

# DELHAIZE AMERICA

## Coaching Memo

**Signed:**

**Location/Dept:**

## Response

and make sure the department is not reporting hours over goal, along with the other AMCS.

If Tim fail to meet these expectations, further performance counseling, up to and including

termination, will occur.

# DELHAIZE AMERICA

## Coaching Memo

**Signed:**

**Date:**



# Retail Performance Appraisal
## Hourly Position

Associate Name: _Timothy Record_    Employee #: _203057_

Position: _Asst Manage of Customer Service_   _TRAnsfered from Pos'ns_   _5-10-14_    Store #: _8-317_

Associate's Signature: _____   _to 12-31-14_    Date: _4/2/15_

Dept. Manager's Signature: _Lindsey J Preston_   Date: _4/2/15_

Manager's Signature: _____     Date: _____

## General Instructions

When the 90-day review has been completed, or after the annual review process, the associate and manager should complete the plans section of the Roles and Goals Form *(Section I)*. The associate must receive a copy. At the time of the annual review, the results section of the Roles and Goals Form *(Section I)* must be completed. The rating and comment sections of the Skills Review Form *(Section II)* must be completed also by utilizing *The Five Levels of Differentiating Performance Form - RHR 135*. The ratings are listed below:

- Does Not Meet Expectations
- Partially Meets Expectations
- Meets All Expectations
- Exceeds Expectations
- Far Exceeds Expectations

The manager must fill in the rating and comment sections, while the associate must fill in the comment section. The associate should receive scheduled time to review the appraisal forms prior to meeting with the manager. The review should take place in a location that will ensure uninterrupted privacy. Ample time should be allowed for the appraisal session. Both the manager and the associate should come prepared. The overall rating *(Section IV)* should be completed by the manager, taking into consideration the information discussed during the review and approval by the Store Manager. Upon completion of the appraisal session, both manager and associate should sign and date the form. A signed copy should be provided to the associate.

*The completed and signed appraisal form must be forwarded to the Associate Relations Manager.*

RHR150B (1/07)

EXHIBIT

_Record #6_
_10/3/19_

Associate Name: _____

Employee #: _____

Store #: _____

Date: _____

# Hannaford

## Assistant Department Manager/Service Leader/Supervisor Insert

Instructions:  At appraisal time, the assistant department manager/service leader/supervisor and the manager should complete this insert together as part of the retail hourly performance appraisal.

| Operational/Leadership | Does Not Meet | Partially Meets | Meets All | Exceeds | Far Exceeds | Associate Comments: | Manager Comments: |
|---|---|---|---|---|---|---|---|
| Responsive to the needs of associates. Is approachable and maintains a stimulating, cooperative environment. | | ✓ | | | | | |
| Listens well and encourages good two-way communication. | | | ✓ | | | | |
| Trains associates effectively and encourages the development of others. | | ✓ | | | | | |
| Completes all objectives and assigned tasks within specified time frames. | | ✓ | | | | | |
| Organizes work for self and others to maintain and enhance work efficiency. | | | ✓ | | | | |
| Delegates and motivates associates effectively. | | ✓ | | | | | |
| Follows through on delegated tasks. | | | ✓ | | | | |
| Adheres to Management Planning Program. | | ✓ | | | | | |
| Respects and follows company policies on discipline. | | | ✓ | | | | |

Overall Comments:

Tim has great customer service skills. He gives his complete attention to the customer during the entirety of their contact and always greets them with a smile. He also thanks the customer at the end of their transaction. Tim responds quickly and pleasantly to any customer requests and always does his best to make sure their needs are satisfied. Tim is very funny and outgoing and uses these great traits to win customers. Tim is open to suggestions and often shares his own suggestions to improve the way we work. Tim needs to remember to always host when he has no customers and to ask all of the required customer service questions, especially as he serves as a role model in the department.

Tim is courteous, friendly, and helpful to fellow associates both at work and during their shopping experience. However, Tim needs to remember to keep all of the relationships he has formed here professional. The perception of his favoritism has caused unnecessary drama in the department. Tim needs to form relationships with all associates and treat everyone fairly and consistently.

Tim achieves all established quality work standards. He uses proper ergonomic motions. He bags items appropriately and efficiently. When outside in the parking lot, Tim uses the tether and collects carriages according to standard practice. One of Tim's opportunities, however, is to remember to ask every customer coming through a regular lane with at least one carriage if they would like help outside. Tim doesn't quite achieve all established quantity work standards. His RPMs are 19 and 13. Our standards for RPMs are 25 and 16.

Tim follows all company policies, procedures, and practices and he is responsive to quickly changing demands. He reports to work as scheduled, follows break and lunch policies, and his absences have valid explanations. Tim always presents a clean and neat appearance in accordance with the company Personal Appearance policy.

As a Customer Service Leader, Tim tries his best to be responsive to the needs of associates, but doesn't always hit that mark. Some associates don't consider Tim approachable. He has struggled with maintaining a stimulating and cooperative environment. Tim is an excellent communicator and listens well. Tim needs to remember to always coach in the moment, whether it is about a positive or negative behavior, to ensure all associates are giving excellent customer service. Tim has struggled to complete all assigned tasks within the specified time frame. However, he is organized on the sales floor and organizes his work for himself and others. Tim needs to remember to delegate tasks to other associates. As a Customer Service Leader, Tim needs to be the last person to open on a register. This is because he needs to be leading the sales floor at all times when he is scheduled. When Tim delegates, he is good about following up on those tasks. Tim has struggled with adhering to Management Planning Program. He needs to add or cut help when appropriate in order to avoid hours over goal and run at 100% efficiency. Tim respects and follows company policies on discipline.

Overall, Tim meets all expectations. He is a consistent worker with great customer service skills, though improvement is still needed in several areas.

**SECTION ___ Roles and Goals - Hourly Associate**

Associate Name: _____

Dept.: _____

Date: _____

**A. Role Clarification and Review:** Review your job description to clarify role and responsibilities. Identify skill development necessary to continue to develop within your current position.

_____

**B. Goals:** Identify one to three goals to be accomplished in present position. One goal must be a Behavioral Goal (ie. Be There, Make It Easy, Add Something To Their Day, Be The Difference). Specify action steps and time frame.

| Plans | Results |
|---|---|
| Goal and Action Step: _____ ~~could~~ ~~there~~ ___ ~~sun~~ ~~user~~ ~~all~~ ~~big~~ ~~training~~ | |
| Measurement: _____ | |
| Time Frame: ___ ~~row~~ ~~on work~~ ~~filter~~ ___ ~~Rain~~ ~~Dallas~~ ~~at~~ ~~work~~ ~~is~~ ___ ~~Bi~~ ~~be~~ ~~out~~ ~~a~~ ~~work~~ | |
| Goal and Action Step: _____ | |
| Measurement: _____ | |
| Time Frame: _____ | |
| Goal and Action Step: _____ | |
| Measurement: _____ | |
| Time Frame: _____ | |

SECTION ___ *Skills Review*

| Relationship/Customer Service Skills | Does Not Meet | Partially Meets | Meets All | Exceeds | Far Exceeds | Associate Comments | Manager Comments |
|---|---|---|---|---|---|---|---|
| **Be There** – Gives complete attention to the customer and greets the customer with a smile. Stays focused on the customer during their contact. Thanks the customer with a smile. | | | ✓ | | | *[illegible handwriting]* | |
| **Make It Easy** – Responds quickly and pleasantly to any customer requests. Asks clear questions, identifies the customer's needs. | | | ✓ | | | *[illegible handwriting]* | |
| **Add Something To Their Day** – Assures customer needs are satisfied. Takes advantage of opportunities to win customers. | | | ✓ | | | *[illegible handwriting]* | |
| **Be The Difference** – Shares ideas to improve the way we work. | | | ✓ | | | *[illegible handwriting]* | |
| **Teamwork** | | | | | | | |
| Courteous, friendly and helpful to fellow associates both at work and during their shopping experience. | | | ✓ | | | *[illegible handwriting]* | |
| **Standard Operation Procedures** | | | | | | | |
| Achieves established quality work standards. | | | ✓ | | | *[illegible handwriting]* | |
| Achieves established quantity work standards. | | ✓ | | | | *[illegible handwriting]* | *[illegible]* |
| Follows all company policies, procedures and practices. | | | ✓ | | | *[illegible handwriting]* | |
| Ability to be responsive to quickly changing demands. | | | ✓ | | | *[illegible handwriting]* | |
| Reports to work as scheduled, follows break and lunch policy, absences have valid explanations. | | | ✓ | | | *[illegible handwriting]* | |
| Always presents a clean and neat appearance in accordance with the company Personal Appearance Policy. | | | | | | *[illegible handwriting]* | |

**SECTION III   *Performance Against Role Responsibilities and Goals:***
*(To be completed by manager)*

### Year-End Comments on Strengths and Opportunities

.

**SECTION IV   *Year-End Overall Rating:***
*(Please circle overall rating)*

- Does Not Meet Expectations
- Partially Meets Expectations
- Meets All Expectations
- Exceeds Expectations
- Far Exceeds Expectations

**SECTION V   *Post-Review Comment***

# DELHAIZE AMERICA
## Performance Counseling Form

### Associate Information

Associate Name: **Tim Record**                    Date:                4/16/ 15
Associate ID:                                      Job Title:           **Assistant MCS**
Manager:                                           Store/Department:    **8319 Customer Service**

### Reason for Counseling

☐ Job Performance          ☒ Personal Behavior          ☐ Serious Misconduct

Rule # and description If Behavioral or Gross Misconduct: Personal Behavior

Dates of Previous Counseling:

### Type of Counseling

Step 1:                Step 2:              Step3:               Step 4: Final Disciplinary Action
☒ Verbal counseling   ☐ First counseling   ☐ Final counseling   ☐ Demotion ☐ Transfer ☐ Discharge

Step 4 only:  Date AR Contacted     4/13/15

### Details

Date of Incident: 4/13/15   **Time of Incident :**
**Description of Incident:** On April 13th it was brought to Tanya and my attention that there are a few associates on the front end that feel uncomfortable working with AMCS Tim Record. We were informed that these associates feel as though Tim has made comments and remarks that they feel to be unprofessional and have made them feel uncomfortable working with Tim. These associates have also stated that they feel that Tim invades there personal space by standing very close to them which sometimes results in Tim brushing up against these associates. Tim needs to understand that these behaviors are unprofesional and he needs to ensure he is conuducting himself as a supervisor at all times.

**Plan for Improvement:**

Consequences of Further Infractions: Future violations of company policies will result in furthur disciplinary action up to and including termination.

Associate Statement: (If you disagree with the information contained In this form please give a detailed explanation)

### Signatures

**EXHIBIT**

Record #1
10/3/19

**DELHAIZE AMERICA**
**Performance Counseling Form**

_refused to sign_ (TB)
Associate Signature

_Ashley Compo_
Manager Signature

Date

4-16-15
Date

_Merryn Pope_
Witness Signature (Only if associate refuses to sign, please note the refusal on the associate line.)

4. 16.15
Date

Please distribute one copy to the associate and one copy to the Records Retention Dept.

Contact   Laws & Expense

# DELHAIZE 美 AMERICA

Home     Human Resources     Supply Chain     Policies     Applications
Delhaize America   Policies   Associate Conduct   Personal Behavior   Personal Behavior   Personal Behavior
Back

Printable Version

**Your Total Rewards@Work**                    **POLICIES**

## Personal Behavior

### All Delhaize America, LLC Associates

**Special Note:** Consultation with your Associate Relations Specialist/Manager/Partner prior to application or implementation of the provisions of this policy is required.

The Company holds integrity among its core values, which includes adherence to lawful, ethical and professional conduct. Our goal is to provide a work environment that benefits and protects the rights and safety of all.

The following conduct is prohibited, and will subject you to disciplinary action up to and including termination of employment (See the Performance Counseling Policy for further information on the accountability process), as determined by your supervisor in consultation with your Associate Relations Specialist/Manager/Partner:

1. Insubordination. This includes refusing to follow management's instructions concerning a job related matter and willful failure to comply with the Standard Practices prescribed by the Company.
2. Verbal or physical assault or intimidating or threatening any associate, vendor or customer.
3. Violation of the Company's Respect in the Workplace policy.
4. Possession of firearms, ammunition, explosives, and illegal knives on Company property, unless the associate is specifically authorized by the Company to carry such a weapon on the property or allowed by state law.
5. Unauthorized sharing of Company passwords or PIN numbers
6. Engaging in fraudulent behavior that intentionally exposes the Company to risk or potential loss. Examples include writing personal checks to the Company on insufficient funds, the unauthorized use of credit, debit, or gift cards, misuse of store or vendor coupons, or giving or receiving other unauthorized discounts or markdowns.
7. Theft or misuse (including defacing or damaging) of Company property, or that of a customer, vendor, or another associate.
8. Violation of established safety practices or failure to report an accident. This includes contributing to unsanitary or dangerous conditions.
9. Habitual tardiness or absenteeism without approval (see Attendance and Punctuality policy for more information).
10. Gambling on Company property.
11. Falsifying any Company documents, records or reports, whether in paper or electronic form, including but not limited to an application for employment, a production record, a time record (including working off the clock and leaving the place of work without permission while still on the clock), shipping or receiving records, account reports, or benefit enrollment documents.
12. Requiring or permitting a subordinate to work off the clock.
13. The use of alcoholic beverages or illegal drugs on Company property or reporting to work under the influence of alcohol or performance inhibiting drugs.
14. The purchase, possession, use, sale, or distribution of any age restricted product by an associate not of legal age. These products include, but are not limited to alcohol, tobacco, fireworks, and other age restricted materials. Additionally, the sale or distribution of any age restricted product to a customer or associate not of legal age.
15. Serious inefficiency, including neglecting or avoiding work duties or responsibilities.
16. Conduct unbefitting of a manager or any other conduct by an associate which violates Company policy, State or Federal law.
17. The possession, on Company property, of a controlled substance (and/or drug paraphernalia), other than a drug prescribed for you by a physician, or the sale of controlled substances on Company property.
18. Failure to comply with the Food Safety & Food Defense Policy (See the Food Safety and Defense Policy for further details);
19. Failure to comply with any Delhaize America policy related to information security, data privacy, or HIPAA security. (See the Delhaize America Information Security Policy Book, Delhaize Information Security Standards Book, and the Delhaize America HIPAA Security Policies and Procedures for further details.)

The foregoing are examples of behavior that will not be permitted, but the list is not intended to be all-inclusive.

The Company respects associates' right to engage, or refrain from engaging, in activity protected by Section 7 of the National Labor Relations Act, including forming, joining, or assisting labor organizations, bargaining collectively, and engaging as a group in activities aimed at improving their wages, hours or working conditions. Nothing in this policy is intended to restrict these rights, nor will the policy be applied in such a way.

Back

Delhaize America Intranet
DG Connect                     Intranet          Intranet
Delhaize Group Web site         Web site          Web site

Copyright © 2015 Delhaize America. All rights reserved.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s). |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC 523-2018-00274 | |

**Equal Employment Opportunity Commission**

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Timothy Record | (603) 828-1981 | 06/10/1961 |

| Street Address | City, State and ZIP Code |
|---|---|
| 548 Broad Street | Portsmouth, New Hampshire 03801 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Hannaford Brothers Company | 26,000 + | (207) 883-2911 |

| Street Address | City, State and ZIP Code |
|---|---|
| 145 Pleasant Hill Road | Scarborough, Maine 04074 |

RECEIVED

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

DEC 0 4 2017

| Street Address | City, State and ZIP Code |
|---|---|

E.E.O.C
BOSTON AREA OFFICE

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 03/01/2017    Latest 08/31/2017

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

1. I had been employed by Hannaford Brothers Company ("Hannaford") for approximately 10 years.
2. I am gay and my co-workers were aware of my sexual orientation.
3. I was working as the assistant seafood department manager in the Hampton, NH Hannaford store when, in or around February 2017, Hannaford hired Bruce Grover as the meat department manager.
4. As the meat department manager, Mr. Grover was my direct supervisor.
5. Almost immediately after Mr. Grover was hired, and through the date I resigned, Mr. Grover subjected me to a highly offensive, discriminatory, hostile and abusive work environment, and Mr. Grover's intentional and overt harassment made me apprehensive about working at Hannaford in Hampton, NH.
6. The harassment and abusive treatment by Mr. Grover included, but was not limited to:
   a. Remarking to another Hannaford employee while I was present that I "am three feet shorter with my head in the pillow";
   b. While Mr. Grover and I were on the floor during store hours, Mr. Grover tapped me in the genitals twice and said "baseball," "baseball";
   c. When I declined to try some of the meats from a vendor offering samples in the store, Mr. Grover said, with an obvious tone of inflection, that everyone knows I "eat the meat";
   d. Mr. Grover would openly refer to me by derogatory, demeaning and effeminate names, calling me, for example, a "bitch" with obvious inflection to signify his intent in using that particular name; and
   e. When I was bending to place down a mat beneath a scale in the meat department and Mr. Grover was nearby, Mr. Grover made gestures to another employee to suggest that I was attempting to perform a sexual act on him.
7. In or around April 2017, I complained to the store manager, Ms. Ashley Campo, about Mr. Grover's conduct and harassment.

EXHIBIT

Record #8
10/2/19

8.  Hannaford protocols require employees report misconduct or unlawful activities to their immediate supervisors; however, I reported to Ms. Campo because my immediate supervisor was the one engaging in the offensive and unlawful conduct.

9.  To that end, I told Ms. Campo about Mr. Grover's remarks that about my face in the pillow and eating the meat, as well as Mr. Grover's tapping of my genitals.

10. Ms. Campo assured me she would have a conversation with Mr. Grover and would look into my complaints.

11. Believing Ms. Campo would treat my complaints with the appropriate gravity such unlawful conduct deserves, I did not file additional complaints with HR or corporate headquarters.

12. Although the overt acts of harassment and abuse subsided for a while, Mr. Grover's abusive, discriminatory and harassing treatment resurfaced in August 2017.

13. Mr. Grover's misconduct included, but was not limited, referring to me by derogatory and effeminate names and making gestures to suggest to another employee that I was trying to perform sexual acts on him.

14. Given Ms. Campo's prior assurances and representations following my initial complaints, I construed the resurfacing of Mr. Grover's discriminatory and abusive conduct as Hannaford being more tolerant of bigotry than my rights to a workplace free of discrimination, harassment and abuse.

15. Mr. Grover's actions caused me mental anguish and distress, and I could not continue to work under a supervisor who was able to engage in discriminatory, abusive and harassing conduct with impunity. Nor could I continue to work for a company that was complicit in such behavior and conduct of its employees.

16. Accordingly, I had no choice but to tender my resignation.

17. When I told Ms. Campo I planned to resign, I confronted her about Mr. Grover's actions and Hannaford's response to my legitimate complaints that were raised months beforehand.

18. To my dismay and astonishment, I learned that Hannaford decided to handle my claims of sexual harassment, discrimination and abuse internally at the Hampton store. In other words, I learned that Hannaford had completely dismissed and disregarded my complaints, as well as my rights as a human being.

19. I have been discriminated, harassed and subjected to sexual assault and abuse because of my sexual orientation.

20. Hannaford has also retaliated against me. That is, Hannaford deliberately chose to not transfer me to another location even though I know it is Hannaford's policy to remove and transfer persons who complain of harassment and discrimination. What is more, my employee file omits records of several complaints I had made about being the victim of discrimination, abuse and harassment during my tenure with Hannaford.

21. I have suffered significant emotional distress, mental anguish, physical harm and pain and suffering as a result of the actions and omissions set forth above.

22. Additionally, I have also suffered lost income, lost wages, lost promotion opportunities and legal fees and costs as a result of the discrimination, harassment and abuse set forth above.

23. For these reasons, I file this charge of discrimination against Hannaford.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 11/29/20 Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) 11/29/17 |

CHRISTOPHER J. FISCHER
MY COMMISSION EXPIRES
JULY 19, 2022
NEW HAMPSHIRE
NOTARY PUBLIC

November 6, 2017

This past April I was in the Seafood dept. having a conversation with Tim Record. Bruce Grover walked by, and Tim stated he did not know if he would be able to continue working with Bruce. I asked him why, and he said he was tired of his sexual remarks. One of which included a reference of Tim "eating meat". I told Tim I would look into it. I then talked to Bruce, and he said it was said to be funny. I told Bruce this was unacceptable, and that he needed to apologize to Tim, which he did. Later on that night, I talked again to Tim and asked him how the talk with Bruce went. Tim said he accepted Bruce s apology, with the condition that it never happens again, because if it did, he would go to HR. To my knowledge, no other situations occurred.

Jeff Howard

Evening Operations Manager


EXHIBIT
Record #9
10/3/19

EXHIBIT

Record #10
10/3/19

tabbies.

**george spelvin** <trecord2580@gmail.com>                                      Fri, Aug 25, 2017 at 4:58 AM
To: tdube@hannaford.com

Hello
After much consideration and thought I have decided to leave Hampton Hannaford. My last day will be Friday September
1st 2017.
Tim Record

---

**george spelvin** <trecord2580@gmail.com>                                      Fri, Aug 25, 2017 at 7:08 AM
To: bruce.grover@hannaford.com, ashleycampo@hannaford.com

[Quoted text hidden]

---

**Campo, Ashley** <ashleycampo@hannaford.com>                                   Fri, Aug 25, 2017 at 8:28 AM
To: george spelvin <trecord2580@gmail.com>

Hi Tim,


i am very sorry to hear that. I would like to touch base with you next time we are working together if you are ok with
that. Please feel free to reach out to me anytime you need to. Thank you.


Ashley Campo
Store Manager
Hampton NH #8319

RECORD <<001>>

8/26/17

# Conversation Recap

On Saturday 8/26/17 I sat with Tim Record to talk about the one week notice I received from him the previous day via e-mail.

Tim told me that he was no longer comfortable working with Bruce as his manager, and after talking with his family he has decided to leave. At this time, Tim told me he has another job as a Manager Trainee at the Golden Harvest in Kittery, ME.

Tim asked me if HR was ever contacted when Bruce made an inappropriate remark to Tim regarding his sexual preference when he first started back in February. I told Tim that HR was not contacted as some time had passed before I found out about the situation. I reminded Tim that I did follow up on the situation and then followed up with him to make sure that he was comfortable with Bruce's apology and the outcome of how the situation was handled and Tim told me he was fine.

From there Tim stared to tell me some recent events of why is not comfortable working with Bruce. Tim claimed that on Sunday Aug 20th he was straightening out a mat in front of the seafood scale and Bruce was near the department along with our Center Store Manager, Kyle. Tim stated that when he bent over Bruce made a face and covered his private parts towards Kyle.

The previous week (W/E 8/19) Tim stated he was putting things away in the department and Bruce came over and started asking him questions of why things were not done and put away. Tim stated that Bruce's tone was very aggressive. Tim said that Kyle was in Produce blocking cut fruit and Tim said to Kyle, "Do you hear the way he is speaking to me?" Kyle replied that he was staying out of it.

Tim stated that he requested his breaks at 9am recently due to needing to take medication. Tim stated that Bruce did not cover his breaks until well after 9am on three separate days W/E 8/19. Tim said when he went upstairs on his break Bruce was in the manager office playing on his phone, Tim says Bruce is often on his phone in the office when he should be working. Tim also stated on the same week that Bruce has been making him wait until 6 hours to take a lunch.

Time claimed that when he was doing fresh inventory in July that Bruce had him performing inventory by himself. Tim stated he had to do inventory, train a new person, and wait on customers. Tim stated when he approached Bruce about this that Bruce's response was, "You don't have to be a bitch about it."

The last piece of information that Tim wanted to share with me was last week (W/E 8/19) Bruce was preparing his anniversary dinner while the department was behind and associates were upset by this.

When I asked Tim why he didn't tell me any of this previously he stated he just had too much going on with the passing of his mother. I apologized to Tim for him feeling this way and us not knowing about it. I told him I will be looking into his concerns and speaking with Bruce when he returns from vacation next week.



EXHIBIT

Record #11
10/3/19

## Bruce

george spelvin [trecord2580@gmail.com]
**Sent:** Thursday, August 31, 2017 6:23 PM
**To:**   Record, Timothy

Gay harassment continue
× placing mat in front of scale  - looked and covered his crotch.
× bitch comment , " I know you can do it, bitch "
Belittling me in front of Kyle

Ignoring requests for brakes when on medication
17,18,20...... all at least 3 hours and 50 minutes before I had a break
He told me that I could have lunch at the 6 hour mark completely against
standard practice.......
-Absurd management Behavior
On the internet looking to find Kyle a girlfriend on company time
( John Garland)
Making anniversary dinner in Department instead of helping Associates who
need assistance( Pam Proctor)
 Having Tim do inventory , train new Associates, and wait on customers all of
the same time never been done or heard of
Leaves early without even saying goodbye to Associates and asking them if
they need any help whatsoever

→ Ignoring request for break,

Jim Record

EXHIBIT
Record #12
10/3/19

# Fax/ACT

Associates for Cognitive Therapy
500 Market Street 1-G
Portsmouth, NH 03801
603.427.1428

Date: ___4-10-19___

To: ___Danielle @ Boynton Waldron___

Fm: ___J. Wagner___

Re: ___Tim Record___

@#: ___431-9973___

Notes/Instructions:

Oops! Sorry... These are the only times I've
seen Tim.. 1-10-18 & 11-29-18

jw.



EXHIBIT
Record # 13
10/3/19

Jeffrey M. Wagner, Ph.D.
500 Market Street Unit 1-G
Portsmouth, NH 03801
603.427.1428

January 10, 2018

Re: Tim Record

Psychological Assessment

Tim called to review issues pertaining to treatment received as Seafood Manager at Hannaford in Hampton, NH.

**Mental Status and Behavioral Observations**

Tim is a 56- year old gay man. He was on time for his appointment and was casually and appropriately dressed and groomed. He was oriented X3. No hallucinations, delusions, homicidal or suicidal ideation was noted. There was no thought disorder. Mood appeared depressed and affect sad. He was occasionally tearful when discussing events at Hannaford.

**Description of the Narrative**

Tim had worked at Hannaford for 10 years. During that time, he had noted numerous gay slurs conveyed by co-workers (e.g., after gay marriage was legal in NH, a co-worker said, "God hates gays"). There were other such comments that he reported to his manager, but noted that no action was taken and the slurs continued.

Last February (2017), he got a new manager (Bruce), who, Tim said, "tapped him in the genitals" with a loaf of bread. When Tim's cousin came to meet Tim in the store, Tim introduced the cousin to Bruce, who made a gay slur as a response. When Tim brought up a workplace issue to Bruce, Bruce replied, "you don't have to be such a bitch about it". Tim said that Bruce would never talk to a straight man like that.

Tim had routinely gone to his managers (first Robin, then and currently Ashley) regarding this treatment, but no one from HR ever got back to him about any action taken to stop this behavior. At one point, he asked Ashley if she had talked to either Bruce or HR about the comments and behavior and she told him "no".

He said that at one point, a woman who was subordinate to him (Katie) demonstrated obsessive attachment behavior, such as leaving notes on his car, showing him a picture of his mother's house, appearing at Walmart when he was shopping there. (In the profession, we would call this a "psychotic transference"). There was no behavior on Tim's part that would either provoke or encourage this behavior, and it appeared that the woman did not know Tim's

Record 2

sexual orientation. Other women, however, complained as they considered this an
"inappropriate relationship", and Tim was asked to move to a different location.
The importance of this last event to Tim was that Hannaford did nothing to stop the gay slurs
and belittling behavior towards him, but would ask him to transfer when this woman's behavior
(not in any way encouraged or reciprocated by him) resulted in complaints from other female
workers.

Four months ago, he was unable to tolerate both the ongoing slurs directed his way, and the
fact that his managers had not followed through with actions to stop the behavior. He left his
Hannaford job due to the resulting psychological stress and its effect on him.

Since that time, he has sought legal representation, and thus seen his personnel file. He said
that many positive items in the file had been removed (e.g., an award for Manager of the Year n
2015 was missing), and there was some possibility that other workers had been asked to submit
any negative information about Tim for the file.

**Current Symptoms**

Tim is experiencing symptoms of Major Depression, including sleep onset insomnia, mid-cycle
and early morning awakening, loss of appetite, decreased libido, sense of worthlessness, loss of
ability to experience pleasure (anhedonia), tearfulness, increased irritability, decreased interest
in social contacts. There is not suicidal ideation. These are symptoms of Major Depressive
Episode.

**Formulation**

Tim's Major Depressive Episode is a direct result of both the derogatory behavior and
comments directed at him by personnel at Hannaford (both co-workers and Bruce, the Meat
Manager and his direct supervisor) and the fact that no action was taken to address these
behaviors by managers or HR at Hannaford.

Both the original behaviors/comments and lack of further follow-up and action left Tim feeling
like "they just don't care", "I don't matter", "I'm not worth their time". This devaluation and
invalidation directly led to Tim's depression.

#### Record 3

While Tim said that his mother died last February, he dealt with this loss without issue. In observing his affect and demeanor when discussing either his mother's death or the continuous derogatory behaviors from Hannaford, it is clear that the change in affect – the sadness and tearfulness – occurred when discussing the Hannaford treatment.

We discussed various strategies for dealing with the depressive symptoms and understanding the psychological and interpersonal dynamics that routinely give rise to these symptoms.

Jeffrey M. Wagner, Ph.D.

Jeffrey M. Wagner, Ph.D.
500 Market Street Unit 1-G
Portsmouth, NH 03801
603.427.1428

Re: Tim Record

11-29-2018

Saw Tim in January for assessment. He continues to deal with aftermath of treatment received at Hannaford, as detailed in January 2018 report. Continues with depressive symptoms – low mood, sleep issues, anhedonia, increased irritability, decreased libido, sense of worthlessness. Discussed strategies to help with these symptoms and to protect sense of self in face of invalidating treatment & comments.

Jeffrey M. Wagner, Ph.D.

On 8/13/2017 I was blocking the produce melon/drinks side case at approx. 10:15 am. As I was finishing up blocking and started to make my way towards the Seafood Department, I saw Bruce ask Tim to do a certain task. I did not hear what was said or how it was said to Tim. I remember Tim looking at me and say did you hear that. My response was don't involve me. You guys work it out. I did not believe it was anything egregious. My thought was Tim did not want to do what Bruce had asked him as I have observed on other occasions.

When I have overseen the store, I have remined Tim on my first walk around 8am to make sure he cleans the glass on the seafood case. When I would do my 10am store walk the glass has not been cleaned. To which I would find the manager in charge of the meat department and ask them to have Tim clean the glass.

On another occasion when I was overseeing the store, I made my way to seafood around 8:15am and I observed the lobster tank empty. I asked Tim if he knew what was going on. He said no. My next conversation was with the John Garland about if he knew why we did not have any lobsters in the tank. Tim claims that I snapped at him that morning. That was completely inaccurate. I don't recall having another conversation with him until I found out what had happened to the lobster talk.

On 8/17/2017 I was stocking the meat side case. During that time Tim, had walked from the seafood to the meat department three to four times. I believe the first time I said good morning to Tim. On the 3rd or 4th time Tim walked up to me and said "thank you for stocking the pickles today" with a smile. My response was "not a problem or your welcome".

On several occasions when I have been working on the computer in the manager's office, Tim would come in to get his lunch box out of the filing cabinet. At that time, he would touch my arm or as her would reach down to open the bottom drawer tap my leg and say "oh excuse I need to get into their" Recently If I saw Tim coming into the office I would stop my work and move before he got near the drawer.

On other occasions, I have been working in the grocery aisles and have looked down to the end of the aisle and observed Tim walk by the aisle I was in, Tim would turn around and walk down my aisle.

Earlier this year when I was doing my center store walk, Tim approached me and said "I had a dream about you last night" My response was "oh that's nice" and continued with my store walk. This was an uncomfortable conversation.

Tim, on another occasion during my center store walk told me "he used to be a male pole dancer"

Tim would also like to first bump me or hit elbow to elbow if he had gloves on. I would think to myself does he do this to other managers or just me?

*Kyle Quigley* 8/30/17


EXHIBIT
Record #14
10/3/19

**From:** Campo, Ashley
**Sent:** Wednesday, September 13, 2017 11:02 AM
**To:** george spelvin
**Subject:** RE: Hi

Hi Tim,

I am here Saturday from 1-5pm. You are definitely welcome to stop by. Unfortunately your position has been filled but you can apply to any FT position that are available. I believe there is quite a few open right now. Please let me know if you need any help looking at posting. Thank you.

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.
*DELHAIZE CONFIDENTIAL: DO NOT FORWARD OR CIRCULATE*

**From:** george spelvin [trecord2580@gmail.com]
**Sent:** Wednesday, September 13, 2017 9:54 AM
**To:** Campo, Ashley
**Subject:** RE: Hi

Hi Ashley,
Can I come talk to you on Saturday. The next day I have off. I would like to return to Hannaford full time if my position was still left open.
Let me know what time Saturday we can talk I hope I'm open
Thank you

On Sep 11, 2017 11:32 AM, "Campo, Ashley" <ashleycampo@hannaford.com> wrote:
Hi Tim,

Hope all is well. I am working tomorrow but I am closing. I will be here 1-10pm you can come in anytime that is convenient for you. If that does not work I am here all day Wed, Fri and 1-5pm Sat as well. Thank you.

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.
*DELHAIZE CONFIDENTIAL: DO NOT FORWARD OR CIRCULATE*

**From:** george spelvin [trecord2580@gmail.com]
**Sent:** Monday, September 11, 2017 9:34 AM
**To:** Campo, Ashley
**Subject:** Hi



EXHIBIT
Record #15
10/3/19

Hello Ashey,
I'd like to take you up on your offer
I wanted to see if you have time to talk tomorrow about returning to Hannaford
Please let me know if you have time.
Tim Record

**From:** Campo, Ashley
**Sent:** Thursday, September 21, 2017 8:35 AM
**To:** george spelvin
**Subject:** RE: Checking In

HI Tim,

Sorry I was off yesterday and just found out I am closing on my house at 4pm today in Barnstead so I will be leaving the store at 3pm. If you would like you could give me a call? 603-582-5243. They just posted an Asst Seafood Manager job in Raymond if you are interested.

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.
*DELHAIZE CONFIDENTIAL: DO NOT FORWARD OR CIRCULATE*

**From:** george spelvin [trecord2580@gmail.com]
**Sent:** Wednesday, September 20, 2017 9:01 AM
**To:** Campo, Ashley
**Subject:** RE: Checking In

Hi Ashley
I get out of work at 3 p.m. on Thursday I will be at Hannaford at 4 p.m. to talk to you.
Thank you
Tim

On Sep 19, 2017 10:58 AM, "Campo, Ashley" <ashleycampo@hannaford.com> wrote:
Hi Tim,

I am off Wed, Fri & Sat this week. I am here til 3 today and 1-5 Thur.

Have you been able to look at the postings at all? Thank you.

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.
*DELHAIZE CONFIDENTIAL: DO NOT FORWARD OR CIRCULATE*

**From:** george spelvin [trecord2580@gmail.com]
**Sent:** Tuesday, September 19, 2017 10:32 AM

**To:** Campo, Ashley
**Subject:** Re: Checking In

Good morning Ashley,
I actually have Saturday off. Can we meet anytime you want it's convenient for you. I still would
like to get a job full time to keep all my benefits vacation and time that I built.
Thank you so much, have a great day
Tim


On Sep 19, 2017 7:56 AM, "Campo, Ashley" <ashleycampo@hannaford.com> wrote:
Hi Tim,

I wanted to check in and see where you may be at with things. I wanted to see if you wanted to stay on
PT still and if you need help or still interested in apply for FT roles within the company. I would still me
more than happy to meet with you.

I would need to know if you wanted to stay on PT by the end of this week (9/23) as you are still active in
the system. Please don't hesitate to reach out to me or call me if you have any questions. Thank you.

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.

**From:** Campo, Ashley
**Sent:** Wednesday, September 27, 2017 2:55 PM
**To:** trecord2580@gmail.com
**Subject:** RE: Hampton Deli

Hi Tim,

I understand you needing to take a FT position. At this point would you like us to terminate your employment with Hannaford?

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.
*DELHAIZE CONFIDENTIAL: DO NOT FORWARD OR CIRCULATE*

**From:** trecord2580@gmail.com [trecord2580@gmail.com]
**Sent:** Wednesday, September 27, 2017 2:54 PM
**To:** Campo, Ashley
**Subject:** Re: Hampton Deli

Hi Ashley,
I've decided to take a full-time position elsewhere thank you.
Tim Record

*Sent from my Verizon LG Smartphone*

------ Original message------
**From:** Campo, Ashley
**Date:** Wed, Sep 27, 2017 9:20 AM
**To:** george spelvin;
**Cc:**
**Subject:** Hampton Deli

Hi Tim,

I called and left you a message on Monday but have not heard back from you. Are you still interested in Deli PT? If so did you want to start next week? Also what is your availability and any upcoming request offs that you need?

If you have any questions or would like to discuss further please feel free to give me a call, I am here until 5pm today. I would really need a response by the end of the day today as I am not here for the next two days and deli needs to complete their schedule. Thank you.

Ashley Campo
Store Manager
Hampton NH #8319
P: (603) 926-9808
F: (603) 929-4042
ashleycampo@hannaford.com

Hannaford is a Delhaize America company.

Sept. 21, 2017; 12:04 pm

Hi Ashley it's Tim I just got your message it is noon and I understand [partially inaudible] … the closing of your house so that's exciting, but let … could you just text me or email me and let me know when you are going to be available … I don't want to be terminated … I want to get back to Hannaford -- I need your help to do that um hopefully you know my pay is not going to change or anything like that um but I do want to take you up on your offer to get back in there and stay so if [partially inaudible] I could just let me know if I can talk to Terry or something.  I have Saturday off if I could talk to anybody at Hannaford then I will contact them get in touch with them

Thank you so much for your help.  Talk to you later.  Bye.



EXHIBIT

Record #16
10/3/19

# DELHAIZE 🐾 AMERICA

September 30, 2017

Tim Record

548 Broad St. Apt 4F

Portsmouth, N.H. 03801

Dear Tim,

In the last communication with Ashley, you stated that you have accepted a full-time position outside of Hannaford. I wish to offer congratulations on that. On Wed. 9-27-17, she asked if we should terminate your employment with Hannaford.

As of Saturday, 9-30-2017, you still haven't responded. If we don't hear from you by October 12, 2017, we will process your termination of employment with Hannaford.

Sincerely,

Theresa E. Dube

Associate Relations Manager

Hampton Hannaford

630 Lafayette Rd.

Hampton, N.H. 03842
Delhaize America  P.O. Box 1000 Portland, ME 04104 USA
t: 207.883.2911 | www.delhaizegroup.com



the companies of
**DELHAIZE 🐾 AMERICA**  |  **FOOD🦁LION**  🦁  RECORD <<001>>